IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FELICIA SHELTON, | ) | |
| | ) | |
| JOHN BERNSEN, and | ) | |
| | ) | |
| BRYAN HUGHES, | ) | |
| | ) | |
|       Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10-cv-2146 |
| | ) | |
| VILLAGE OF BEL NOR, | ) | JURY TRIAL REQUESTED |
| a municipal corporation, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WALT NELSON, | ) | |
| in his individual and official capacity | ) | |
| as a Trustee of the Village of Bel Nor and | ) | |
| its Police Commissioner, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHIEF SCOTT FORD, | ) | |
| in his individual and official capacity as | ) | |
| Chief of Police, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LT. RICHARD TATE, | ) | |
| in his individual and official capacity as | ) | |
| a lieutenant of the Bel Nor Police | ) | |
| Department, | ) | |
| | ) | |
|       Defendants. | ) | |

## COMPLAINT

## PARTIES & JURISDICTION

1.    Plaintiff, Felicia Shelton (hereinafter "Shelton") is an individual with her

place of residence in St. Louis County, Missouri in the Eastern Division of the Eastern

District of Missouri.  At all times relevant herein, she was employed as a police officer with the Village of Bel Nor.  She is an African-American female.

2.      Plaintiff, John Bernsen (hereinafter "Bernsen"), is an individual with his place of residence in St. Louis County, Missouri in the Eastern Division of the Eastern District of Missouri.  At all times relevant herein, he was employed as a police officer with the Village of Bel Nor.  He is a white male.

3.      Plaintiff, Bryan Hughes (hereinafter "Hughes") is an individual with his place of residence in St. Louis County, Missouri in the Eastern Division of the Eastern District of Missouri.  At all times relevant herein, he was employed as a police officer with the Village of Bel Nor.  He is a white male.

4.      Defendant Village of Bel Nor, Missouri (hereinafter "Village" or "Bel Nor") is a municipal corporation organized under Missouri law, and is classified as a village.  The Village lies in the Eastern Division of the Eastern District of Missouri.

5.      Defendant Walt Nelson (hereinafter "Nelson") is and was at all times relevant herein a trustee of the Village and its Police Commissioner.  He is an individual with his place of residence in St. Louis County, Missouri in the Eastern Division of the Eastern District of Missouri.  He is sued in both his individual and official capacities.  Nelson is a white male.

6.      Defendant Scott Ford (hereinafter "Ford") is and was at all times relevant herein the Chief of Police of the Bel Nor Police Department.  Upon information and belief, he resides in St. Louis County, Missouri in the Eastern Division of the Eastern District of Missouri.  He is sued in both his individual and official capacities.  Ford is a white male.

7.     Defendant Lt. Richard Tate (hereinafter "Tate") is and was at all times relevant herein a lieutenant of the Bel Nor Police Department.  Upon information and belief, he resides in St. Louis County, Missouri in the Eastern Division of the Eastern District of Missouri.  He is sued in both his individual and official capacities.  Tate is a white male.

8.     This action is brought pursuant to 42 U.S.C. § 2000(e) *et seq.*, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and R.S.Mo. § 213.010 *et seq.*   The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.  Plaintiffs further invoke the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in the district and all of the events complained of herein occurred in the district.

10.     Plaintiffs request a jury trial pursuant to Federal Rule of Civil Procedure 38(b).

11.     Upon information and belief, the Village maintains a policy or policies of insurance with respect to tort claims filed against it, and therefore, to the extent that the Village may assert the defense of sovereign immunity with respect to any tort claims set forth below, the Village has waived such defense under the provisions of §537.610 R.S.Mo. by maintaining such policy or policies of insurance.

## FACTS COMMON TO ALL COUNTS

12.     The acts complained of herein were taken under color of state law.

13.     The acts complained of herein were taken by those with final policy

making authority and/or as part of a pattern of misconduct that was so pervasive as to constitute the policy, custom, usage, or practice of the Village.

14.     Plaintiffs filed timely charges of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") and Missouri Commission on Human Rights (hereinafter "MCHR") on or about August 11, 2010.  Plaintiffs were issued right to sue letters by the EEOC on August 19, 2010 and by the MCHR on September 21, 2010.

## FACTS COMMONS TO FELICIA SHELTON'S CLAIMS

15.     Shelton was hired as a police officer for the Village on or about June 8, 2008.  She was hired before Ford became the Chief of the Bel Nor Police Department. She faithfully performed her duties as a police officer until her discharge on or about June 30, 2010.

16.     Several months prior to Shelton's termination, Hughes was hired as a part-time officer of the Bel Nor Police Department on or about February 14, 2010.

17.     Even though Shelton had been working for the Bel Nor Police Department for over a year and a half at the time Hughes was hired, she had not been given a locker at the station, despite several requests that she be assigned a locker.

18.     On or about February 17, 2010, Ford showed Hughes a locker in the police station that Ford said he intended to give Hughes.  Ford also showed Hughes his pornography inside the locker.  Ford explained to Hughes that he kept his pornography in the locker, which was the reason that he had not given the locker to Shelton.  As set forth in more detail below, Hughes told Ford he could not keep pornography at the police station.

19.     On or about February 18, 2010, Hughes inquired of Shelton if she knew why she had not been given a locker at the police station, and Shelton responded that she knew she had not been assigned a locker because the Chief kept his pornography in a locker at the station.

20.     When Hughes asked Shelton how she knew that Ford was storing pornography in a police station locker, she explained that Ford had shown her his pornography on more than one occasion.  Shelton further explained that she did not complain about this conduct for fear of being fired.

21.     At some time prior to the acts alleged herein, two female police officers employed by the University of Missouri St. Louis (hereinafter "UMSL") were harassed by a male officer of the UMSL police department.  The two female officers named Shelton as a witness to the incident, and she was contacted by the Equal Employment Opportunity Commission (hereinafter "EEOC").

22.     Shortly thereafter, the EEOC contacted Ford about the UMSL incident. Ford mistakenly believed that Shelton had filed an EEOC complaint against the Village/Police Department.

23.     Hughes was present when Ford listened to the voicemail message from the EEOC about Shelton.  Ford told Hughes that Shelton was "just like that b--ch Schaefer and went to the EEOC about the Department."  Officer Cydney Schaefer (hereinafter "Schaefer") was an African-American, female employed by the Bel Nor Police Department, who had retained an attorney because of disciplinary action taken against her by the Department.  Hughes tried to explain to Ford that Ford misunderstood the message and that Shelton had not filed an EEOC complaint against the Department, but

Ford would not listen to him.  Ford also told Hughes, "They (females) have no business being police officers."

24.     On or about March 3, 2010, Ford angrily confronted Shelton about the call he had received from the EEOC, hitting a locker, cursing at Shelton, and pinning Shelton up against a wall.  Ford yelled at Shelton that she was "just like that no good, stupid b—ch Schaefer."  Ford called Shelton a "stupid b--ch" and told her that he was going to bring the Department down on her.

25.     As Shelton was leaving this encounter with Ford, Shelton and Hughes heard Ford state: "She may be from West County, but she's still just a ghetto ni—er."

26.     After Ford was contacted by the EEOC about Shelton, Shelton was written up and given a two-day suspension (served May 26 and 27, 2010) for responding too fast to a burglary in progress call based upon a complaint made by Nelson on or about May 13, 2010.

27.     Shelton had never been disciplined by the Bel Nor Police Department prior to this incident.

28.     When Shelton tried to explain to Tate that she did not act inappropriately when responding to the burglary in progress call, Tate responded by calling Shelton "a fu--ing liar."

29.     Shortly before Shelton was fired by the Defendants, and after Ford's possession of pornography was disclosed as set forth in more detail below, Ford and Nelson approached Hughes and Ford told Hughes that if he helped in getting Shelton fired, Hughes would be made a full-time officer with the Department.  Ford told Hughes, "if we can just get rid of Shelton, things will be better."  Nelson asked Hughes if he

thought things would be better with Shelton gone.  Hughes told Ford and Nelson that he would not be a part of any plan to fire Shelton.

30.     On or about June 4, 2010, a car travelling at a high rate of speed attempted to hit Shelton's car with her in it after Shelton engaged her lights to pull the car over. Shelton had to swerve onto the Normandie Golf Course to avoid being hit.  Shelton then engaged in a pursuit of the vehicle that attempted to hit her.

31.     Defendants used this pursuit as a pretextual reason to fire Shelton because of her race and gender and in retaliation against Shelton because of Ford's belief that she had engaged in protected activity.

32.     As set forth above, Shelton was fired by the Defendants on or about June 30, 2010.

33.     Shelton has suffered and will continue to suffer lost wages and other benefits of her employment and lost employment opportunities as a direct and proximate result of the actions of the Defendants as set forth herein.

34.     As a direct and proximate result of the acts of the Defendants as set forth herein, Shelton has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

35.     In addition to the conduct set forth above, Ford had made additional derogatory comments about female police officers and African-Americans.  By way of illustration, but not necessarily exhaustive of Fords' statements showing racial and gender hostility, Ford:

    a.     On a regular basis made statements to Hughes that Schaefer and

7

Shelton should not be police officers;

     b.     Told Shelton that she would not be able to arrest anyone except for her looks, and that the only reason she was able to arrest anyone at all was because guys wanted to f--k her;

     c.     Told Bernsen that Shelton "acted like a real ghetto b--ch and went Northside" on him when Ford confronted Shelton about the call from the EEOC;

     d.     Would yell in the police station, "ni--er, ni--er" when a call would come over the base radio at the station about black males;

     e.     Referred to the residents of Greendale, a predominantly African-American community, as "those people," and would say, "f--k those people," "they have no business being here," "they are lazy," and routinely referred to the Greendale residents as "ni--ers."

36.     Similarly, Tate has referred to the Greendale residents as "ni--ers."

### FACTS COMMONS TO JOHN BERNSEN'S CLAIMS

37.     Bernsen was hired as a police officer for the Village on or about July 28, 2005.  On or about October 15, 2008, he was promoted to the rank of sergeant by Ford. He faithfully performed his duties as a police officer until his discharge by the Defendants on or about July 12, 2010.

38.     On or about June 9, 2010, Bernsen and Hughes met with Village Trustee Bill Dee (hereinafter "Dee") at the police station.

39.     Bernsen and Hughes complained about and showed Dee the pornography that Ford was storing at the police station, which was photographed by Dee.  Bernsen told Dee that if Ford became aware that Bernsen and Hughes were the source of the

complaints about Ford's pornography at the police station, they would be fired.

40.     Several days later, Ford's pornography was removed from the police station and pin-up girls on the walls of the police station were also removed.

41.     Thereafter, Ford approached Hughes about Bernsen and Shelton, believing that they were responsible for reporting Ford's possession of pornography at the police station to Dee.  It was at this time that Ford requested, in Nelson's presence, Hughes' help in firing Shelton.

42.     On or about June 30, 2010, the same day that Shelton was fired, Bernsen was demoted from sergeant to patrol officer for allegedly failing to adequately supervise Shelton when she engaged in the pursuit of the individual who had tried to hit her vehicle head-on.  The allegation against Bernsen was nothing more than pretext to retaliate against him because of Ford's belief that Bernsen (and Shelton) had reported his possession of pornography to Dee and because Bernsen refused to support Ford and Tate's pretextual claim that Shelton had engaged in an inappropriate pursuit but had instead concluded that Shelton had acted properly in the pursuit under the totality of the circumstances.

43.     Thereafter, between June 30 and July 12, 2010, Bernsen was issued several pretextual warnings to retaliate against him because Ford believed that Bernsen had reported his possession of pornography to Dee.  Bernsen had received no discipline while employed by the Department prior to June 30, 2010.

44.     On June 24, 2010 Bernsen was involved in an incident with Hughes that ultimately led to Bernsen's wrongful discharge.  More specifically, Hughes was called into the station by Tate after Hughes responded to a domestic call that was taken over by

Sgt. Steven Bishop (hereinafter "Bishop"), who then complained about Hughes' conduct. During Hughes' confrontation with Tate, Tate directed Hughes to surrender his Department issued equipment, told Hughes he had resigned from the Department, and assaulted Hughes.

45.     Hughes, knowing that he had recently been asked to assist in finding reasons to fire Shelton, believed that Ford and Tate were now looking for false reasons to fire him.  Therefore, Hughes contacted Bernsen, his supervisor, for assistance.

46.     Bernsen, knowing that it was likely that the Defendants would retaliate against Hughes because he refused to participate in Ford's retaliatory efforts to fire Shelton and because he suspected that Defendants were aware of Hughes involvement in the reporting of Ford's possession of pornography to Dee, contacted Dee and Village trustee, Stephanie Kries, to respond to the Bel Nor Police Department.  Both trustees responded to the Department as requested.

47.     Bernsen was fired on July 12, 2010 by the Defendants for the pretextual reasons of failing to properly use the chain of command, insubordination, and failing to wear body armor because of the events of June 24, 2010.

48.     Bernsen has suffered and will continue to suffer lost wages and other benefits of his employment and lost employment opportunities as a direct and proximate result of the actions of the Defendants set forth herein.

49.     As a direct and proximate result of the acts of the Defendants as set forth herein, Bernsen has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

## FACTS COMMONS TO BRYAN HUGHES' CLAIMS

50.     Hughes was hired by the Bel Nor Police Department on or about February 14, 2010 and served without incident or discipline until he and Bernsen reported Ford's possession of pornography at the station to Dee.

51.     As set forth above, after Hughes was hired by the Bel Nor Police Department in February 2010, Ford offered to give him the locker Ford stored pornography in at the station.  When Ford showed Hughes the pornography he was keeping at the station, Hughes made it clear to him that he could not keep pornography at the station because it would cause him problems.  Nonetheless, Ford continued to keep pornography at the station until Bernsen and Hughes reported Ford's possession of pornography to Dee on or about June 9, 2010.

52.     After Ford was required to remove his pornography and pin-up girls from the police station because of Bernsen and Hughes' complaint to Dee, Ford complained to Hughes about both Shelton and Bernsen because he believed that they were involved in the report.  Upon information and belief, Ford did not know at that time that Hughes had been involved in reporting Ford's possession of pornography.  As set forth above, Ford, in Nelson's presence, requested Hughes' help in firing Shelton, whom they believed was the source of all of Ford's problems.  Hughes refused to help Ford and Nelson fire Shelton.

53.     As set forth above, on or about June 24, 2010 Hughes responded to a domestic disturbance call in Greendale.  Shortly thereafter, Bishop arrived on the scene and took control of it.  Hughes relinquished control of the scene to Bishop, who then took statements from the alleged victim and aggressor.

54.     Thereafter, Bishop instructed Hughes to draw a number and write a report about the incident, but Hughes could not write a report about the incident because he did not have the facts or information because Bishop had assumed control of the scene. Hughes advised Bishop that he did not have the information needed to write the report, and Bishop became irate.

55.     A short time thereafter on June 24, 2010, Hughes was called into the station by Tate.  Tate also became irate with Hughes and told Hughes he had resigned from the Department and demanded Hughes' equipment.   Hughes disputed that he had resigned, but nonetheless gave Tate his weapon, but not his badge.  Tate was cursing Hughes, asking Hughes if he wanted to take Tate on, and assaulted Hughes.

56.     When Tate realized that Hughes' recorder was on during this confrontation, Tate also took Hughes' recorder from him.

57.     After his confrontation with Tate, at which Hughes was told that he had resigned from the Department, Hughes contacted Nelson, the Police Commissioner. Nelson advised Hughes that he was intoxicated and could not come to the police station.

58.     Hughes then contacted Bernsen, as his superior in the chain of command, for assistance.  Hughes advised Bernsen of his confrontation with Tate and fictional resignation.  As set forth above, Bernsen then contacted other Village trustees, believing that Ford and Tate were retaliating against Hughes because he refused to help Ford fire Shelton and because Ford then knew that Hughes, like Bernsen, had reported Ford's possession of pornography to Dee.

59.     On July 7, 2010, Hughes was fired by the Defendants for the pretextual reasons of insubordination, failing to properly use the chain of command, and failing to

report Tate's assault on him, all relating to the incident of June 24, 2010.

60.     Hughes has suffered and will continue to suffer lost wages and other benefits of his employment and lost employment opportunities as a direct and proximate result of the actions of the Defendants as set forth herein.

61.     As a direct and proximate result of the acts of the Defendants as set forth herein, Hughes has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

### COUNT I
### PLAINTIFF SHELTON'S  TITLE VII AND MHRA CLAIMS
### BASED UPON RACE AND GENDER  DISCRIMINATION

For Count I of Plaintiff Felicia Shelton's cause of action against all Defendants, Plaintiff states:

62.     Shelton alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 61 above.

63.     Shelton is a member of the protected classes African-American and female.

64.     Shelton was qualified for the position she held, patrol officer, and she was meeting her employer's legitimate job expectations at the time of her discharge but was instead fired for a pretextual reason because of her race and gender.

65.     African-Americans and females are treated less favorably than other employees of the Village/Bel Nor Police Department because of Ford and Tate's animosity towards African-Americans and/or females.

66.     Shelton suffered an adverse employment action when she was fired by the

Defendants for a pretextual reason because of her race and gender.

67.     Upon information and belief, after Shelton was terminated, she was replaced by someone who was not a member of her protected class in that her replacement is a white, male.

68.     Any purported reasons presented by Defendants for Shelton's discharge are nothing but pretext to cover-up Shelton's illegal discharge on the basis of her race and gender.

69.     The actions, policies and practices complained of herein were in violation of Shelton's rights secured by 42 U.S.C. §2000(e) *et seq.* and R.S.Mo. §213.010 *et seq.*

70.     Shelton has suffered and will continue to suffer economic injury as a result of her wrongful discharge to include lost wages and benefits of her employment and lost employment opportunities.

71.     As a result of her wrongful discharge, Shelton has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

72.     The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Shelton's constitutional and statutory rights as set forth above, making an award of punitive damages appropriate to punish the Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff Felicia Shelton prays this Court enter judgment in her favor and against the Defendants and thereafter order Defendants to make Shelton whole by awarding her damages for any and all loses or damages she has suffered including lost wages and other benefits of employment and lost employment opportunities; award

damages to Shelton for her emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Shelton punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Shelton the costs of this action, together with her reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

**COUNT II**
**VIOLATION OF FELICIA SHELTON'S RIGHT TO EQUAL**
**PROTECTION COGNIZABLE UNDER 42 U.S.C. SECTION 1983**

For Count II of Plaintiff Felicia Shelton's cause of action against all Defendants, Plaintiff states as follows:

73.     Plaintiff incorporates by reference as if fully set forth herein paragraphs 1 through 72 of this Complaint.

74.     Defendants, acting under color of state law, deliberately acted against Shelton as set forth above because of her gender, female, and race, African-American, causing her to be deprived of her rights secured by the Constitution and laws of the United States.

75.     The actions, policies and practices complained of were in violation of 42 U.S.C. §1983 in that they have denied Shelton of her rights secured by Title VII of the Civil Rights Act of 1964, as well as equal protection of the law as secured by the Fourteenth Amendment to the United States Constitution.

76.     The actions complained of herein were made by those with final policy-

making authority and/or approved by those with final policy-making authority within the the Village as part of a deliberate policy of discrimination against African American, female employees of the Village, who are treated less favorably than their white, male counterparts.

77.     As a direct and proximate result the acts of the Defendants as alleged herein, Shelton was discharged from her employment with the Village, resulting in her sustaining and continuing to sustain lost wages and other benefits of her employment and lost employment opportunities.

78.     As a direct and proximate result of the acts of the Defendants as alleged herein, Shelton has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

79.     The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Shelton's constitutional rights as set forth above, justifying an award of punitive damages against the Defendants in their individual capacities to punish them and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff Felicia Shelton prays this Court enter judgment in her favor and against the Defendants and thereafter order Defendants to make Shelton whole by awarding her damages for any and all loses or damages she has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Shelton for her emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of

enjoyment of life, stress, and loss of professional reputation; award Shelton punitive

damages against the individual Defendants in their individual capacities in such sum as

this Court believes will serve to punish them and to deter them and others from like

conduct; award Shelton the costs of this action, together with her reasonable attorneys'

fees; and grant such other and additional relief as may appear to the Court to be equitable

and just under the circumstances.

**COUNT III**
**VIOLATION OF SHELTON'S RIGHTS SECURED**
**BY  42 U.S.C. SECTION 1981**

For Count III of Plaintiff Felicia Shelton's cause of action against all Defendants,

Plaintiff states as follows:

80.    Plaintiff incorporates by reference as if fully set forth herein paragraphs 1

through 79 of this Complaint.

81.    Defendants fired Shelton on or about June 30, 2010.

82.    Shelton's race was the determining factor, motivating factor, or played a

part in the Defendants' decision to discharge Shelton.

83.    Defendants stated reason for firing Shelton was not the real reason for

firing her but a pretext to hide race discrimination.

84.    As a direct and proximate result the acts of the Defendants as alleged

herein, Shelton was discharged from her employment with the Village, resulting in her

sustaining and continuing to sustain lost wages and other benefits of her employment and

lost employment opportunities.

85.    As a direct and proximate result of the acts of the Defendants as alleged

herein, Shelton has suffered and will continue to suffer emotional pain and suffering,

mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

86.     The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Shelton's statutory rights as set forth above, justifying an award of punitive damages against the Defendants in their individual capacities to punish them and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff Felicia Shelton prays this Court enter judgment in her favor and against the Defendants and thereafter order Defendants to make Shelton whole by awarding her damages for any and all loses or damages she has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Shelton for her emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Shelton punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Shelton the costs of this action, together with her reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

**COUNT IV**
**SHELTON'S HOSTILE WORK ENVIRONMENT CLAIM**
**UNDER TITLE VII AND MHRA**

For Count IV of Plaintiff Shelton's cause of action against Defendants Village of Bel Nor, Walt Ford, and Scott Ford, Plaintiff states:

87.     Shelton alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 86 above.

88.     Shelton is a member of a protected class because of her race and gender.

89.     Shelton suffered unwelcome harassment because of her race and gender when Ford referred to her as a "b--ch," a "ni--er," and subjected her to the pornography and pin-up pictures at work.

90.     A causal connection/nexus exists between the harassment Shelton suffered and her race and gender, particularly in that Ford's comments to Shelton and others show that he is both a racist and a sexist.

91.     Upon information and belief, Nelson authorized or tacitly approved of Ford's conduct described herein.

92.     The harassment Shelton suffered affected a term, condition, or privilege of her employment.

93.     Alternatively, but without waiver of the foregoing, Ford's conduct created an intimidating, hostile or offensive work environment and/or had the purpose or effect of unreasonably interfering with Shelton's work performance.

94.     Defendants knew of the harassment Shelton suffered and failed to take prompt and effective remedial action.  Instead, as set forth above, Nelson assisted Ford in trying to terminate Shelton because of her race and gender.

95.     Defendants discriminatory and abusive actions created an atmosphere that was both subjectively hostile or abusive to Shelton and severe and pervasive enough to create a work environment that a reasonable person would objectively find hostile or abusive.

96.     The actions, policies and practices complained of herein were in violation of Plaintiffs' rights secured by 42 U.S.C. §2000(e) *et seq.* and R.S.Mo. §213.010 *et seq.*

97.     As a direct and proximate result of the hostile work environment created by the Defendants as set forth herein, Shelton has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

98.     The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Shelton's federal statutory rights as set forth above, and therefore, an award of punitive damages is warranted and necessary to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff Felicia Shelton prays this Court enter judgment in her favor and against the Defendants and thereafter order Defendants to make Shelton whole by awarding her damages for her emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Shelton punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Shelton the costs of this action, together with her reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT V
## SHELTON'S RETALIATION CLAIM UNDER TITLE VII AND MHRA

For Count V of Plaintiff Shelton's cause of action against all Defendants, Plaintiff states:

99.     Shelton alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 98 above.

100.     Ford believed that Shelton had engaged in protected activity when both Shelton and Ford were contacted by the EEOC in March 2010.

101.     Shelton was subjected to adverse employment actions, termination on June 30, 2010, a two-day suspension served on May 26 and 27, 2010, and a hostile work environment before she was fired after Ford mistakenly believed that Shelton had filed an EEOC complaint against the Village/Department.

102.     A causal connection/nexus exists between Shelton's protected activity and the adverse employment actions set forth in paragraph 101 above.

103.     The actions, policies and practices complained of herein were in violation of Shelton's rights secured by 42 U.S.C. §2000(e) *et seq.* and R.S.Mo. §213.010 *et seq.*

104.     As a direct and proximate result of her wrongful discharge, Shelton has suffered and will continue to suffer economic injury to include lost wages and benefits of her employment and lost employment opportunities.

105.     As a direct and proximate result of her wrongful discharge, Shelton has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

106.     The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Shelton's federal statutory rights as set forth above, and therefore, an award of punitive damages is warranted and necessary to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff Felicia Shelton prays this Court enter judgment in her favor and against the Defendants and thereafter order Defendants to make Shelton whole by awarding her damages for any and all loses or damages she has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Shelton for her emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Shelton punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Shelton the costs of this action, together with her reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT VI
## BERNSEN'S RETALIATION CLAIM UNDER TITLE VII AND MHRA

For Count VI of Plaintiff Bernsen's cause of action against all Defendants, Plaintiff states:

107.     Bernsen alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 106 above.

108.     Bernsen engaged in protected activity when he reported Ford's possession and storing of pornography at the station and when he refused to support Ford's efforts to fire Shelton because of her race and gender under the pretextual reason that she had engaged in an improper pursuit.

109.     Bernsen was subjected to adverse employment action because of his protected activity when he was terminated on July 12, 2010 by the Defendants.

110.    A causal connection/nexus exists between Bernsen's protected activity and his termination by the Defendants, which was an adverse employment action.  This act of reprisal was the direct result of Bernsen's protected activity.

111.    The actions, policies and practices complained of herein were in violation of Bernsen's rights secured by 42 U.S.C. §2000(e) *et seq.* and R.S.Mo. §213.010 *et seq*.

112.    As a direct and proximate result of his wrongful discharge, Bernsen has suffered and will continue to suffer economic injury to include lost wages and benefits of his employment and lost employment opportunities.

113.    As a direct and proximate result of his wrongful discharge, Bernsen has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

114.    The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Bernsen's federal statutory rights as set forth above, and therefore, an award of punitive damages is warranted and necessary to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff John Bernsen prays this Court enter judgment in his favor and against the Defendants and thereafter order Defendants to make Bernsen whole by awarding him damages for any and all loses or damages he has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Bernsen for his emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of

enjoyment of life, stress, and loss of professional reputation; award Bernsen punitive

damages against the individual Defendants in their individual capacities in such sum as

this Court believes will serve to punish them and to deter them and others from like

conduct; award Bernsen the costs of this action, together with his reasonable attorneys'

fees; and grant such other and additional relief as may appear to the Court to be equitable

and just under the circumstances.

### COUNT VII
### BERNSEN'S WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY - REFUSING TO PERFORM AN ILLEGAL ACT

For Count VII of Plaintiff Bernsen's cause of action against all Defendants,

Plaintiff states:

115.    Bernsen alleges and incorporates by reference as if fully set forth herein,

paragraphs 1 through 114 above.

116.    Bernsen was an employee of a village in the State of Missouri, making

him an employee at-will.

117.    Bernsen's termination by the Defendants on July 12, 2010 was in

contravention of Missouri public policy, which prohibits an at-will employee from being

terminated for refusing to perform an illegal act and/or refusing to act contrary to a strong

mandate of public policy, in this case the public policy of the state and federal

government in prohibiting race and gender-based employment discrimination as set forth

in 42 U.S.C. § 2000(e) *et seq.* and R.S.Mo. § 213.010 *et seq.*

118.    Specifically, Bernsen was discharged by the Defendants for refusing to

support Ford in the illegal race and gender-based termination of Shelton for the pretextual

reason of engaging in an improper pursuit, an act that would be illegal and/or contrary to

a strong mandate of public policy prohibiting employment discrimination.

119.    As a direct and proximate result of his termination in violation of public policy, Bernsen has suffered and will continue to suffer lost wages and other benefits of employment and lost employment opportunities.

120.    As a direct and proximate result of his termination in violation of public policy, Bernsen has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

121.    Defendants' conduct was outrageous because of their evil motive and reckless indifference to the rights of Bernsen in wrongfully terminating his employment in retaliation for refusing to perform and illegal act/act in violation of the strong public policy of the State of Missouri making an award of punitive damages appropriate to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff John Bernsen prays this Court enter judgment in his favor and against the Defendants and thereafter order Defendants to make Bernsen whole by awarding him damages for any and all loses or damages he has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Bernsen for his emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Bernsen punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like

conduct; award Bernsen the costs of this action, together with his reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT VIII
## BERNSEN'S WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY – WHISTLEBLOWING

For Count VIII of Plaintiff Bernsen's cause of action against all Defendants, Plaintiff states:

122.    Bernsen alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 121 above.

123.    Bernsen faithfully performed his duties under the terms and conditions of his employment with the Village until his wrongful discharge on July 12, 2010 by the Defendants.

124.    Bernsen was discharged by the Defendants because he reported to Dee that Ford was keeping pornography in a locker at the police station, and therefore,   was discharged contrary to the public policy of the State as set forth in 42 U.S.C. § 2000(e) *et seq.* and R.S.Mo. 213.010 *et seq.*

125.    The Defendants discharged Bernsen in violation of the public policy of the State of Missouri because of his whistleblower activity.

126.    Defendants were aware of Bernsen's whistleblowing activity when they fired him as a Village police officer for the pretextual reasons set forth in paragraph 47 above to cover-up their own misconduct.

127.    As a direct and proximate result of his wrongful termination in violation of public policy, Bernsen has suffered and will continue to suffer lost wages and other

benefits of employment and lost employment opportunities.

128.    As a direct and proximate result of his wrongful termination in violation of Missouri public policy, Bernsen has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

129.    Defendants' conduct was outrageous because of their evil motive and reckless indifference to the rights of Bernsen in wrongfully terminating his employment for whistleblowing, making an award of punitive damages appropriate in this case to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff John Bernsen prays this Court enter judgment in his favor and against the Defendants and thereafter order Defendants to make Bernsen whole by awarding him damages for any and all loses or damages he has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Bernsen for his emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Bernsen punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Bernsen the costs of this action, together with his reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT IX
## HUGHES' RETALIATION CLAIM UNDER TITLE VII AND MHRA

For Count IX of Plaintiff Hughes' cause of action against all Defendants, Plaintiff states:

130.    Hughes alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 129 above.

131.    Hughes engaged in protected activity when he reported Ford's possession and storing of pornography at the station and when he refused to support Ford and Nelson's efforts to fire Shelton because of her race and gender when they asked him for his assistance in firing Shelton.

132.    Hughes was subjected to an adverse employment action because of his protected activity when he was terminated by the Defendants on July 7, 2010.

133.    A causal connection/nexus exists between Hughes' protected activity and his termination by the Defendants, which was an adverse employment action.  This act of reprisal was the direct result of Hughes' protected activity.

134.    The actions, policies and practices complained of herein were in violation of Hughes' rights secured by 42 U.S.C. §2000(e) *et seq.* and R.S.Mo. §213.010 *et seq.*

135.    As a direct and proximate result of his wrongful discharge, Hughes has suffered and will continue to suffer economic injury to include lost wages and benefits of his employment and lost employment opportunities.

136.    As a direct and proximate result of his wrongful discharge, Hughes has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

137.    The conduct of the Defendants as set forth herein was wanton, willful, and

showed a reckless indifference to Hughes' federal statutory rights as set forth above, and therefore, an award of punitive damages is warranted and necessary to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff Bryan Hughes prays this Court enter judgment in his favor and against the Defendants and thereafter order Defendants to make Hughes whole by awarding him damages for any and all loses or damages he has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Hughes for his emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Hughes punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Hughes the costs of this action, together with his reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT X
## HUGHES' WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY - REFUSING TO PERFORM AN ILLEGAL ACT

For Count X of Plaintiff Hughes' cause of action against all Defendants, Plaintiff states:

138.    Hughes alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 137 above.

139.    Hughes was an employee of a village in the State of Missouri, making him an employee at-will.

140.     Hughes' termination by the Defendants on July 7, 2010 was in contravention of Missouri public policy, which prohibits an at-will employee from being terminated for refusing to perform an illegal act and/or refusing to act contrary to a strong mandate of public policy when he refused to assist Ford and Nelson in terminating Shelton because of her race and gender, which would violate the public policy of the state and federal government as set forth in 42 U.S.C. § 2000(e) *et seq.* and R.S.Mo. 213.010 *et seq.*

141.     Hughes was discharged by the Defendants for refusing to assist in the illegal termination of Shelton because she is an African-American female, an act that would be illegal and/or contrary to a strong mandate of public policy prohibiting employment discrimination.

142.      As a direct and proximate result of his termination in violation of public policy, Hughes has suffered and will continue to suffer lost wages and other benefits of employment and lost employment opportunities.

143.     As a direct and proximate result of his termination in violation of public policy, Hughes has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

144.     Defendants' conduct was outrageous because of their evil motive and reckless indifference to the rights of Hughes in wrongfully terminating his employment in retaliation for refusing to perform and illegal act/act in violation of the strong public policy of the State of Missouri, making an award of punitive damages warranted and necessary to punish Defendants and to deter them and others from the same or similar

transgressions in the future.

WHEREFORE, Plaintiff Bryan Hughes prays this Court enter judgment in his favor and against the Defendants and thereafter order Defendants to make Hughes whole by awarding him damages for any and all loses or damages he has suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Hughes for his emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Hughes punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Hughes the costs of this action, together with his reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

**COUNT XI**
**HUGHES' WRONGFUL DISCHARGE IN VIOLATION**
**OF PUBLIC POLICY – WHISTLEBLOWING**

For Count XI of Plaintiff Hughes' cause of action against all Defendants, Plaintiff states:

145.    Hughes alleges and incorporates by reference as if fully set forth herein, paragraphs 1 through 144 above.

146.    Hughes faithfully performed his duties under the terms and conditions of his employment with the Village until his wrongful discharge on July 7, 2010  by the Defendants.

147.    Hughes was discharged by the Defendants because he reported to Dee that

31

Ford was keeping pornography in a locker at the police station, and therefore, was discharged contrary to the public policy of the State as set forth in 42 U.S.C. § 2000(e) *et seq.* and R.S.Mo. 213.010 *et seq.*

148.    The Defendants discharged Hughes in violation of the public policy of the State of Missouri because of his whistleblower activity.

149.    Defendants were aware of Hughes' whistleblowing activity when they fired him as a Village police officer for the pretextual reasons set forth in paragraph 59 above to cover-up their own misconduct.

150.    As a direct and proximate result of his wrongful termination in violation of public policy, Hughes has suffered and will continue to suffer lost wages and other benefits of employment and lost employment opportunities.

151.    As a direct and proximate result of his wrongful termination in violation of Missouri public policy, Hughes has suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

152.    Defendants' conduct was outrageous because of their evil motive and reckless indifference to the rights of Hughes in wrongfully terminating his employment for whistleblowing, making an award of punitive damages appropriate in this case to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiff Bryan Hughes prays this Court enter judgment in his favor and against the Defendants and thereafter order Defendants to make Hughes whole by awarding him damages for any and all loses or damages he has suffered including lost

wages and other benefits of employment; award damages to Hughes for his emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Hughes punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Hughes the costs of this action, together with his reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT XII
## CONSPIRACY TO VIOLATE PLAINTIFFS' STATUTORY AND CONSTITUTIONAL RIGHTS COGNIZABLE UNDER 42 U.S.C. §1983

For Count XII of all of the Plaintiffs' cause of action against Defendants Ward Nelson, Chief Scott Ford, and Lt. Richard Tate, they state as follows:

153.    Plaintiffs incorporate by reference as if fully set forth herein, paragraphs 1 through 152 of their Complaint.

154.    Defendants, acting under color of state law, conspired together and amongst themselves and as a result reached a mutual understanding to discriminate against Shelton because of her race and gender and to retaliate against Shelton, Bernsen, and Hughes because of their protected activity, and/or to undertake a course of conduct to protect each other from the consequences of their wrongful acts as set forth above as officials of the Village and in furtherance of this conspiracy violated Plaintiffs' federal statutory and constitutional rights as set forth herein.  In furtherance of this conspiracy, the Defendants committed the following overt acts:

     a.     Fired Shelton because of her race and gender and in retaliation because Ford mistakenly believed that she engaged in protected activity;

     b.     Engaged in a hostile work environment against Shelton because of her race and gender by engaging in conduct that included but was not necessarily limited to calling her a "b--ch" and a "ni--er" and showing her pornography and subjecting her to pin-up girls at the police station;

     c.     Upon information and belief, created a hostile work environment for other African American and female employees of the Department;

     d.     Soliciting the aid of Hughes in firing Shelton because of her race and gender, although Hughes refused to cooperate in this illegal activity;

     e.     Firing Hughes in retaliation for his reporting that Ford possessed pornography in a locker at the police station and for refusing to aid Ford and Nelson in firing Shelton;

     f.     Firing Bernsen in retaliation for his reporting that Ford possessed pornography in a locker at the police station and for refusing to support Ford in his efforts to fire Shelton for the pretextual reason that Shelton engaged in an improper pursuit.

     g.     Defendants engaged in the conduct as set forth herein to protect themselves from the consequences of their own misconduct.

155.    Defendants shared the general conspiratorial objective which was to fire Plaintiffs in violation of their federal statutory and/or constitutional rights to be free from illegal discrimination and retaliation when engaging in protected activity.  Such conduct is so pervasive in the Village and/or is engaged in by Village officials with final policy-

making authority that the Village's officials are effectively insulated from civil sanction, and therefore, Defendants felt free to engage in the misconduct described above, without any fear of sanction or retribution.

156.   Defendants furthered the conspiracy by participating in it from its inception or by participating in the cover-up thereof and/or ignoring the course of conduct set forth herein so as to insulate themselves and others from liability for the outrageous and unlawful acts of the Defendants described above, showing a tacit understanding to carry out the prohibited conduct.

157.   As a direct and proximate result of the conspiracy amongst the Defendants and in furtherance thereof, Plaintiffs were fired for illegal and pretextual reasons, and thereby deprived of their rights protected by the Equal Protection Clause of the United States Constitution, 42 U.S.C. § 1981, and/or 42 U.S.C. § 2000(e) *et seq.*

158.   As a direct and proximate result of the conspiracy amongst Defendants and in furtherance thereof, Plaintiffs were discharged from their employment with the Village, resulting in their sustaining and continuing to sustain lost wages and other benefits of their employment and lost employment opportunities.

159.   As a direct and proximate result of the conspiracy amongst Defendants, Plaintiffs have suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

160.   The conduct of the Defendants as set forth herein was wanton, willful, and showed a reckless indifference to Plaintiffs' constitutional and/or federal statutory rights, justifying an award of punitive damages against the Defendants in their individual

capacities to punish Defendants and to deter them and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiffs Felicia Shelton, John Bernsen, and Bryan Hughes pray this Court enter judgment in their favor and against the Defendants Ward Nelson, Chief Scott Ford, and Lt. Richard Tate and thereafter order Defendants to make them whole by awarding them damages for any and all loses or damages they have suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Plaintiffs for their emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Plaintiffs punitive damages against the individual Defendants in their individual capacities in such sum as this Court believes will serve to punish them and to deter them and others from like conduct; award Plaintiffs the costs of this action, together with their reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

### COUNT XII
### FAILURE TO INSTRUCT, TRAIN, SUPERVISE, CONTROL, DISCIPLINE AND NEGLIGENT RETENTION, COGNIZABLE UNDER 42 U.S.C. §1983

For Count XII of all of the Plaintiffs' cause of action against Defendants Village and Nelson, they state as follows:

161.    Plaintiffs incorporate by reference as if fully set forth herein, paragraphs 1 through 160 of their Complaint.

162.    There exists within the Villages policies or customs, practices and usages that are so pervasive that they constitute the policies of these Defendants, that caused the

violations of Plaintiff's federal statutory and/or constitutional rights as set forth above. The policies, customs, practices, and usages that exist are:

    a.     To discriminate against females employed by the Department;

    b.     To discriminate against African Americans employed by the Department;

    c.     To create a hostile work environment for females and/or African Americans employed by the Department;

    d.     To retaliate against officers of the Department who engage in protected activity;

    e.     To fail to report and/or remedy illegal discrimination, retaliation, and/or harassment.

163.     Defendants Village and Nelson were vested with the duty, power and authority to train, supervise, discipline and otherwise control the officers and employees of the Village's police department, to include Ford and Tate.  These Defendants have failed in their duty to train, supervise and discipline Ford and Tate in general and specifically.  Specifically, these defendants have failed to adequately train, supervise and discipline Ford and Tate in their duties to comply with the constitution and laws of the United States prohibiting discrimination, retaliation, and/or a hostile work environment and with regard to their duty to report transgressions of federal law.  The supervisory Defendants named herein have effectively abrogated the power to train, supervise, discipline and control Ford and Tate by failing to act in the face of numerous transgressions of which the Defendants knew or should have known, allowing such transgressions to become the custom, policy and practice of the Village/Department.  As

the lawfully designated policy authorities governing Ford and Tate, these Defendants have the power and the responsibility to prevent the existence of the policies and practices set forth above and have failed and refused to do so by routinely ignoring these practices.  The failures of these Defendants have caused the violations of Plaintiffs' federal statutory and constitutional rights as set forth above.

164.    Additionally and without waiver of the foregoing, upon information and belief, Ford had previously been accused of illegal discrimination and/or retaliation, and the Defendants did nothing to put an end to such conduct or otherwise discipline him for engaging in such conduct.

165.    Defendant Village is the policy making body governing Ford and Tate and its failure to affirmatively act in the face of transgressions about which it knew or should have known, established the policies of the Village to condone conduct that violates the constitution and laws of the United States in general and specifically the statutory and constitutional violations set forth in this Complaint.  Alternatively, the Village has delegated and abrogated all or part of its policymaking power.  Had the Village affirmatively acted to properly train the law enforcement personnel under their control or to properly supervise the law enforcement personnel under their control or to properly discipline the law enforcement personnel under their control when they acted in violation of the constitution and laws of the United States, the deprivations of the Plaintiffs would not have occurred.

166.    Defendant Nelson is the Police Commissioner, with supervisory authority over the Village's police department and his failure to affirmatively act in the face of transgressions about which  he knew or should have known established the policies of the

Defendants to condone and otherwise tolerate conduct that violates the constitution and laws of the United States in general and specifically the statutory and constitutional violations set forth in this Complaint. Alternatively, Nelson has delegated and abrogated all or part of his supervisory power. Had Nelson affirmatively acted to properly train the law enforcement personnel under his control or to properly supervise the law enforcement personnel under his control or to properly discipline the law enforcement personnel under his control when they acted in violation of the constitution and laws of the United States, the deprivations of the Plaintiffs would not have occurred.

167.    The Defendants are aware of or should be aware of the practices of Ford and Tate in failing and refusing to comply with Title VII, the Equal Protection Clause, and 42 U.S.C. § 1981, as well as of the persistent failure and refusal of Ford and Tate to report violations of the Constitution and laws in their employment activities. Nevertheless, these Defendants have done nothing to prevent or stop these practices, but instead have routinely ignored these practices, thereby tacitly authorizing and/or approving of these practices.

168.    In their failures as set forth above, these Defendants intentionally disregarded known facts or alternatively were deliberately indifferent to a risk of constitutional and statutory violations, of which they knew or should have known, and their culpability caused the violations of the Plaintiffs' federal statutory and constitutional rights as set forth herein.

169.    As a direct and proximate result of the conduct of the Defendants as set forth herein, Plaintiffs were discharged from their employment with the Village, resulting in their sustaining and continuing to sustain lost wages and other benefits of their

employment and lost employment opportunities.

170.    As a direct and proximate result of the conduct of the Defendants as set forth herein, Plaintiffs have suffered and will continue to suffer emotional pain, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation.

171.    The conduct of Nelson as set forth herein was wanton, willful, and showed a reckless indifference to Plaintiffs' constitutional and/or federal statutory rights as set forth above, justifying an award of punitive damages against Nelson in his individual capacity so at to punish this Defendant and to deter him and others from the same or similar transgressions in the future.

WHEREFORE, Plaintiffs Felicia Shelton, John Bernsen, and Bryan Hughes pray this Court enter judgment in their favor and against Defendants Village of Bel Nor and Walt Nelson and thereafter order these Defendants to make Plaintiffs whole by awarding them damages for any and all loses or damages they have suffered including lost wages and other benefits of employment and lost employment opportunities; award damages to Plaintiffs for their emotional injuries, including but not limited to emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of professional reputation; award Plaintiffs punitive damages against Defendant Nelson in his individual capacity in such sum as this Court believes will serve to punish him and to deter him and others from like conduct; award Plaintiffs the costs of this action, together with their reasonable attorneys' fees; and grant such other and additional relief as may appear to the Court to be equitable and just under the circumstances.

Respectfully submitted,

PLEBAN & PETRUSKA LAW, LLC


by:   /s/ C. John Pleban              
      C. John Pleban #24190
      Lynette M. Petruska, #41212
      2010 S. Big Bend Blvd.
      St. Louis, MO  63117
      Telephone:  314-645-6666
      Facsimile:  314-645-7376

      Attorneys for Plaintiffs