IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FELICIA SHELTON, et al.,        )
           )
      Plaintiffs,       )
           )
v.           )    Case No. 10-CV-2146-NAB
           )
VILLAGE OF BEL NOR, et al.,    )
           )
      Defendants.     )

**PLAINTIFFS' COMBINED STATEMENT OF CONTROVERTED MATERIAL FACTS MAKING SUMMARY JUDGMENT INAPPROPRIATE[1]**

    COME NOW Plaintiffs, by and through counsel, and for their Combined Statement of Controverted Material Facts Making Summary Judgment Inappropriate state as follows:

**Response to Facts Alleged by Village of Bel-Nor with Citations to Identical Allegations Made by Other Defendants[2]**

**Plaintiff Shelton**

    1.    Admitted.  This response is also incorporated into Ford's Statement of Undisputed Material Facts (doc. 70) (hereinafter "Ford"), ¶ 1; Tate's Statement of Undisputed Material Facts (doc. 65) (hereinafter "Tate"), ¶ 1; and Nelson's Statement of Undisputed Material Facts (doc. 71) (hereinafter "Nelson"), ¶ 1.

    2.    Objection.  Plaintiffs object to paragraph 2 because this is not a reason for Felicia Shelton's (hereinafter "Shelton") discharge (or even the basis for discipline at the time it occurred), and therefore, not relevant to this proceeding or a material fact for purposes of

---

[1] While Defendants filed four separate statements of facts that are largely identical, although numbered differently to unnecessarily increase the cost of this litigation and make the summary judgment record more complex than it needs to be, Plaintiffs opt to provide a single statement of facts for the convenience of the Court.

[2] Plaintiffs have cross-referenced Defendants Ford, Tate, and Nelson's Statements of Undisputed Material Facts in responding to the Village of Bel Nor's Statement of Undisputed Material Facts for the sake of brevity.  Plaintiffs' responses to the Village of Bel Nor's Statement of Undisputed Material Facts are incorporated by reference as if fully set forth in response to Ford, Tate, and Nelson's Statements of Undisputed Material Facts.

summary judgment.  Subject to and without waiver of the foregoing objection, denied.  Exhibit T actually states that the other vehicle backed into Shelton's police vehicle.   Plaintiffs further admit that almost a year **after** this accident, Scott Ford (hereinafter "Ford') blamed Shelton for this accident, although no fault had been attributed to Shelton at the time it occurred.  See Defendants' Exhibits T[3] and JJ.  See also ¶¶  349-359 below as to Exhibits JJ and Y, which is incorporated by reference into all allegations for which Defendants rely upon Exhibit JJ.  This response is also incorporated into Ford, ¶ 2; Tate, ¶ 2; and Nelson, ¶ 2.

3.      See Objection set forth in paragraph 2, which is incorporated by reference. Subject to and without waiver of the foregoing objection, denied.  Exhibit U does not attribute any fault (that Shelton parked too close to a large crime scene van) at the time this accident was caused by Officer Clay Peeler, not Shelton, who was not even in her vehicle when it was struck. Plaintiffs admit that 9 months after Shelton's vehicle was struck by another police officer, Ford blamed Shelton for this accident, although no fault was attributed to her at the time it occurred. This response is also incorporated into Ford, ¶ 3; Tate, ¶ 3; and Nelson, ¶ 3.

4.      See Objection set forth in paragraph 2, which is incorporated by reference. Subject to and without waiver of the foregoing objection, denied.  Neither Exhibit V, nor JJ, state what Defendants' claim in paragraph 4, except that the car rolled.  Plaintiffs further direct the Court's attention to Exhibit JJ (FAS00324) in which Ford claims that this accident resulted in injury to the driver of the other car.  The accident report states "none apparent" as to injury to the driver.  Exhibit V, p. 3.  This response is also incorporated into Ford, ¶ 4; Tate, ¶ 4; and Nelson, ¶ 4.

5.      Admitted in part and denied in part.  Admitted that Ford testified as stated.

---

[3] All exhibits designated by letter refer to the exhibits attached to the Village of Bel Nor's Statement of Undisputed Material Facts (doc. 87).

Denied that Shelton failed to put the car in park, as she stated she put the car in park but it slipped out of park, and the Highway Patrol said there were problems with the gear.  Exhibit 1, 97:19-25.  Defendants have not produced any documents to support Ford's claim that he had the car inspected by a mechanic.  Richard Tate (hereinafter "Tate") testified that Shelton was not charged with any of the accidents set forth in paragraphs 2-4 above.  Exhibit 2, 7:8-9.  By way of further answer Ford did not document these purported problems until June 9, 2010.  Exhibit JJ. This response is also incorporated into Nelson, ¶ 5.

6.     Admitted in part and denied in part.  Shelton admits acknowledging receipt of the Bel Nor Police Department's General Orders/Operational Procedure Manual, but this occurred on 5/27/08 when she was hired, not on February 28, 2010 as Defendants claim.  See Exhibits W and S. This response is also incorporated into Ford, ¶ 5; Tate, ¶ 5; and Nelson, ¶ 6.

7.     See Objection set forth in paragraph 2, which is incorporated herein.  Subject to and without waiver of the foregoing objection, denied.  Exhibit X is a one page document face sheet of a report that does not evidence substantive mistakes or poor writing.  This response is also incorporated into Ford, ¶ 6; Tate, ¶ 7; and Nelson, ¶ 7.

8.     See Objection set forth in paragraph 2, which in incorporated by reference.  By way of further response, objection and denied.  The police report is the best evidence of the mistakes claimed by Ford and has not been produced to support this claim.  This response is also incorporated into Ford, ¶ 14; Tate, ¶ 14; and Nelson, ¶ 8.

9.     Admitted that Exhibit Z speaks for itself.  By way of further answer, according to the Missouri State Highway Patrol website, EVOC stands for Emergency Vehicle Operation Course.  This response is also incorporated into Ford, ¶ 12; Tate, ¶ 12; and Nelson, ¶ 9.

10.     Admitted but irrelevant.  This response is also incorporated into Ford, ¶ 13; Tate,

¶ 13; and Nelson, ¶ 10.

      11.    Admitted in part and denied in part.  Ford did not testify that he signed Shelton up for this course to improve her skills.  This response is also incorporated into Nelson, ¶ 11.

      12.    Admitted but irrelevant.  By way of further answer, Ford also testified that he did not recall if he consulted with Shelton to make sure she was available before signing her up for this course.  Exhibit 3, 130:4-131:12.  This response is also incorporated into Ford, ¶ 15; Tate, ¶ 15; and Nelson, ¶ 12.

      13.    Admitted but irrelevant.  By way of further answer, Shelton told Ford she could not attend the report writing class he signed her up for.  Exhibit 4, 143:8-16.  This response is also incorporated into Ford, ¶ 16; Tate, ¶ 16; and Nelson, ¶ 13.

      14.    See Objection set forth in paragraph 2, which is incorporated by reference. Subject to the foregoing objection, denied.  Exhibit BB is not dated 4/19/10 and does not involve a burglary charge.  This response is also incorporated into Ford, ¶ 17; Tate, ¶ 17; and Nelson, ¶ 14.

      15.    See Objection set forth in paragraph 2, which is incorporated by reference. Subject to the foregoing objection, denied.  The 4/20/10 police report is the best evidence of the mistakes claimed by Ford and has not been produced.  his response is also incorporated into Nelson, ¶ 15.

      16.    See Objection set forth in paragraph 2, which is incorporated by reference. Subject to the foregoing objection, admitted.  By way of further answer, Commissioner Walter Nelson (hereinafter "Nelson") testified that Shelton lost the whole light bar across the top of the car, and that he knew this because he saw it and the incident absolutely stood out to him.  Exhibit 5, 18:23-19:6.  Only when Nelson was confronted with the report written at the time, which

showed that only a portion of the light bar was missing from the police car, did Nelson change his story.[4]  Exhibit 5, 91:7-12.  This response is also incorporated into Ford, ¶ 18; Tate, ¶ 18; and Nelson, ¶ 16.

17.     See Objection set forth in paragraph 2, which is incorporated by reference. Subject to the foregoing objection, admitted that Exhibit DD speaks for itself.  By way of further answer, Exhibit DD states that a department vehicle should be inspected before and after a tour of duty (each and every time).  However, Operational Procedure 200.1 states that a vehicle must be inspected at the beginning of each tour of duty.  Exhibit 6.  This response is also incorporated into Ford, ¶ 19; Tate, ¶ 19; and Nelson, ¶ 17.

18.     See Objection set forth in paragraph 2, which is incorporated by reference. Subject to the foregoing objection, admitted.  By way of further answer, see ¶ 17 above.  This response is also incorporated into Ford, ¶ 20; Tate, ¶ 20; and Nelson, ¶ 18.

19.     Admitted in part and denied in part.  Once again Shelton denies that she signed the Acknowledgement of Police Manual on or about April 2010.  She did sign it on May 27, 2008.  Shelton further denies that Exhibit W acknowledged Shelton's understanding of the Village's pursuit policy Shelton only acknowledged receipt of the manual and special orders and her responsibility for the same as the property of the Department.  his response is also incorporated into Nelson, ¶ 19.

20.     Denied.  No complaint filed by Nelson had been produced by Defendants, which would be in Defendants exclusive possession and control.  See also Exhibit R, § 6.04 (VBN00044), which requires complaints by the Commissioner to be in writing.  This response is also incorporated into Ford, ¶ 21; Tate, ¶ 21; and Nelson, ¶ 20.

---

[4] This shows that Defendants are more than willing to make any false statement necessary to avoid the consequences of their illegal activity.

21.     Plaintiff admits that Exhibit FF speaks for itself.  By way of further answer, the Court is directed to Exhibit FF, which states that Nelson reported that he was returning to his residence at approximately 21:00 hours when the police car passed Nelson in his vehicle with lights and air horn activated (but no siren) and bottomed out near the intersection of Clearview and Glen Echo.  According to Nelson, this report was incorrect: he was not returning to his house or in his vehicle, there were no emergency lights, no siren, and the officer was not using an air horn, he does not remember the car bottoming out, and if the report says this event occurred at 2100 hours, it is wrong.  Exhibit 5, 29:22-30:15 & 31:19-32:1.  This response is also incorporated into Ford, ¶ 22; Tate, ¶ 22; and Nelson, ¶ 21.

22.     Denied.  Tate conducted the investigation, not Ford.  See Exhibit FF.  However, Plaintiff admits that Exhibit FF speaks for itself.  By way of further answer, Nelson reported that Shelton was driving approximately 50 mph.  Nelson admitted that he could no say with any degree of certainty the car was going 50 mph because he has no experience judging speed.  Exhibit 5, 31:12-18.  See also ¶ 21 above.  This response is also incorporated into Ford, ¶ 23; Tate, ¶ 23; and Nelson, ¶ 22.

23.     Admitted.  By way of further answer, see ¶¶ 21 & 22 above.  Shelton was suspended after Ford called her a "nigger."  This response is also incorporated into Ford, ¶ 25; Tate, ¶ 25; and Nelson, ¶ 23.

24.     See Objection set forth in paragraph 2, which is incorporated by reference.  By way of further answer, Plaintiffs admit that Report 10-235 speaks for itself.  Plaintiffs further note that Exhibit QQ was approved by Ford on June 1, 2010, 8 days after the report was written, not rejected because of the purported problems later reported.  By way of further response, the report states that Bel-Ridge Officer Johnson and Bel Nor Sgt. Steven Bishop (hereinafter

6

"Bishop") assisted in this arrest, not Shelton.  This response is also incorporated into Ford, ¶¶ 24 & 82; Tate, ¶ 24 & 81; and Nelson, ¶ 24.

25.     Admitted that Plaintiff was involved in a pursuit on June 4, 2010 after a vehicle swerved into her lane of travel and approached her vehicle head-on, causing her to swerve onto a portion of the Normandie Golf Course.  See Exhibit GG (FAS00291).  By way of further answer Plaintiffs direct this Court's attention to Exhibit HH in which Tate and Ford reported that a violation of the pursuit policy occurred **before** their internal investigation was completed.  This response is also incorporated into Ford, ¶ 26; Tate, ¶ 26; and Nelson, ¶ 25.

26.     Admitted.  The dash-mounted radar unit showed the violator travelling at 61 mph before it swerved into Shelton's lane and approached her vehicle head on.  Exhibit GG (FAS00291).  This response is also incorporated into Ford, ¶ 27; Tate, ¶ 27; and Nelson, ¶ 26.

27.     Plaintiff admits that she made a u-turn in an attempt to curb the violator.  However, her emergency lights and siren had been activated before she turned northbound, not after.  Exhibit GG (FAS00291).  This response is also incorporated into Ford, ¶ 28; Tate, ¶ 28; and Nelson, ¶ 27.

28.     Admitted.  This response is also incorporated into Ford, ¶ 30; Tate, ¶ 30; and Nelson, ¶ 28.

29.     Admitted.  By way of further answer, see ¶ 42 below.

30.     Admitted.  By way of further answer, see ¶ 36 below.

31.     Admitted.

32.     Admitted.  By way of further answer, the investigation, to include photographs of the Normandie Golf Course support this account.  See ¶¶ 292-93 below.  This response is also incorporated into Ford, ¶ 31; Tate, ¶ 31; and Nelson, ¶ 29.

33.     Admitted but irrelevant in light of Bel Nor policy and practice.  By way of further answer, Bernsen authorized the pursuit by allowing it to continue.  Exhibit 4, 123:19-23.  Bel Nor's policy allows a fresh pursuit to be carried out of the Village for a dangerous felony.  Exhibit 4, 121:6-11.  See also Exhibit R, § 312.6 (VBN00245).  Even Ford admitted that when Officer Steven Kimbrell (hereinafter "Kimbrell") was involved in a pursuit, and he was the immediate supervisor, he did not specifically authorize the pursuit.  He just did not tell Kimbrell to terminate or disengage the pursuit.  Exhibit 3, 192:22-193:1.

34.     Shelton admits that she did not notify dispatch that she was initiating the pursuit for the assault upon her.

35.     Objection because vague, confusing, and misleading.  Without wavier of the foregoing objection, Plaintiffs admit that failing to yield is a traffic violation if this is what the Village claims.

36.     Admitted.  By way of further answer, according to Ford, if the pursuit happened as Shelton described it, it was a justified pursuit.  Exhibit 3, 197:3-9.  Tate agreed that if the pursuit happened as Shelton described it, it was a valid pursuit.  Exhibit 2, 113:15-19.

37.     Objection, Exhibit B is not properly cited.  By way of further answer Ford permitted a pursuit to continue by not telling Kimbrell to terminate it.  See ¶ 33 above.

38.     Admitted.  By way of further answer, Bernsen did not have time to determine whether the pursuit was valid or invalid.  During the pursuit, he was trying to gather information to determine what was going on. With the information he had, he could not determine whether the pursuit was valid before it was naturally terminated.  Exhibit 4, 231:9-22.

39.     Denied.  Exhibit B, p. 109 does not stand for the proposition set forth.

40.     Plaintiffs admit that Tate investigated Shelton's June 4, 2010 pursuit, not a June 6,

2010 pursuit.  See Exhibit II.  By way of further answer, Exhibit HH shows that Tate and Ford concluded that Shelton violated the Department's pursuit policy **before** the internal investigation was completed.  This response is also incorporated into Ford, ¶ 33; Tate, ¶ 33; and Nelson, ¶ 30.

41.     Admitted.  This response is also incorporated into Ford, ¶ 34; Tate, ¶ 34; and Nelson, ¶ 31.

42.     Admitted.  By way of further answer, Shelton told Bernsen as soon as he pulled up next to her on the street that the other car attempted to hit her head on.  This occurred right after Shelton lost sight of the vehicle.  Exhibit 4, 118:16-119:4.  This response is also incorporated into Ford, ¶ 35; Tate, ¶ 35; and Nelson, ¶ 32.

43.     Objection vague.  Subject to this objection, admitted as to what Shelton reported during the radio transmissions only.  See also ¶ 42 above.  This response is also incorporated into Ford, ¶ 36; Tate, ¶ 36; and Nelson, ¶ 33.

44.     Admitted.  This response is also incorporated into Ford, ¶ 37; Tate, ¶ 37; and Nelson, ¶ 34.

45.     Admitted that Tate concluded this.  According to Bernsen this would be true on a straight highway, but there are a lot of circumstances that factor into how to catch a vehicle.  Exhibit 4, 132:5-9.  See also ¶ 295 below.  This response is also incorporated into Ford, ¶ 38; Tate, ¶ 38; and Nelson, ¶ 35.

46.     Admitted.  This response is also incorporated into Ford, ¶ 39; Tate, ¶ 39; and Nelson, ¶ 36.

47.     Denied.  Both Tate and Ford testified that a pursuit consistent with Shelton's description of it would not violate Bel Nor's pursuit policy.  See ¶ 36 above.  Bernsen, the supervising officer, also testified that Shelton did not violate Bel Nor's pursuit policy.  Exhibit 4,

118:16-20.  See also ¶ 33 above.  This response is also incorporated into Ford, ¶ 40; Tate, ¶ 40; and Nelson, ¶ 37.

48.     Admitted that Tate testified to this.  However, Exhibit II (FAS 00238) shows that Tate recommended termination.  This response is also incorporated into Ford, ¶ 41; Tate, ¶ 41; and Nelson, ¶ 38.

49.     Admitted that Exhibit II speaks for itself.  By way of further answer, these allegations were nothing but pretext for illegal discrimination and retaliation because the pursuit did not violate Bel Nor policy.  See ¶ 47 above.  Additionally, Shelton did not engage in reckless driving a month before the pursuit (See ¶¶  279-82 below), and Shelton was not charged with lying in her memo about the pursuit (See Exhibit 7).  While Shelton may have identified the color of the suspect car incorrectly, this would not be a dischargeable offense. This response is also incorporated into Ford, ¶ 42; Tate, ¶ 42; and Nelson, ¶ 39.

50.     Admitted that Shelton was fired on June 30, 2010, the remaining allegations are denied for the reasons set forth in ¶ 49 above.  This response is also incorporated into Nelson, ¶ 40.

51.     Denied.  See ¶ 270 below .  This response is also incorporated into Nelson, ¶ 41.

52.     Denied.  According to Tate, Nelson told Tate he wanted Shelton to be suspended for 2 days before Tate's investigation began.  Exhibit 2, 101:16-23.  This is the discipline Shelton received.  Village's Statement of Undisputed Material Facts, ¶ 23.  Nelson admitted that he was consulted on Shelton's termination, and that her termination was discussed at length. Exhibit 5, 27:1-12.  This response is also incorporated into Nelson, ¶ 42.

53.     Denied.  Exhibit G, 27:7-12 does not stand for the proposition cited, as Nelson conveniently testified that he could not recall if he recommended Shelton's termination first or

Ford did.  Therefore, Nelson's testimony at Exhibit G, 99:18-24 (in which he states he only concurred in Tate or Ford's recommendation) conflicts with his own testimony.  See also ¶ 64 below.  Paragraph 53 conflicts with ¶ 54 because Nelson cannot be both uninvolved in Shelton's termination and concur in it.  This response is also incorporated into Nelson, ¶ 43.

54.     Admitted in part.  The Charge was filed on August 11, 2010.  This response is also incorporated into Ford, ¶ 44; Tate, ¶ 44; and Nelson, ¶ 44.

55.     Admitted.   This response is also incorporated into Ford, ¶ 46; Tate, ¶ 46; and Nelson, ¶ 45.

56.     Admitted.  This response is also incorporated into Nelson, ¶ 46.

57.     Exhibit M does not include a right to sue letter from the MCHR.  However, Shelton admits that she received a right to sue letter from the MCHR on September 21, 2010.  This response is also incorporated into Ford, ¶ 48; Tate, ¶ 48; and Nelson, ¶ 47.

58.      Admitted.  This response is also incorporated into Ford, ¶ 49; Tate, ¶ 49; and Nelson, ¶ 48.

59.     Denied.  Tate admitted that Nelson told Tate he wanted Shelton to be suspended for 2 days before Tate had even investigated Nelson's allegations against her, which was a discussion with Tate about Shelton's employment.  Exhibit 2, 101:16-23.   This response is also incorporated into Nelson, ¶ 49.

60.     Admitted that Steven Goodwin's (hereinafter "Goodwin") employment was terminated.  Denied that Goodwin engaged in an improper pursuit.  He was terminated for complaining to Ford and Tate after Ford reneged on his promised to Goodwin to make him lieutenant.  Exhibit 8, ¶¶ 12-14.  This response is also incorporated into Ford, ¶ 62; Tate, ¶ 61; and Nelson, ¶ 50.

11

61.     Admitted in part.  More specifically, Cydney Schaefer (hereinafter "Schaefer") was suspended for engaging in the improper pursuit.  According to Ford, this chase involved an abandoned vehicle fleeing into Pagedale and the driver exiting the vehicle without it being in park.  Exhibit 3, 124:19-21.  Denied that the pursuit was improper.  See ¶ 60 above.  This response is also incorporated into Ford, ¶ 63; Tate, ¶ 62; and Nelson, ¶ 51.

62.     Admitted that Ford claimed that Sgt. Steven Bishop (hereinafter "Bishop") was given a counseling form that was placed in his file for a year after he admitted to engaging in an illegal pursuit.  By way of further answer, Ford also testified that no investigation was conducted into the Bishop pursuit and that Bishop was given a "talking to" about what pursuit was and not to do it.  Exhibit 3, 186:10-15.  Tate testified that no report was prepared on this pursuit, in violation of Department policy. Exhibit Z.  See also Exhibit R, § 312.8 (VBN00247), which requires both the pursuing officer and the Department's Review Board to prepare reports on any pursuit.  This response is also incorporated into Ford, ¶ 64; Tate, ¶ 63; and Nelson, ¶ 52.

63.     Denied.  When Ford showed the pornography to Bryan Hughes (hereinafter "Hughes"), he referred to the pornography as his.  Exhibit 9, 85:13-22.  Tate testified that Ford had been keeping "adult magazines" at the police station since he started working there.  Exhibit 2, 74:20-75:1.  Even Ford admitted that he had ten "adult magazines" at the Bel Nor Police Department: Club, Hustler, and Playboy.  Exhibit 3, 23:1-10.  He further testified that he has been chief since the day before Thanksgiving 2008 and had been keeping "adult magazines" at the station for as long as he has been chief.  Exhibit 3, 26:17-23.  This response is also incorporated into Nelson, ¶ 53.

64.     Denied.  Ford, Tate and Nelson have all admitted that they were part of the decision to terminate Shelton.  See Exhibit II (FAS 00238) in which Tate recommended

12

Shelton's termination and Ford imposed the termination recommended (FAS00239).  See also ¶ 52 above, in which Nelson admitted that he discussed Shelton's termination with Ford at length.  Nelson also testified that he was asked to ratify any dismissal in the Department.  Exhibit 5, 22:9-12.  This response is also incorporated into Nelson, ¶ 54.

65.     Denied.  Shelton actually testified that she had no specific knowledge of Nelson's involvement in her termination but that Ford told her that anything that happens in the Department has to go through Nelson, Exhibit B, 390:13-19.  Shelton also testified she believed Nelson was involved in her discharge because Ford told her he was involved in her earlier write-up.  Exhibit 1, 389:15-24.  More importantly, Nelson **admitted** his involvement in Shelton's termination.  See ¶ 64 above.[5]  This response is also incorporated into Nelson, ¶ 55.

66.     Admitted that Shelton testified that when blacks applied to the Bel Nor Police Department they were not given the time of day.  Denied that this is the only evidence that Shelton has that the Defendants discriminate against African American females.  By way of further response, see ¶¶ 196-216 below which are incorporated by reference herein.  This response is also incorporated into Nelson, ¶ 56.

67.     No statement of fact is set forth at ¶ 67.

68.     Admitted that Schaefer, who remains employed by Bel Nor stated this.  By way of further answer, both Hughes and Shelton heard Ford refer to Schaefer as a "bitch," a derogatory reference to females.  Exhibit 9, 109:2-6 & Exhibit 1, 138:6-25 & 255:18-21.  Hughes also testified that Ford referred to Schaefer using the "N" word when Schaefer wasn't present.  Exhibit 9, 142:8-12.  This response is also incorporated into Ford, ¶ 67; Tate, ¶ 66; and Nelson, ¶ 57 .

69.     See ¶ 68 above, which is incorporated by reference herein.  By way of further

---

[5] Ford, Tate, and Nelson's depositions do not stand for the proposition cited: Shelton's knowledge.

response, see ¶¶ 246 & 253 below.  This response is also incorporated into Ford, ¶ 68; Tate, ¶ 67; and Nelson, ¶ 58.

70.     Admitted that this is what Schaefer has stated.  By way of further answer, both Hughes and Shelton were present when Ford claimed that Schaefer filed an EEOC complaint. Exhibit 9, 103:1-4, 104:13-15, & 106:18-23 & Exhibit 1, 138:6-25 & 255:18-21.  This response is also incorporated into Ford, ¶ 69; Tate, ¶ 68; and Nelson, ¶ 59.

71.     Admitted but irrelevant.  Shelton and Schaefer did not even work together. Exhibit 2, 52:6-17.  This response is also incorporated into Ford, ¶ 70; Tate, ¶ 69; and Nelson, ¶ 60.

**Plaintiff Bernsen**

72.     Admitted.  This response is also incorporated into Ford, ¶ 71; Tate, ¶ 70; and Nelson, ¶ 61.

73.     Admitted.  This response is also incorporated into Ford, ¶ 72; Tate, ¶ 71; and Nelson, ¶ 62.

74.     See Objection set forth in paragraph 2, which is incorporated herein.  Subject to and without waiver of the foregoing objection, admitted.  By way of further answer, after Ford permanently became Chief (and therefore, after 2/13/07), Bernsen was promoted to the rank of sergeant by Ford, showing that this incident was not significant until after Bernsen engaged in protected activity.  Exhibit 10, ¶ 5.  This response is also incorporated into Ford, ¶ 73; Tate, ¶ 72; and Nelson, ¶ 63.

75.     Admitted.  By way of further answer, Tate and Nelson were also aware of Ford's pornography at the station and did nothing.  Exhibit 2, 74:20-75:1 & Exhibit 1, 423:10-20.  This response is also incorporated into Ford, ¶ 74; Tate, ¶ 73; and Nelson, ¶ 64.

14

76.     Plaintiffs admit that after Ford mistakenly believed that Shelton filed an EEOC complaint against the department, Ford prepared a memo about Bernsen and Shelton, which speaks for itself.  See ¶¶ 349-352 below.  By way of further answer, in this memo Ford expressed concern that Shelton might be providing Trustee Kries with information about the Department and Ford.  Exhibit Y (FAS00320).  By way of further answer, Ford did nothing to change Bernsen's supervision of Shelton despite these purported serious concerns.  Exhibit 3, 146:10-20.  Ford further claimed that none of the incidents documented in his March 28, 2010 memo resulted in Shelton or Bernsen being written up or disciplined.  Exhibit 3, 155:13-20.  This response is also incorporated into Ford, ¶ 75; Tate, ¶ 74; and Nelson, ¶ 65.

77.     Admitted.  By way of further answer, Bernsen wore his body armor on a daily basis after this memo was issued and any allegation that he was not wearing his body armor on duty was false.  Exhibit 4, 168:19-169:7, 171:10-19, 174:24-175:2 & 189:24-190:4.  This response is also incorporated into Ford, ¶ 76; Tate, ¶ 75; and Nelson, ¶ 66.

78.     Admitted.  See also ¶ 77 above.  This response is also incorporated into Ford, ¶ 77; Tate, ¶ 76; and Nelson, ¶ 67.

79.     See Objection set forth in paragraph 2, which is incorporated herein.  Subject to and without waiver of the foregoing objection, denied.  Exhibit OO does not stand for the proposition cited as it has nothing to do with a larceny report submitted by Bernsen.  Exhibit PP is a report submitted by Shelton, not Bernsen.  This response is also incorporated into Ford, ¶ 78; Tate, ¶ 77; and Nelson, ¶ 68.

80.     See Objection set forth in paragraph 2, which is incorporated herein.  By way of further response, objection and denied.  The 4/12/10 police report, which is in Defendants' exclusive possession and control, is the best evidence of the mistakes claimed by Ford and has

not been produced.  This response is also incorporated into Ford, ¶ 79; Tate, ¶ 78; and Nelson, ¶ 69.

81.     See Objection set forth in paragraph 2, which is incorporated herein.  By way of further response, objection and denied.  The 4/12/10 police report, which is in Defendants' exclusive possession and control, is the best evidence of the mistakes claimed by Ford and has not been produced.  This response is also incorporated into Ford, ¶ 80; Tate, ¶ 79; and Nelson, ¶ 70.

82.     See ¶ 81 above.  This response is also incorporated into Ford, ¶ 81; Tate, ¶ 80; and Nelson, ¶ 71.

83.     Admitted.  This response is also incorporated into Ford, ¶ 83; Tate, ¶ 82; and Nelson, ¶ 72.

84.     Admitted.  By way of further answer, Bernsen explained that when a pursuit lasts 60 seconds to a minute and a half, authorizing it after it is over is timely authorization as required by Department policy.  He cannot terminate a pursuit before he figures out why the pursuit is occurring. Exhibit 4, 184:3-4 & 186:24-187:10.  Ford also admitted that he did not terminate a pursuit by Kimbrell but permitted it to continue by not terminating it.  Exhibit 3, 192:22-193:1.  This response is also incorporated into Ford, ¶ 84; Tate, ¶ 83; and Nelson, ¶ 73.

85.     Denied because Department policy prohibits fresh pursuit into another jurisdiction except in the case of a dangerous felony, which had been committed when the car attempted to hit Shelton.  Exhibit R, § 312.6(1)(B) (VBN00245).  The policy does not require permission to go into another jurisdiction only for the supervisor to evaluate continuation of the pursuit.  *Id.* See also Exhibit GG (FAS00291).  This response is also incorporated into Nelson, ¶ 74.

86.     Admitted that Bernsen helped Shelton prepare some portions of the report, such

as how to enter the stolen vehicle, fingerprints, and how to upload the pictures taken into the report.  Bernsen also lifted the prints from the stolen car.  Denied that Shelton testified that Bernsen assisted her in preparing the narrative portion of the report.  Exhibit B, 63:12-18 & 65:20-66:13.  Since neither Tate, nor Ford, ever interviewed Bernsen or Shelton about the pursuit, there would be no way for them to know or conclude that Shelton and Bernsen prepared the police report together, and therefore, Plaintiffs object to Exhibits JJ as lacking a foundation. Exhibit RR does not stand for the proposition set forth.  This response is also incorporated into Ford, ¶¶ 32 & 87; Tate, ¶ 32 & 86; and Nelson, ¶ 75.

87.    Bernsen admits that he received Exhibit RR but denies the allegations set forth in it.  Bernsen further denies that the written complaint was about his "violations of jurisdiction" (whatever that means) as Exhibit RR does not stand for the proposition cited.  By way of further answer Exhibit RR found that Bernsen violated Department policy, which requires a supervisor to "respond to the pursuit when practical, but must respond to the scene of the arrest." Therefore, Bernsen responding to the scene of the pursuit could not violate Department policy. Admit that Bernsen responded to the pursuit.  Village's Statement, ¶ 83.  Bernsen denies that JJ was provided to him, it was provided to Nelson.  This response is also incorporated into Ford, ¶ 89; Tate, ¶ 88; and Nelson, ¶ 76.

88.    Denied.  Bernsen admits that additional allegations were included by Tate and Ford in Complaint 2010-4, which was prepared after Bernsen engaged in protected activity, but Exhibit RR does not stand for the proposition cited,  as the only discipline Bernsen incurred was a reduction in rank and period of probation for alleged improper supervision, not an additional reprimand for other alleged infractions.  Exhibits RR and TT.  This response is also incorporated into Ford, ¶ 90; Tate, ¶ 89; and Nelson, ¶ 77.

89.     Admitted that Tate recommended that Bernsen be demoted and Ford concurred in this recommendation after Bernsen engaged in protected activity.  Exhibit RR.   Denied that this recommendation was made on June 5, 2010 as Defendant's claim, unless Defendants are admitting that this recommendation was made before they completed their investigation, as Exhibit RR shows that the radio transmissions were not reviewed until June 7, 2010.  Exhibit RR (JB00028).  Bernsen also denies that the reasons for his demotion were proper.  He testified that he did not improperly supervise the Shelton pursuit.  Exhibit 4, 182:6-8.  This response is also incorporated into Ford, ¶ 91; Tate, ¶ 90; and Nelson, ¶ 78.

90.     Admitted that Exhibit R, § 6.03(V) speaks for itself.  By way of further answer, according to Ford, Shelton and Bernsen had violated § 6.03(V) without discipline before they engaged in protected activity by talking to Trustees Dee and Kries.  Exhibit JJ (FAS00323). Additionally, the Village/Department's sexual harassment policy does not provide a reporting mechanism other than to a subordinate when the Chief of Police is accused of sexual harassment. Exhibit R, § 14.03 (VBN00122).  This response is also incorporated into Nelson, ¶ 79.

91.     Admitted.  By way of further answer, Shelton also spoke to Dee about Ford's pornography at the police station, as well as about Ford calling her the "N" word and shoving her up against a locker (although he could not remember if Ford or Tate engaged in this conduct). Exhibit 12, 13:16-14:3 & Exhibit 1, 13:9-17; 15:8-10; & 5:16:6-15.  This response is also incorporated into Ford, ¶ 92; Tate, ¶ 91; and Nelson, ¶ 80.

92.     Bernsen admits receiving Complaint 2010-6, Exhibit SS.  However, he denies that he received  this complaint on June 24, 2010 because it references events that allegedly occurred on July 5, 6, and 9, 2010, which could not have been included in Complaint 2010-6 unless it was written after the events occurred.  Bernsen denies the allegations contained in Complaint 2010-6

or that he violated Department policy.  See e.g. ¶ 77.  See also ¶¶ 312-16 below.  This response is also incorporated into Ford, ¶ 96; Tate, ¶ 95; and Nelson, ¶ 81.

93.      Admitted that Bernsen was demoted and placed on 6 months probation.  Denied that Bernsen failed to adequately supervise the pursuit.  See ¶ 89 above.  It is also once again denied that this pursuit occurred on June 5, 2010.  This response is also incorporated into Ford, ¶ 97; Tate, ¶ 96; and Nelson, ¶ 82.

94.      Bernsen admits that as part of the ongoing retaliation against him for engaging in protected activity that on June 9, 2010, Sgt. Derek Owens issued a Corrective Action against him as set forth in Exhibit UU, which Bernsen testified was unfair discipline.  Exhibit 4, 207:19-208:8.  By way of further answer, Bernsen admitted that he was disciplined fairly when he failed to properly patrol a district resulting in the failure to detect a crime as set forth in ¶ 74 above.  Exhibit 4, 201:3-8.  This response is also incorporated into Ford, ¶ 98; Tate, ¶ 97; and Nelson, ¶ 83.

95.      Bernsen admits that as part of the ongoing retaliation against him for engaging in protected activity, he received a Corrective Action from Tate on July 6, 2010.  By way of further answer, this Corrective Action was unfair because all of the officers were behind on their tests.  Exhibit 4, 210:21-211:11.  This response is also incorporated into Ford, ¶ 99; Tate, ¶ 98; and Nelson, ¶ 84.

96.      Bernsen admits that as part of the ongoing retaliation against him for engaging in protected activity, he received a Corrective Action from Tate at Ford's request on July 9, 2010.  This response is also incorporated into Ford, ¶ 100; Tate, ¶ 99; and Nelson, ¶ 85.

97.      Admitted that the Notice of Allegations was issued to Bernsen.  Denied that the allegations are true or that Bernsen violated Department policy.  See ¶¶ 312-16 below.  This

response is also incorporated into Ford, ¶ 101; Tate, ¶ 100; and Nelson, ¶ 86.

98.    Admitted that Exhibit R, Rule 6.09 gives the Chief the right and responsibility to impose discipline to include termination.  Denied that Ford was the sole person who terminated Bernsen's employment as Tate and Nelson participated in this decision by recommending Bernsen's termination. Exhibit 2, 42:11-20 & Exhibit 5, 12:23-20:14  See also Exhibit 5, 21:3-15 in which Nelson testified that "we" demoted him (Bernsen) first. This response is also incorporated into Ford, ¶ 113; Tate, ¶ 112; and Nelson, ¶ 87.

99.    Admitted that Bernsen was fired on July 12, 2010 but denied that it was for the reasons set forth by Defendants or that Bernsen violated Department policy.  See also ¶¶ 312-16 below .  This response is also incorporated into Ford, ¶ 102; Tate, ¶ 101; and Nelson, ¶ 88.

100.    Admitted in part.  This Charge was filed on August 11, 2010.  This response is also incorporated into Ford, ¶ 103; Tate, ¶ 102; and Nelson, ¶ 89.

101.    Admitted.  This response is also incorporated into Ford, ¶ 105; Tate, ¶ 104; and Nelson, ¶ 90.

102.    Admitted.  This response is also incorporated into Ford, ¶ 107; Tate, ¶ 106; and Nelson, ¶ 91.

103.    Admitted.  This response is also incorporated into Ford, ¶ 108; Tate, ¶ 107; and Nelson, ¶ 92.

104.    Admitted.  This response is also incorporated into Ford, ¶ 109; Tate, ¶ 108; and Nelson, ¶ 93.

105.    Denied.  See ¶¶ 178 & Plaintiffs' Statement of Additional Material Facts below. This response is also incorporated into Nelson, ¶ 94.

106.    Admitted as to Bernsen's testimony, an individual untrained in the law.  Denied

that there are no facts to show that Nelson took any action to get Bernsen terminated when Nelson admitted that he recommended Bernsen's termination, which admission occurred after Bernsen's deposition.  See ¶ 98 above.  This response is also incorporated into Nelson, ¶ 95.

107.    Denied.  See ¶¶  312-316 below.  This response is also incorporated into Nelson, ¶ 96.

108.    Denied.  Exhibit Y is dated March 28, 2010, not 2009.  By way of further answer, see ¶ 76 above and ¶¶ 304-05 below.  This response is also incorporated into Nelson, ¶ 97.

109.    Denied.  Exhibit G, 57 does not stand for the proposition cited.  The actual question posed was "Are you aware that at some point in time Scott Ford was storing adult magazines at the police station?"  Nelson's answer was "No."   This response is also incorporated into Nelson, ¶ 98.

110.    See response to ¶ 105 above for Plaintiffs' response to this redundant statement.  This response is also incorporated into Nelson, ¶ 99.

111.    Admitted but irrelevant.  This response is also incorporated into Nelson, ¶ 100.

112.    Admitted that Bernsen did not see this disparate treatment himself.  However, he was aware of such treatment as a result of comments made to him by Ford.  Exhibit C, 28:5-24.  By way of further answer Bernsen testified that Ford treated the female officers different from the male officers.  Ford believed female officers could not handle certain situations, so he would have a male officer accompany the females on certain prisoner transports and he would make sure a male officer was with a female or have a male officer handle certain calls.  Exhibit 4, 231:23-233:3.

113.    Admitted in part and denied in part.  Bernsen actually testified that Shelton never complained about being harassed by Ford prior to the EEOC incident. He further testified that

she did not complain about race discrimination before this incident, but she did complain to him about gender discrimination and his attitude towards women prior to the EEOC incident.  Exhibit C, 23:7-24, 24:8, 24:25-25:1, 25:17-23.

**Plaintiff Hughes**

114.     Admitted.  By way of further answer, Hughes applied to the Bel Nor Police Department after Ford called him on several occasions to come work for him as a part-time officer.  Ford had him write a letter of application to Bel Nor.  To his knowledge, the job was never posted.  Ford also promised Hughes full-time hours in the position and told Hughes he wanted him in the position because he needed the help and Hughes had experience.  Exhibit 9, 8:8-9:8; 16:15-17:10; & 19:5-7.  This response is also incorporated into Ford, ¶ 114; Tate, ¶ 119; and Nelson, ¶ 101.

115.     Admitted in part.  Exhibit ZZ actually states that Hughes began his employment with Bel Nor on February 15, 2010, not February 14.  However, there is no dispute that Hughes was employed by the Bel Nor Police Department.  This response is also incorporated into Ford, ¶ 115; Tate, ¶ 120; and Nelson, ¶ 102.

116.     See Objection set forth in paragraph 2, which is incorporated herein.  Subject to and without waiver of the foregoing objection, Plaintiffs admit that AAA is part of a document evaluating Hughes relating to his field training.  Hughes was released from training as qualified by Ford the same day.  Exhibit 11.  This response is also incorporated into Ford, ¶ 116; Tate, ¶ 121; and Nelson, ¶ 103.

117.     See Objection set forth in paragraph 2, which is incorporated herein.  Subject to and without waiver of the foregoing objection, admitted that Report 10-214 speaks for itself.  Denied that the officers were not trained for this activity or that they needed permission to

engage in this enforcement activity.  See Exhibit 10, ¶ 7.  By way of further answer, there is no

evidence that Bernsen or Hughes were disciplined for this activity, showing that there was

nothing inappropriate about it.  This response is also incorporated into Ford, ¶ 117; Tate, ¶ 122;

and Nelson, ¶ 104.

118.    Admitted.  By way of further answer, Hughes was dispatched to respond to the

station where Ford and Nelson were discussing Shelton.  They asked Hughes to agree that

Shelton was the problem and that everything was out of control but if they could get rid of

Shelton everything would be okay.  Then Ford told Hughes, "if we got rid of Shelton, I wouldn't

hire another part-time officer.  What we'd do is make you the full-time officer."  Hughes made it

clear he was not going to be a part of getting rid of Shelton. Exhibit D, 143:3-144:6.  Exhibit H

does not stand for the proposition cited.  This conversation took place 2 days after the

pornography was reported to Dee.  See ¶ 266 below.  This response is also incorporated into

Nelson, ¶ 105.

119.    Admitted that Hughes testified that Ford and Nelson never told him to take an

active part in trying to get rid of Shelton.  However, this is what he understood from the

conversation. Exhibit D, 144:7-9.  See also ¶ 118 above in which Hughes made it clear that he

was not going to be a part of any plan to get rid of Shelton. This response is also incorporated

into Nelson, ¶ 106.

120.    See response to ¶ 116 for the response to this redundant statement.  This response

is also incorporated into Nelson, ¶ 107.

121.    Admitted that Ford made this self-serving claim.  However see Exhibit 3, 170:13-

171:2, in which Ford testified that by the June 9, 2010 memo, it was his opinion that morale was

a problem because Bernsen, Shelton, and Hughes had alienated themselves from everyone else in

23

the department and banded together, showing that Ford knew that the three were acting in concert.  This response is also incorporated into Ford, ¶ 119; Tate, ¶ 124; and Nelson, ¶ 108.

122.    See response to ¶ 91 which is incorporated by reference herein.  This response is also incorporated into Ford, ¶ 118; Tate, ¶ 123; and Nelson, ¶ 109.

123.    Denied and irrelevant.  Exhibit CC does not stand for the proposition set forth but it a police report prepared by Shelton.  This response is also incorporated into Ford, ¶ 120; Tate, ¶ 124; and Nelson, ¶ 110.

124.    Admitted.  This response is also incorporated into Ford, ¶ 121; Tate, ¶ 126; and Nelson, ¶ 111.

125.    Admitted that Bishop contacted Ford about Hughes.  By way of further response, Ford had recently promoted Bishop to sergeant, even though Bishop had less than a year's experience in law enforcement.  Exhibit 9, 159:11-15 & 172:6-14.  This response is also incorporated into Ford, ¶ 122; Tate, ¶ 127; and Nelson, ¶ 112.

126.    Objection as to hearsay because the statement at issue purportedly made by Hughes is not an admission or declaration against interest and Bishop's report is not a sworn declaration.  Without waiver of the foregoing objection, denied.  Hughes questioned why he was writing the report when he did not have control of the call.  He did not refuse to write the report. He was questioning the report because he was concerned he was being set up to take a false report because reports are not usually written on verbal disturbances, and he did not have any of the information because Bishop talked to the individuals involved while he remained on the street.  Exhibit 9, 158:18-159:5; 161:9-162:8; &163:10-18.  This response is also incorporated into Ford, ¶ 123; Tate, ¶ 128; and Nelson, ¶ 113.

127.    Objection as to hearsay because the statement at issue purportedly made by

24

Hughes is not an admission or declaration against interest and Bishop's report is not a sworn

declaration.  Without waiver of the foregoing objection, denied.  Back at the station Hughes

explained to Bishop that the issue he had was being asked to make a report when he could not

testify to the facts and circumstances of the situation, and therefore, he questioned what he was

supposed to put in the report.  Hughes said he would take the report but that he would have to put

in it Bishop's statements.  Bishop did not order Hughes to take the report and told Hughes, he

would take the report.  Exhibit 9, 162:11-165:4.  This response is also incorporated into Ford, ¶

124; Tate, ¶ 129; and Nelson, ¶ 114.

      128.    Admitted that Bishop made this statement but irrelevant.  This response is also

incorporated into Ford, ¶ 125; Tate, ¶ 133; and Nelson, ¶ 115.

      129.    Objection hearsay as to what Bishop stated to Ford and Tate.  Without waiver of

the foregoing objection, Plaintiffs admit that Exhibit EEE makes such a claim.  This response is

also incorporated into Ford, ¶ 126; Tate, ¶ 131; and Nelson, ¶ 116.

      130.    Once again Exhibit DDD does not stand for the proposition set forth.  However,

Hughes admits that he was called into the station by Tate, but denies that he was insubordinate to

Bishop.  By way of further answer, before giving Hughes a stern lecture on respecting his

sergeant and insubordination, Tate did no investigation to confirm Bishop's version of the

events.  Exhibit 2, 98:21-99:7.  This response is also incorporated into Ford, ¶ 127; Tate, ¶ 132;

and Nelson, ¶ 117.

      131.    See ¶ 130 above, which is incorporated by reference herein.  This response is also

incorporated into Ford, ¶ 128; Tate, ¶ 129; and Nelson, ¶ 118.

      132.    Admitted.  However, Exhibit DDD does not stand for the proposition set forth.

This response is also incorporated into Ford, ¶ 129; Tate, ¶ 134; and Nelson, ¶ 119.

133.    Exhibit DDD does not stand for the proposition set forth.  By way of further answer, Hughes explained to Tate he would not write the memo he was being directed to write because Tate was asking Hughes to say he did something he did not do.  Hughes then tried to explain the facts and circumstances of the call and why he could not take the report, which only enraged Tate.  Exhibit 9, 167:10-20.  By way of further answer, Tate was yelling and screaming at Hughes.  When Hughes stood up, Tate chest bumped Hughes backwards and asked Hughes if he thought he was tough and wanted to take Tate on.  Hughes told Tate he needed to calm down because he was blowing the situation way out of proportion.  Exhibit 9, 168:2-8.  This response is also incorporated into Ford, ¶ 130; Tate, ¶ 135; and Nelson, ¶ 120.

134.    Denied.  Tate told Hughes he had resigned and wanted his gun and badge, Hughes told Tate that he did not care what Tate said, he was not resigning.  Exhibit 9, 174:21-175:6.  Even Tate could not recall if Hughes said he quit during this exchange.  Exhibit 2, 96:4-6.  Once again, Exhibit DDD does not stand for the proposition cited.  This response is also incorporated into Ford, ¶ 131; Tate, ¶ 136 & 177; and Nelson, ¶ 121.

135.    Admitted that Tate seized Hughes' recorder.  By way of further answer, the same tape recorder was used by Hughes to tape record the conversation between Hughes and Tate, which would have established the exchange between Tate and Hughes.[6]  Exhibit 9, 209:24-210:24.  Denied that Hughes was abusive or insubordinate to Bishop.  See ¶¶ 126-27 above and ¶ 390 below.  This response is also incorporated into Ford, ¶ 132; Tate, ¶ 137; and Nelson, ¶ 122.

136.    Exhibit DDD does not stand for the proposition cited.  However, Plaintiffs admit that Ford responded to the station after Tate's confrontation with Hughes.  By way of further answer, Ford directed Tate to come to his house and then he and Tate returned to

---

[6] Defendants never produced the recording of the conversation between Tate and Hughes, claiming it was not on the recorder, presumably because it would have shown that it was Tate who was hostile and abusive towards Hughes, as Hughes claimed.

the station together.  Exhibit 3, 208:3-13.  This response is also incorporated into Ford, ¶ 133; Tate, ¶ 138; and Nelson, ¶ 123.

137.    Admitted that Ford claims to have come to this conclusion.  By way of further answer, Dee, who is impartial, reviewed the same video and concluded that the video was inconclusive as to whether Tate assaulted Hughes.  Exhibit 12, 24:8-16.  Cf. Exhibit EEE in which Tate and Ford claim that Dee concurred that no assault had taken place.  Dee also brought Hughes' allegation against Tate to the Board and told the Board it needed to be investigated. Nelson claimed the video proved that Hughes was lying, while Dee explained that it did not prove anything because you couldn't see whether or not the two came into contact with each other on the video.  Exhibit 12, 24:17-25:12.  Exhibit DDD does not stand for the proposition cited.  This response is also incorporated into Ford, ¶ 134; Tate, ¶ 139; and Nelson, ¶ 124.

138.    Plaintiffs admit that Trustees Dee and Kreis responded to the Bel Nor police station.  However, nothing in Exhibits DDD or EEE explains why the trustees responded to the station.  This response is also incorporated into Ford, ¶¶ 95 & 138; Tate, ¶ 94 & 140; and Nelson, ¶ 125.

139.    Denied.  See ¶ 137 above.  This response is also incorporated into Ford, ¶ 136; Tate, ¶ 141; and Nelson, ¶ 126.

140.    Exhibit F at page 96 does not stand for the proposition cited.  However, Hughes admits that he worked two days after Tate falsely claimed that he resigned.  This response is also incorporated into Ford, ¶ 137; Tate, ¶ 142; and Nelson, ¶ 127.

141.    Objection because vague and confusing.  Subject to this objection, if Defendants are claiming that Hughes refused to write a memo of the incidents involving Bishop and Tate after Hughes was reinstated, denied as Exhibit F at pages 89-90 and 100 does not stand for this

27

proposition.  This response is also incorporated into Ford, ¶ 138; Tate, ¶ 143; and Nelson, ¶ 128.

142.    Admitted but irrelevant.  This response is also incorporated into Ford, ¶ 139; Tate, ¶ 144; and Nelson, ¶ 129.

143.    Denied.  Exhibits EEE, F at page 94, and E at page 210 do not stand for the proposition cited that Hughes could be heard arguing with Bishop, but only that Owens, Ford, and Tate listened to the recording.  By way of further answer see ¶ 390 below.  This response is also incorporated into Ford, ¶ 140; Tate, ¶ 145; and Nelson, ¶ 130.

144.    Objection as to vague and confusing.  Without waiver of this objection, admitted that Ford claimed to have previously not known the extent of Hughes' insubordination but denied that Hughes was insubordinate.  See ¶ 390 below.  This response is also incorporated into Ford, ¶ 141; Tate, ¶ 146; and Nelson, ¶ 131.

145.    Admitted that Ford and Tate claimed that Hughes was insubordinate after engaging in protected activity, but denied that Hughes was insubordinate.  See ¶¶ below.  This response is also incorporated into Ford, ¶ 142; Tate, ¶ 147; and Nelson, ¶ 132.

146.    Admitted that Tate recommended Hughes termination.  Denied that Hughes was insubordinate or violated the Department's policies.  By way of further answer, Tate was permitted to investigate Hughes and prepare the report even though he knew Hughes accused him of assault.  Exhibit 2, 91:24-92:5.  Ford testified that he recommended Hughes termination, but this sworn statement is refuted by Exhibit EEE (BEH00029).  Exhibit 3, 214:2-10.  This response is also incorporated into Ford, ¶ 143; Tate, ¶ 148; and Nelson, ¶ 133.

147.    Admitted that Ford terminated Hughes on July 7, 2010.  Denied as to reasons for this termination, see ¶¶ below.  This response is also incorporated into Ford, ¶ 144; Tate, ¶ 149; and Nelson, ¶ 134.

28

148.     Denied.  While Rule 6.09 states that the chief has the right and responsibility to impose discipline, Nelson testified that he can countermand the chief's recommended discipline. Exhibit 5, 77:16-20.  This response is also incorporated into Nelson, ¶ 135.

149.     Admitted that Nelson testified to this but at Exhibit G, p. 21.  By way of further answer, Nelson testified that he was asked to ratify any dismissal.  Exhibit 5, 22:9-12. See also ¶ 148 above.  This response is also incorporated into Nelson¸¶ 136.

150.     Admitted that Nelson testified that Hughes was terminated for insubordination. Denied that Hughes was insubordinate. See ¶ 362 below.  This response is also incorporated into Nelson, ¶ 137.

151.     Denied.  Exhibit G (not D) at page 57 only stands for the proposition that Nelson claims that he was unaware that Ford was storing pornography at the police station.  By way of further answer, Shelton testified that Nelson was aware of Ford's pornography at the police station because he saw it.  Exhibit 1, 423:10-20.  This response is also incorporated into Nelson, ¶ 138.

152.     Denied.  See ¶¶ 318-334 below.  This response is also incorporated into Nelson, ¶ 152

153.     Admitted.  By way of further answer, Hughes told Ford that he could not say things like that because he was the Chief of Police.  Hughes did not want Ford to get in trouble or lose his job because Ford had just given him a job and Ford was going to make Hughes a full-time officer.  Exhibit 9, 43:23-45:6 & 45:16-24.  This response is also incorporated into Nelson, ¶ 140.

154.     Admitted.  This response is also incorporated into Nelson, ¶ 141.

155.     Denied.  Shelton testified that Nelson was aware of Ford's pornography at the

police station because he saw it. Exhibit 1, 423:10-20.  This response is also incorporated into Nelson, ¶ 142.

156.    Admitted in part.  This Charge was filed on August 11, 2010.  This response is also incorporated into Ford, ¶ 145; Tate, ¶ 150; and Nelson, ¶ 143.

157.    Admitted.  This response is also incorporated into Ford, ¶ 147; Tate, ¶ 152; and Nelson, ¶ 144.

158.    Admitted.  This response is also incorporated into Ford, ¶ 148; Tate, ¶ 153; and Nelson, ¶ 145.

159.    Admitted.  This response is also incorporated into Ford, ¶ 149; Tate, ¶ 154; and Nelson, ¶ 146.

160.    Admitted that Tate testified to this.  This response is also incorporated into Nelson, ¶ 147.

161.    Admitted that Nelson testified to this but irrelevant.  This response is also incorporated into Nelson, ¶ 148.

**Facts Common to All Plaintiffs**

162.    Admitted.  This response is also incorporated into Ford, ¶ 153; Tate, ¶ 164; and Nelson, ¶ 149.

163.    Admitted.  By way of further answer see ¶¶ 307-310 below.

164.    Denied.  Rule 312.6 does not require prior approval for a pursuit to enter another jurisdiction.

165.    Admitted.  By way of further answer, Shelton activated her lights and sirens in this pursuit.  Exhibit GG (FAS00291).

166.    Rule 312.2 does not stand for the proposition cited.  However, Rule 312.1

contains this language.  By way of further answer, Shelton was not charged with failing to notify dispatch of the pursuit, location, or reason.  While she was charged with failing to terminate the pursuit when danger is outweighed by the need for apprehension, this charge was based on an alleged "high speed" pursuit for a traffic charge.  Exhibit II (FAS00238).  Shelton pursued based upon the assault upon her.  Exhibit GG, p. 1.

167.    Denied.  See ¶ 148 above.  This response is also incorporated into Ford, ¶ 155; Tate, ¶ 166; and Nelson, ¶ 151.

168.    Admitted that Rule 6.09 speaks for itself but see ¶ 148 above in which Nelson testified that he could countermand the chief's decision.  This response is also incorporated into Ford, ¶ 156; Tate, ¶ 167; and Nelson, ¶ 152.

169.    Admitted that Bel Nor Code § 110.080.B provides that the duties of the Police Commissioner are "to participate in personnel decisions including the hiring, firing, promotion and demotion of Police Officers and other Police Department employees," which shows that Nelson participated in Plaintiffs' terminations as he claimed.  See also ¶¶ 64 and 148 above in which Nelson testified that he was asked to ratify all terminations.  This response is also incorporated into Nelson, ¶ 153.

170.    Denied that Exhibit K, § 105.030(C) stands for the proposition for which it is cited, as it simply describes the order of Board business.  Admitted that § 200.080 gives the Board the authority to remove police officers, which stands in contrast to ¶ 168 above.  This response is also incorporated into Nelson, ¶ 154.

171.    Denied.  Exhibit R, Rule 14.00 (VBN 00121) specifically prohibits "offensive graffiti" which includes pornography. However, the evidence in this case shows that the Board of Trustees was made aware of Ford's possession of pornography in the workplace, but they did not

even investigate the allegation.  Exhibit 12, 25:20-25.  When Dee reported the pornography to

the Trustees, it was his understanding that the other Village officials were already aware of it.

Exhibit 12, 10:19- 11:11.  Ford admitted that he was never disciplined for possessing

pornography.  Exhibit 3, 30:8-11.  Evidence was also presented that another pornographic

magazine was found at the police station in the backroom lockers 3 to 4 months before Tate's

deposition on January 12, 2012.  Exhibit 2, 76:1-23.  Bel Nor has shown tolerance for Ford's

possession of pornography, despite its purported "zero tolerance" policy.  This response is also

incorporated into Ford, ¶ 165; Tate, ¶ 176; and Nelson, ¶ 155.

172.    Denied.  See ¶ 171 above.  By way of further answer, Shelton, Bernsen, and

Hughes all appealed their unlawful discharges to the Village's Board of Trustees, which did

nothing, to include failing to hold the hearing required by Department policy.  Exhibit 1, 281:23-

282:16; Exhibit 4, 195:17-196:16 & 203:16-24; and Exhibit 9, 200:5-15.  See also Exhibits 13-a,

13-b, and 13-c and ¶ 362 below.  This response is also incorporated into Nelson, ¶ 156.

173.    Admitted in part and denied in part.  According to ¶ 170 above, the Board has the

authority to fire.  This response is also incorporated into Ford, ¶ 157; Tate, ¶ 168; and Nelson, ¶

157.

174.    Denied as to terminations because ¶ 174 contradicts ¶ 170 above, which gives the

Board firing power.  This response is also incorporated into Ford, ¶ 158; Tate, ¶ 169; and Nelson,

¶ 158.

175.    Denied because ¶ 175 contradicts ¶ 170 above.  See also ¶ 148 above in which

Nelson testified that he can countermand the chief's recommended discipline.  This response is

also incorporated into Nelson, ¶ 159.

176.    Admitted that Nelson testified to this.  However, Nelson admitted that he did no

independent investigation into the pursuit that led to Shelton's discharge and did not even read

the report relating to this pursuit.  He simply relied on the information provided to him by Ford

and Tate.  Exhibit 5, 72:18-73:15.  This response is also incorporated into Nelson, ¶ 160

     177.    Admitted that Nelson testified to this but denied in part.  Shelton testified that

Nelson was aware of Ford's pornography at the police station because he saw it.  Exhibit 1,

423:10-20.  This response is also incorporated into Nelson, ¶ 161.

     178.    Admitted.  But Nelson further admitted that he and Ford discussed Shelton and

Bernsen weekly and sometimes daily, and that in 2009-2010, Nelson was talking to Ford as

much as 3-4 times a day.  Exhibit 5, 10:17-25; 48:9-14; & 48:23-25.  This response is also

incorporated into Nelson, ¶ 162.

     179.    Denied.  Hughes was present when Ford played the message from the EEOC.

Ford became enraged because he thought Shelton had filed a complaint against the Department.

Ford said, "That bitch, Officer Shelton, is just like Schaefer.  She went and got a lawyer, and she

filed and EEOC complaint against us."  Ford also was yelling and screaming saying, "She's

going to sue this place.  She's going to bring this place down, I know it."  Exhibit 9, 103:1-4,

104:13-15, & 106:18-23.  Ford then called Shelton at home and told her to get her ass into work.

Shelton complied.  Hughes, 108:11-14.  According to Shelton, Ford thought she filed the

complaint and did not believe her when she said she did not.  Exhibit 1, 215:6-15.  This response

is also incorporated into Nelson, ¶ 163.

     180.    Admitted.  This response is also incorporated into Ford, ¶ 11; Tate, ¶ 11; and

Nelson, ¶ 164.

     181.    Admitted in part.  Shelton did not file a complaint with the EEOC until after she

was fired by the Defendants.  See Exhibit L.  However, she did make an internal complaint/

report with Dee about both the pornography at the station that Ford paraded in front of her and Ford calling her a "nigger" and shoving her against a wall.  Exhibit 12, 13:9-17 & 15:16:6-15.  She also complained to her supervisor, Bernsen, about gender discrimination before the EEOC incident and after the EEOC incident that she was being harassed by Ford.  Exhibit 4, 23:7-24, 24:8, 24:25-25:1, 25:17-23.  Shelton also complained to Bernsen about the pornography.  Exhibit 1, 268:17-22 and Exhibit 4, 223:10-25.  This response is also incorporated into Ford, ¶ 65; Tate, ¶ 64; and Nelson, ¶ 165.

182.    Admitted.  However, another pornographic magazine was found at the police station in the backroom lockers 3 to 4 months before Tate's deposition on January 12, 2012.  Exhibit 2, 76:1-23.  This response is also incorporated into Ford, ¶ 167; Tate, ¶ 178; and Nelson, ¶ 166.

183.    Admitted that this was Ford's testimony.  By way of further answer, Ford was accused of being a racist by Officer Steven Haines of the Beverly Hills police department at a meeting of the officers.  Exhibit 3, 68:9-69:4.  This response is also incorporated into Ford, ¶ 168; Tate, ¶ 179; and Nelson, ¶ 167.

184.    Admitted that Ford testified to this.  This response is also incorporated into Ford, ¶ 169; Tate, ¶ 180; and Nelson, ¶ 168.

185.    Exhibit A, pages 10-11 does not stand for the proposition cited.  Exhibit H, 10:4-8 does not stand for the proposition that Dee went "immediately" to the police station, but it is admitted that Dee did go to the station.  By way of further answer, Ford admitted that he had 10 pornographic magazines as the police station.  Exhibit 3, 23:1-10.

186.    Admitted, except that this information is found in Exhibit H, not Exhibit A.

187.    Denied.  Dee actually testified that he was told the situation was handled, not that

34

the magazine was removed.  Exhibit H, 40:1-6.[7]

188.    While neither Exhibit A, p. 16, nor Exhibit H, p. 16, stand for the proposition cited, admitted.  By way of further answer, Bernsen testified that he, Hughes, and Shelton all talked to Dee at the same meeting about the pornography.  Exhibit 4, 13:16-14:3.

189.    Denied.  Dee actually gave conflicting testimony – testifying that he took the information Shelton provided him to the Board  but that he could not remember making the Board aware of Ford's use of the "N" word.  Exhibit H, 16:1-17:23.

190.    Admitted.  This response is also incorporated into Ford, ¶ 170; Tate, ¶ 181; and Nelson, ¶ 169.

191.    Admitted.  But see, ¶¶ 94-96 above and ¶¶ 199, 228, & 234 below.  This response is also incorporated into Ford, ¶ 171; Tate, ¶ 182; and Nelson, ¶ 170.

192.    Admitted but irrelevant.  This response is also incorporated into Nelson, ¶ 171.

193.    Admitted that Ford is supposed to be in charge of training.  This response is also incorporated into Ford, ¶ 166 and Nelson, ¶ 172.

194.    Admitted.

195.    Admitted.

**Response to Additional Facts Alleged in Defendant Ford's Statement of Undisputed Material Facts[8]**

7.    Admitted.  By way of further answer, see ¶ 8 below.  This response is also incorporated into Tate, ¶ 7.

8.    Denied.  See ¶ 179 above.  This response is also incorporated into Tate, ¶ 8.

---

[7] If only one pornographic magazine was removed from the station, there were still at least 9 pornographic magazines as the station.

[8] Most of the additional facts alleged by Defendant Ford in his Statement of Facts were also alleged in Defendant Tate's Statement of Fact.  For the sake of brevity, Plaintiffs incorporate their response to these facts by reference into Defendant Tate's Statement of Facts, which paragraphs are also identified above.

9. Admitted in part and denied in part. Admitted that Ford told Shelton to call the EEOC but denied that he told Shelton to tell the EEOC what she knew about the UMSL complaint because he believed she had called the EEOC. See ¶ 179 above. This response is also incorporated into Tate, ¶ 9.

10. Admitted that Nelson testified to this. This response is also incorporated into Tate, ¶ 10.

29. Admitted that the vehicle ultimately proceeded eastbound on Natural Bridge. However, at the time the vehicle failed to stop it was travelling northbound on Normandy Avenue, which is adjacent to the Normandie Golf Course. Exhibit GG (FAS00291). This response is also incorporated into Tate, ¶ 29.

43. Admitted that Shelton's employment was terminated on June 30, 2010. Denied that this was done only by Ford, as Tate and Nelson also participated in the termination decision. See ¶ 64 above. This response is also incorporated into Tate, ¶ 43.

45. Admitted. This response is also incorporated into Tate, ¶ 45.

47. See response to ¶ 56 above. This response is also incorporated into Tate, ¶ 47.

50. Denied. See ¶¶ 196-99 & 206-07 below.

51. Admitted that Ford testified he never referred to Schaefer as a "worthless piece of shit." By way of further answer, he did refer to her as a "bitch" and/or a "stupid bitch." Exhibit 9, 109:2-6 & Exhibit 1, 138:6-25 & 255:18-21.

52. Denied. See ¶ 202-03 below. (Nigger Shelton)

53. Admitted that Ford testified that he never said that women are only good for sucking dick. By way of further answer, Shelton heard Ford state that "the only thing women were good for was laying on their backs." Exhibit 1, 179:7-14.

36

54.     Admitted that Ford testified to this.  But by way of further response, see ¶¶ 248-49 below.

55.     Denied.  See ¶¶ 202-03 below.

56.     Denied.  See ¶ 222 below.

57.     Denied in part.  Ford told Shelton "you're just like that stupid bitch, Schaefer." Exhibit 1, 138:6-25 & 255:18-21.

58.     Denied.  Ford told Hughes the pornography was his.  See ¶ # 63 above.  Ford admitted to having 10 "adult magazines" at the station  such as Club, Hustler, and Playboy.  See ¶ 63 above. See also ¶ 59 below.

59.     Denied.  See Exhibit 10, ¶ 8.

60.     Denied.  See ¶¶ 222 & 237 below.

61.     Denied.  See ¶ 60 above.

66.     Admitted but irrelevant.  Shelton (not Schaefer) was denied a locker because of Ford storing pornography in it.  See ¶¶ 217-19, 226-27 & 229 below.  This response is also incorporated into Tate, ¶ 65.

85.     Admitted.  This response is also incorporated into Tate, ¶ 84.

86.     Admitted that the canvassing was out of Bel Nor's jurisdiction.  Denied that permission was required to leave the jurisdiction.  See Exhibit R, Rule 312.6 (VBN00245) and 312.1(B) (VBN00242), which requires a supervisor to respond to the scene of a pursuit.  This response is also incorporated into Tate, ¶ 85.

88.     Admitted.  By way of further answer, see ¶ 383 below.  This response is also incorporated into Tate, ¶ 87.

93.     Admitted.  However, Exhibit C, p. 54 and Exhibit D, p. 180 do not stand for the

proposition for which they are cited.  This response is also incorporated into Tate, ¶ 92.

94.    Admitted.  This response is also incorporated into Tate, ¶ 93.

104.    Admitted.  This response is also incorporated into Tate, ¶ 103.

106.    See response to ¶ 104 for response to this redundant statement.  This response is also incorporated into Tate, ¶ 104.

110.    Denied.  Exhibit C, pp.8-9 actually states that Bernsen is suing Tate because he was in "cahoots" with Ford and Nelson to retaliate against him.  Exhibit C, 8:22-9:2.  See also Exhibit C, 214:16-25.  Therefore, once again the material cited does not stand for the proposition set forth.  See also ¶¶ below .  This response is also incorporated into Tate, ¶ 109.

111.    Denied.  Exhibit F, 42:11-13 relied upon by Ford actually states that Tate recommended Bernsen's termination, showing he was part of the decision to terminate Bernsen. See also Exhibit SS (JB00014) in which Tate recommends Bernsen's termination.  This response is also incorporated into Tate, ¶ 110.

112.    Admitted that Exhibit R, Rule 6.08 speaks for itself.  By way of further answer, Tate still participated in the termination decision.  See ¶ 111 above in this section.    This response is also incorporated into Tate, ¶ 111.

146.    Admitted.  This response is also incorporated into Tate, ¶ 151.

150.    Admitted in part and denied in part.  Hughes testified that Ford did not tell him to take an active part in trying to get rid of Shelton, but this is what he understood from the conversation.  Exhibit D, 144:7-10.  This response is also incorporated into Tate, ¶ 162.

151.    Denied.  Hughes testified that he was dispatched to the station, and when he got there Ford and Nelson were already talking, with Ford including him in the conversation. Exhibit

D, 143:3-9.[9]  This response is also incorporated into Tate, ¶ 163.

152.    Denied.  Ford told Hughes:  "If we got rid of Shelton, I wouldn't hire another part-time officer.  What we'd do is we'd go ahead and make you the full-time officer.  Exhibit D, 143:19-23.  Ford also promised Hughes a full-time position when he was hired.  Exhibit 9, 8:8-9:8 & 19:5-7.

154.    Admitted that policy speaks for itself.  By way of further answer, see ¶ 294-95 below.  This response is also incorporated into Tate, ¶ 165 & Nelson, ¶ 150.

159.    See response to Ford, ¶ 112 above for Plaintiffs' response to this redundant statement.  This response is also incorporated into Tate, ¶ 170.

160.    Plaintiffs admit that Exhibit R, Rule 6.03(V) provides for discipline for failing to properly use the chain of command.  By way of further answer, Hughes attempted to contact the Police Commissioner Nelson when he was assaulted by Tate, but Nelson told Hughes he could not come to the station because he had been drinking.  Exhibit 9, 180:9-11.  This response is also incorporated into Tate, ¶ 171.

161.    See response to Ford, ¶ 112 above for Plaintiffs' response to this redundant statement.  This response is also incorporated into Tate, ¶ 172.

162.    Plaintiffs' deny that Exhibit K, §105.030(C) stands for the proposition cited, as it only set forth the order of Board business.  Nonetheless, Plaintiffs admit that the Board has final policymaking authority.  This response is also incorporated into Tate, ¶ 173.

163.    Admitted that Exhibit K, § 200.080 gives the Board the power to terminate the chief and officers of the police department, which is inconsistent with Exhibit R, §6.09, which purports to give this power to the Chief of Police.

---

[9] For Defendants to suggest that Hughes just happened to walk in on this conversation is simply one of  many false representations of the record made by the Defendants.

164.    Admitted.  This response is also incorporated into Tate, ¶ 175.

**Response to Additional Facts Alleged in Defendant Tate's Statement of Undisputed Material Facts**

50.    Denied.  See ¶¶ 212-14 & 251-54 below.

51.    Exhibit G, p. 53  does not stand for the proposition cited.  By way of further response, Shelton never alleged that Tate made race or gender comments directed at her.  She testified that Tate made racist and sexist comments in her presence.  See ¶ 50 above.

52.    Admitted that Bernsen testified to this.  By way of further answer, Tate participated in Shelton's termination.  See Exhibit II (FAS00238-39).

53.    See ¶ 52 above, which is incorporated by reference herein.

54.    Admitted.

55.    Denied.  Once again Exhibit B, pp. 391-93 does not stand for the proposition cited.  Shelton was asked if she believed Tate played a role in the decision to discharge her, and Shelton responded that she did believe this because of the investigation, Exhibit II & Exhibit B, 391:8-15.  Shelton further testified, "He (Tate) had a role in my discharge, yes."  Exhibit B, 392:11-17.[10]

56.    Exhibit B, pp. 245-47 does not stand for the proposition cited.  By way of further answer, Plaintiffs have never claimed that Tate possessed the pornography, only that he was aware of  Ford's possession of it and did nothing.  See ¶ 63 above & ¶¶ 239-40 below.

57.    Admitted.

58.    Admitted.

59.    Admitted that Tate claimed this.  However, he admitted to discussing Shelton's suspension with Nelson before he even investigated Nelson's allegation against her (which

---

[10] Defendants have so often misrepresented the summary judgment record that these misrepresentations cannot be mere neglect on their part.

resulted in Shelton receiving the discipline Nelson wanted) showing he did have discussions with Nelson about Shelton's employment.  See ¶ 52 above.

60.     Admitted.  By way of further answer, Shelton did complain to Trustees Dee and Kreis.  See ¶¶ .  Additionally, there is no dispute that Tate was aware of Ford's possession of pornography at the police station, and he did nothing.  See ¶¶ above.

113.     Admitted.

114.     Admitted.

115.     Admitted that Tate claimed this.

116.     Objection because this statement is confusing and impossible to respond to. Subject to this objection, to the extent that Defendants are claiming that Bernsen did not have evidence that Tate retaliated against him, see Plaintiffs' Statement of Additional Material Facts below.

117.     Denied.  Prior to the cited testimony, Bernsen testified that Tate was there when he was fired and was probably part of the investigation.  Exhibit 4, 91:4-11.  There is no doubt that Tate conducted the "investigation" and recommended that Bernsen be fired.  Exhibit SS.

118.     Denied.  See Plaintiffs' Statement of Additional Material Facts below.

155.     Admitted that Tate was not part of the conversation Hughes had with Ford and Nelson about getting rid of Shelton.

156.     Admitted.

157.     Admitted.

158.     Admitted.

159.     Admitted that Tate claimed this.

160.     Admitted that Hughes testified to this.  By way of further response, Ford

recommended Tate for promotion to lieutenant when he became Chief, Ford was a reference for Tate when he applied to the Department, and Ford and Tate are/were personal friends.  Exhibit 3, 103:7-17 & 24-25; Exhibit 2, 12:22-25 & 23:8-9.

161.   Admitted.  By way of further answer, Tate was aware that Ford kept pornography at the station and did nothing.  See ¶¶ above.

### Plaintiffs' Statement of Additional Material Facts Making Summary Judgment Inappropriate

### Racial Animus

196.   Ford called African Americans "niggers," "stupid niggers," and also said "I can't stand these animals."  When bulletins would come into the station about black men, Ford would put his hands in the air and yell "nigger, nigger, nigger, nigger, I can't stand them."  Exhibit 4, 64:16-65:6.

197.   When Hughes was first hired, he was paired with Ford.  Ford had Hughes drive him around as part of his field training. During Hughes' field training , Ford used the "N" word regularly – at least every hour.  Exhibit 9, 33:20-34:4 & 34:7-14.  Hughes estimated that during the two weeks he rode along with Ford, Ford used the "N" word some sixty (60) times because he used the word a lot.  Exhibit 9, 52:20-53:21.

198.   Once Ford saw a black man with his pants hanging low walking down Natural Bridge and he told Hughes, "Look at this nigger.  Look at these pants."  Exhibit 9, 43:23-44:5.

199.   Ford kept using the "N" word even though Hughes told him to stop. Exhibit 9, 46:20-47:2.

200.   Ford would use the "N" word when he saw a black person walking down the street and especially in regards to the residents of Greendale.  Ford told Hughes that the mayor of Greendale had no business being mayor and these people have no business running a town.

Exhibit 9, 47:13-22.

201.    Shelton heard Ford say to another black officer (male) that he was ghetto, pimp, and called him a "stupid motherfucker".  Ford told the officer, "You think that black shit is going to work here."  Exhibit 1, 200:11-201:8.

202.    When Ford thought Shelton filed an EEOC complaint, he pinned her up against the wall.  As she was trying to leave the locker room, she heard him say, "You might be from west county, but you're still a ghetto nigger bitch."  Then Ford told Bernsen that Shelton went north side ghetto on him.  Exhibit 1, 210:6:-211:11 & 258:15-17.

203.    Hughes confirmed that Ford pinned Shelton against a wall.  She squeezed her way around his arm.  When she left the locker room Ford made a statement about her being from west county but she's just a ghetto nigger.  Exhibit 9, 110:19-113:18.

204.    When Shelton left after this incident, she was crying.  Exhibit  1, 261:8-9.

205.    According the Hughes, Shelton was very upset that Ford called her a "ghetto nigger."  Exhibit 9, 134:20-22.

206.    Erica Cochran, a Normandy police officer, heard Ford refer to African-Americans as "niggers."  Exhibit 14, ¶¶ 5-6.

207.    Steve Goodwin, a former Bel-Nor police officer, heard Ford use the words "niggers" and "porch monkeys" in referring to African-Americans.  He also heard Ford say things such as "fuckin' niggers" can't help themselves when it comes to committing crimes.  He would hear Ford use the word "Canadians" to describe African-Americans when African-Americans were within earshot.  Exhibit 8, ¶¶ 5-8.

208.    Even Tate has heard Ford use the word "nigger" like a curse word, but he claimed he did not remember the context.  Exhibit 2, 13:1-8.

209.   According to Tate, they typically use the word "ghetto" to refer to African-Americans.  He has heard Ford refer to the residents of Bel Nor and Greendale as "ghetto." Exhibit 2, 14:7-11.

210.   The above testimony stands in sharp contrast to Ford's testimony in which he claims he never used the word "nigger" while on duty at Bel Nor, that he never referred to Shelton as a "nigger", and that he never used racial slurs in his capacity as a Bel Nor police officer or its chief.  Exhibit 3, 7:4-21; 8:6-8; 9:4-25.

211.   Ford did admit to referring to African-Americans as "Canadians," but claims he never did this on duty.  Exhibit 3, 9:4-10:1.

212.   Shelton heard Tate say black women are whores.  Exhibit 1, 90:22-25.

213.   Shelton also heard Tate call a black man a "coon."  Exhibit 1, 95:17-19

214.   Shelton heard Tate say in reference to blacks that those fucking people get on my nerves.  Exhibit 1, 184:16-24.

215.   Even Nelson admitted he had used the word "nigger" when people come into the Village and do certain things.  He testified that he may use this word as often as once a month. Exhibit 5, 95:4-17.

216.   Ford told Hughes that he and Nelson were on the same page and felt the same way: that Nelson was a racist and hated black people.  Exhibit 9, 48:16-23.

**Gender Animus / Hostile Work Environment[11]**

217.   Shelton wanted one of the lockers in the storage room so that she did not have a locker in the locker room with the men.  Exhibit 1, 237:10-23.

218.   When Ford became chief, Shelton asked him if she could have a locker.  Exhibit

---

[11] While one of Ford's pornographic magazines (Club) was produced by Defendants in discovery, it is not attached hereto as unnecessary in light of the overwhelming evidence of Ford's possession of pornography at the police station.

1, 242:11-12.

219.     Ford would not give Shelton a locker in the storage room because that was where

he kept his pornography.  Ford kept pornographic magazines in both his locker and in the locker

in the storage room.  Exhibit 1, 241:17-242:1 & 246:9-15.

220.     Shelton saw pornography in one of the lockers.  Ford would spend 30 minutes or

more a day in the bathroom with his pornography.  She would see him in the station with his

magazines and then see him go to the bathroom.  Exhibit 1, 247:6-248:6 & 267:15-19.

221.     One day Ford held up the pornographic magazine and said to Shelton, "Look at

this.  Look at this."  Exhibit 1, 249:4-7.

222.     Shelton would come into the station and Ford would be looking at his

pornography, and he would show her the magazines.  (This did not happen every day.)  Then he

would go into the bathroom. Exhibit 1, 350:18-351:6.

223.     Ford left his door open on his locker so everyone could view the pornography.

Exhibit 1, 250:4-7.

224.     The pornography at the station was hardcore, and Shelton was offended by it.

Exhibit 1, 423:24-424:9.

225.     Shelton told Bernsen that the way Ford talked about women and when he showed

her the porn magazine made her uncomfortable.  Exhibit 4, 223:10-25.

226.     Three days after Hughes joined the Department, Ford showed him the locker off

the restroom and told him he could use it.  Shelton arrived and became upset and said she did not

understand why Hughes was getting a locker when she had been waiting for one for a year and a

half. Exhibit 9, 62:1-19.

227.     After Shelton left, Ford showed Hughes the locker and that he had pornography in

it and explained that the pornography was the reason he was not giving the locker to Shelton.  He also told Hughes that if he ever needed to look at the pornography, that's where it was kept. Exhibit 9, 62:20-63:1.

228.    Hughes refused the locker and told Ford he could not keep pornography at the station because someone could take offense and Ford would get in trouble.  Exhibit 9, 63:2-9.

229.    The next day Hughes asked Shelton if she knew why Ford did not give her the locker and Shelton said she knew it was because Ford kept his pornography in there.  Exhibit 9, 73:2-4 & 75:16-25.

230.    Hughes asked Shelton how she felt about the porn and why she didn't say anything. Shelton said she did not want to lose her job.  Exhibit 9, 78:11-16.

231.    Shelton confirmed that she did not address these issues because she didn't want to lose her job, and she could not jump the chain of command.  Exhibit 1, 178:20-23. Shelton explained that she could not complain to a person (Ford) who degrades women and who thinks women are the scum of the earth.  Ford already did not think women should be on the police force.  Exhibit 1, 285:3-15.

232.    Shelton told Hughes she also saw porn in Ford's regular locker and that she would come into the station and see Ford looking at the pornography.  Exhibit 9, 78:19-79:4.

233.    Hughes saw Ford carrying the pornography from the locker to the bathroom.  He knew the magazine was pornography because he could see the nude woman on it.  Exhibit 9, 86:6-87:13.

234.    On at least 2 occasions when Ford was taking the pornographic magazines to the bathroom, Hughes told Ford he needed to get rid of the magazines.  Exhibit 9, 88:10-15.

235.    In addition to the pornography, there were about 15 pin-up pictures in the

bathroom.  For example, there were pictures of Ford with Hooters girls.   Exhibit 9, 99:16-100:14.

236.    Shelton confirmed that Ford had different pornography type pictures of women in the bathroom.  Exhibit 1, 233:2-13.

237.    Goodwin was aware of Ford's collection of pornographic magazines.  Ford often showed the magazines (which Goodwin described as hardcore) to male officers while women were present in the room.  Goodwin was present when Ford would flaunt the magazines, and point out specific models as being particularly attractive.  Exhibit 8, ¶¶ 9-11.

238.    Even Normandy Police Officer Cochran saw Ford's pornography at the station because it was in the bathroom and squad room.  Exhibit 14, ¶¶ 7-8.

239.    Tate saw the pornography at the police station.  Shelton 1, 422:10-21.

240.    Tate admitted that he did not believe it was appropriate to keep pornography at the workplace.  He claimed he never addressed this issue with Ford because the opportunity never came up.  Exhibit 2, 77:7-18.

241.    There can be no dispute that Ford kept pornography at the police station because he admitted to this, keeping such magazines as Club, Hustler, and Playboy.  He further admitted that the magazines were stored in both his personal locker and in a locker in the room adjacent to the bathroom.  Exhibit 3, 23:1-10 & 27:4-28:1.

242.    Ford admitted that it was inappropriate for a chief to keep "adult magazines" at a police station.  Exhibit 3, 213:8-11.

243.    Even though the Board of Trustees knew that Ford kept pornography at the police station, he was never disciplined.  Exhibit 3, 30:8-11.

244.    Dee told Hughes that when he brought the pornography up at a Trustee meeting,

47

Nelson asked him if he liked what he saw.  Exhibit 9, 209:9-15.  According to Dee, Nelson was the most vocal in opposition to any investigation by the Board.  Exhibit 12, 25:20-25 & 28:2-4.

245.    On one occasion, Ford and Hughes arrived at a scene where Shelton arrested two people.  Ford told Shelton that the only reason that they (suspects) let you arrest them is because they want to fuck you and you're halfway attractive.  Exhibit 9, 118:7-15 & Exhibit 1, 139:4-12.

246.    Ford also told Hughes that Shelton had no business being in law enforcement because she is a woman, like Schaefer.  Exhibit 9, 122:22-123:6.

247.    Ford would say that women were stupid, he referred to women as cunts, he said the only thing they were good for was laying on their backs.  Exhibit 1, 121:24-123:6.

248.    Ford also said that he did not think women were competent enough to do the job.  Exhibit 1, 123:13-14.

249.    Ford said the only thing women were good for was laying on their backs, that all women were fucking stupid, that women do not have any business in police work, and that these stupid bitches do not need to be on the police department.  Exhibit 1, 179:7-14 & 180:18-19.

250.     Ford told Bernsen that neither Shelton, nor Schaefer, were able to handle the job.  Exhibit 4, 28:11-19.

251.    Tate also thinks women are stupid.  He showed this when he would give Shelton directions or tell her to do something.  Exhibit 1, 88:1-4.

252.    Shelton heard Tate say that women did not have any business in police work.  Exhibit 1, 90:22-25.

253.    Tate would say that Schaefer was lazy, didn't patrol and did not write enough tickets.  He would also say that women in general were like that.  Exhibit 1, 92:6-9.

254.    Tate referred to women as stupid bitches and stupid cunts, and said that women

were fucking stupid.  Exhibit 1, 183:7-11 & 186:25-187:2.

255.    Shelton also heard Nelson refer to women as stupid bitches.  She heard Nelson tell Ford, "women are fucking stupid." Exhibit 1, 188:15-19 & 191:4-5.

256.    Nelson also said that most women cannot do the job and they need to find a different line of work.  Exhibit 1, 192:6-8.

257.    While Shelton gave specific examples, she testified that the racial and sexual discrimination and harassment took place on a daily basis.  Exhibit 1, 424:19-425:6.

**Protected Activity & Retaliation**

258.    Bernsen reported Ford's misconduct to Trustee Bill Dees, State Senator Rita Days, Councilman Conrad Phillips, and Bellerive Mayor Ann Knapp.  There were two separate meetings.  Exhibit 4, 12:6-20.

259.    Bernsen, Shelton, Hughes, Phillips, Days, and Knapp were present for the second meeting, which occurred the Friday after Shelton was fired.  At this meeting the discussion was about (1) the Department maliciously going after him, Shelton and Hughes, (2) Shelton not being the officer who sped past Nelson's home, and therefore, being unfairly written up, (3) Ford possessing pornography openly and in front of Shelton, (4) Ford's attitude towards blacks; and (5) Tate's inappropriate behavior (following a woman home one night and telling her he had a thing for her)  Exhibit 4, 38:18-39:19; 41:1-4; 42:2-43:16; 64:12-65:6; 66:18-24; & 67:5-68:17.

260.    Shelton complained to Bernsen about the pornography.  Exhibit 1, 268:17-22.

261.    Shelton told Trustees Dee and Kreis about the pornography and other mistreatment. Exhibit 1, 269:8-17 & 277:5-8.

262.    Shelton, Bernsen, and Hughes complained about the pornography.  Exhibit 1, 275:6-19.

49

263.    On June 9, 2010, Hughes talked to Trustee Dee about the pornography.  It was clear that Bernsen or Shelton had also talked to Dee about the pornography by then.  Exhibit 9, 91:15-92:5.

264.    Hughes showed Dee the pornographic magazine Ford had in the storage locker. Exhibit 9, 98:2-13.

265.    About a week after he spoke to Dee, Hughes also talked to Trustee Kreis about the pornography in the station and racial and gender discrimination.  Exhibit 9, 181:5-21.

266.    Ford told Hughes that if Bernsen and Shelton think they're going to go to Dee about the pornography, they've got another thing coming.  This occurred about 2 days after the pornography was reported.  Exhibit 9, 205:13-22.

267.    Buchek called Ford and told Ford that Bernsen had called as was upset that there were pornographic magazines in the station.  Buchek told Ford he did not know what it was about, but if there was material of this nature in the station, get rid of it.  Exhibit 3, 38:2-13.

268.    Hughes believes that later Ford became aware that he was also involved in the report of the pornography because Ford's behavior towards Hughes changed.  There was a lack of communication, and Ford no longer trusted Hughes.  By way of example, Ford would routinely have Hughes drive him around unrelated to field training.  This occurred the whole time Hughes was on the force until shortly after he made the complaint to Dee.  Exhibit 9, 120:15-121:16 & 206:8-14.

**Felicia Shelton**

269.    Shelton was hired by the Bel Nor Police Department by Chief Matt Lauer in May or June of 2008. Exhibit 1, 24:23-25:12.

270.    Shelton received an annual evaluation from Ford on January 31, 2010.  She met or

exceeded standards in every evaluation category.  The evaluation further stated "P.O. Shelton meets the standards set forth by the agency as a patrol officer."  Shelton was recommended for a pay increase as a result of her evaluation.  Exhibit 15.

271.    According to Ford, Shelton was doing a good job.  Exhibit 1, 196:19-20.

272.    Ford never told the command staff Shelton was a problem.  Exhibit 3, 56:6-9.

273.    Hughes did not notice any performance issues or deficiencies when he worked with Shelton.  Exhibit 9, 146:7-9.

274.    The behavior/discrimination described by Shelton started before Ford thought she filed an EEOC complaint, but things got worse after the EEOC incident.  Exhibit 1, 138:22-139:2; 143:25-144:3; & 426:22-427:4.

275.    After the EEOC incident, Ford harassed Shelton and retaliated against her because he believed she filed an EEOC complaint.  Ford would not talk to her for a month.  He started switching her schedule without notice, kicked back reports, and wouldn't answer her questions about reports.  He also would not let her go to a fingerprint class.  Exhibit 1, 216:7-16 & 217:3-218:16.

276.    Bernsen was Shelton's supervisor.  Exhibit 4, 118:9-10.  He was her direct supervisor on the day of the pursuit discussed in more detail below.  Exhibit 1, 58:21-23.

277.    Bernsen agreed that after the EEOC incident, Shelton received more attention and scrutiny from Ford and Ford treated her differently.  He was waiting and trying to get Shelton out of the Department.  By way of example, Shelton was on a traffic stop, Ford pulled up and belittled her saying she did not know what she was doing and took over the stop, he would take over her calls undermining her confidence.  Ford also started calling Shelton to come in early at the last minute, even though she had 2 kids.  He wouldn't help her or train her properly to set her

up for failure, and he started going after her in disciplinary ways, like the burglary in progress call and pursuit issue.  Exhibit 4, 134:24-135:6; 135:17-136:3; 138:1-9; 142:12-16; 152:1-15; 155:16-156:7; &  234:7-11.

278.    After the EEOC incident, Shelton complained to Bernsen that she was being harassed by Ford.  Exhibit 4, 23:13-16.

279.    Shelton was suspended over her response to the burglary in progress call even though it was her first offense.  This suspension occurred without explanation and without being able to explain her side of the story.  Exhibit 1, 311:21-24.

280.    Bernsen concluded the first write-up involving Shelton (the response to the burglary in progress call) was mishandled when his investigation showed 2 other officers made this turn.  When he spoke up to defend Shelton, he was retaliated against by Tate and Ford. Exhibit 4, 89:9-90:21.

281.    Tate never asked Shelton how fast she was driving to the burglary in progress call.  Exhibit 2, 74:14-16.

282.    At the time Shelton was responding to the burglary in progress call, it was 21:00 hours (9:00 p.m.), the caller had reported that 3 large crashes had come from the garage area, that the caller thought someone was trying to get in, that the garage was attached to the house, and it sounded like they had already gotten into the garage.  Exhibit 16.

283.    Shelton wanted to appeal her suspension but Ford told her that Nelson wanted her suspended and that an appeal wouldn't make a difference once the suspension went into effect. Exhibit 1, 330:1-6.

284.    Shelton received no training on the Bel Nor pursuit policy.  Exhibit 1, 421:21-24.

285.    Tate admitted that the Department did no training on pursuit driving in 2009 or

2010.  Exhibit 2, 108:17-25.

286.     Shelton was doing routine patrol and her radar locked on a car doing 61 mph.  She turned her lights on, the driver swerved over towards her, and she had to go into the Normandie Golf Course to avoid being hit.  She did a U-turn, dropping the mic, trying to call out, and went after the vehicle.  Exhibit 1, 32:9-33:10.

287.     Shelton initiated the pursuit because the other car tried to strike her vehicle. Exhibit 1, 37:21-23.

288.     After the pursuit was over, Shelton learned the car was stolen.  She believes the car tried to hit her because it had no intention of stopping because it was stolen.  Exhibit 1, 44:12-16.

289.     Bernsen authorized the pursuit by allowing it to continue.  Exhibit 4, 123:19-23

290.     Bernsen does not believe Shelton violated Bel Nor's pursuit policy because she was pursuing a car that attempted to strike her and hit her head on, which ran her off the road. Exhibit 4, 118:16-20.

291.     When Tate was assigned to investigate the pursuit, Ford told him he thought the pursuit was improper.  Exhibit 2,106:4-13.  As set forth above, Tate and Ford concluded the pursuit violated Bel Nor policy before their investigation was even completed!  Exhibit HH, p. 3.

292.     Ford visited the scene where the Shelton pursuit began, and there was no question that a vehicle had left the roadway and gone onto the grass.  Exhibit 3, 187:2-9.

293.     When Tate investigated the Shelton pursuit, he also found evidence that a vehicle had exited the road at the initiation of the chase because there was a tire tread mark in the grass of the Normandie Golf Course that belonged to Shelton's vehicle.  Exhibit 2, 111:17-112:4

294     Tate never asked Shelton how fast she was going in the pursuit even though he

concluded she was going at a high rate of speed.  Exhibit 2, 116:1-8 & Exhibit II (FAS00234).

295.   Tate's belief that Shelton operated the vehicle in an unsafe manner during the pursuit is based solely on his conclusion that she was driving 61 mph.  Exhibit 2, 121:6-12. However, Tate admitted that there was no objective evidence as to how fast Shelton was going. Exhibit 2, 117:4-11.

296.   Tate had no idea of what the intent of the driver was when the driver swerved into Shelton's traffic lane.  Exhibit 2, 118:20-119:8.  However, he put in his report that "The fact that the violator's vehicle swerve (sic) into her traffic lane, does not in and of itself constitute an assault."  Exhibit II (FAS 00233).

297.   Tate admitted it would not be uncommon for a suspect to risk death or injury to himself.  Exhibit 2, 119:24-120:1.

298.   Ford did not interview Shelton about the pursuit and does not know if Tate did. He did not interview Bernsen about the pursuit either.  Exhibit 3, 188:10-17.  Exhibit II shows that Shelton was never interviewed about the pursuit as part of the "investigation."

299.   No review board was appointed for the Shelton pursuit contrary to Department policy.  Exhibit 3, 184:21-185:3 & Exhibit 2, 124:2-11.  See also Exhibit R, Rule 312.8.

300.   Ford also has never prepared the annual report on pursuits required by Department policy.  Ford 3, 185:8-18 & Exhibit 2, 124:2-11.  See also Exhibit R, Rule 312.8.

301.   According to Tate, he originally recommended that Shelton's hours be cut, but Ford wanted her fired.  Exhibit 2, 118:6-11.

302.   If the pursuit happened as Shelton described it, it was a valid pursuit.  Exhibit 2, 113:15-19 & Exhibit 3, 197:3-9.

**John Bernsen**

54

303.    Bernsen was promoted to the rank of sergeant by Ford after Ford became the permanent Chief.  Exhibit 10, ¶ 5.

304.    Bernsen was evaluated by Ford on or about January 3, 2009.  He was generally rated as meeting standards (except in two categories).  Ford stated: "Sgt Bernsen meets the standard expectations set forth by this agency."  Ford further noted, "He (Bernsen) has shown time and time again he is supervisory material."  Ford recommended Bernsen for a pay increase. No work performance deficiencies or job behavior requiring improvement was noted.  Exhibit 17.

305.    On January 31, 2010, Ford again evaluated Bernsen.  His overall rating had improved by 3 points and he was generally rated as meeting or exceeding standards (except in the same two categories).  Once again Ford stated, "John meets the standards set forth by the agency for the position he holds as a sergeant."  Once again, no work performance deficiencies or job behavior requiring improvement was noted.  Exhibit 18.

306.    According to Tate, Bernsen was disciplined (demoted) for not timely authorizing the continuation of the Shelton pursuit.  Exhibit 2, 128:23-129:4.

307.    Tate conceded Department policy does not state what a timely manner is for a supervisor authorizing the continuation of a pursuit.  Exhibit 2, 128:7-11.  See also Exhibit R, Rule 312.1(B).

308.    Bernsen did not have time to determine whether the pursuit was valid or invalid. During the pursuit, he was trying to gather information to determine what was going on. With the information he had, he could not determine whether the pursuit was valid before it was naturally terminated.  Exhibit 4, 231:9-22.

309.    When a pursuit lasts 60 seconds to a minute and a half, authorizing it after it is

over is timely authorization of a pursuit as required by Department policy. He cannot terminate a pursuit before he figures out why the pursuit is occurring. Exhibit 4, 184:3-4 & 186:24-187:10.

310.  Even Ford conceded that the supervisor authorizing the continuation of a pursuit in a timely manner must have a reasonable amount of time to ascertain what is happening. Exhibit 3 191:21-192:3. See also ¶ 33 above.

311.  Bernsen did not improperly supervise the Shelton pursuit. Exhibit 4, 182:6-8.

312.  Bernsen was wearing his bulletproof vest the day he was fired for not wearing a bulletproof vest. After he was instructed to wear his vest, he made it a regular practice to do so – wearing his vest on a daily basis. Therefore, this charge was incorrect. Exhibit 4, 168:19-169:7, 171:10-19, 174:24-175:2 & 189:24-190:4.

313.  Ford did not wear his vest. Exhibit 4, 168:1-4.

314.  Bernsen does not know how he was insubordinate. Exhibit 4, 190:11-17.

315.  Bernsen did not refuse to answer a question posed by Ford about who contacted Dee. Ford was not even talking to Bernsen and never posed a question to him. Because Ford was engaged in conversation with others, not Bernsen, he walked away. Exhibit 10, ¶ 9.

316.  Bernsen does not know how he failed to properly use the chain of command. Exhibit 4, 191:11-18. As set forth in Exhibits Y & JJ, officers talked to Trustees without discipline until Plaintiffs complained about Ford's pornography.

317.  Like Shelton, Bernsen was not given the opportunity to respond to the allegations against him before he was fired. Exhibit SS (JB00012).

**Bryan Hughes**

318.  With respect to the domestic call, Bishop arrived on the scene, he took control of the call and took the two complaining parties into the house and started discussing the incident.

Hughes stayed outside and made sure the bystanders did not go into the residence.  Exhibit 9, 158:18-22.

319.    Bishop then told Hughes to draw a number and write the report, but Hughes did not have the information because he had been on the street and Bishop had the information, so he would not know what to put in the report.  Exhibit 9, 161:9-162:2.

320.    Hughes questioned why he was writing the report when he did not have control of the call.  He did not refuse to write the report.  Hughes was concerned he was being set up to take a false report because reports are not usually written on verbal disturbances, and he did not have any of the information.  Exhibit 9, 162:5-8 &163:10-18.

321.    Back at the station Hughes explained to Bishop that the issue was he was being asked to make a report when he could not testify to the facts and circumstances of the situation, and therefore, questioned what he was supposed to put in the report.  Hughes said he would take the report but that he would have to put in it Bishop's statements.  Bishop did not order him to take the report and told Hughes, he would take the report.  Exhibit 9, 162:11-165:4.

322.    About an hour later Tate called him into the station and told him to write a memo about why he was disrespectful to Bishop on the call and that he needed to apologize to Bishop in the memo.  Exhibit 9, 166:5-16.

323.    Tate would not listen to Hughes and became more enraged when Tate tried to explain the circumstances surrounding the call and why he could not take the report. Exhibit 9, 167:10-20.  Hughes also explained to Tate that he could not write the memo Tate directed him to write because it was not true.  See ¶ 323 above.

324.    Then Tate chest bumped Hughes backwards and asked Hughes if he thought he was tough and wanted to take Tate on.  Hughes told Tate he needed to calm down because he

was blowing the situation way out of proportion.  Exhibit 9, 168:2-8.

325.    Hughes was concerned that Bishop was setting him up because Bishop had been promoted to sergeant by Ford with less than a year's experience in law enforcement.  Exhibit 9, 172:6-14.

326.    Tate told Hughes he had resigned and wanted his gun and badge, Hughes told Tate that he did not care what Tate said, he was not resigning.  Exhibit 9, 174:21-175:6.

327.    Hughes had his tape recorder on during the incident with Tate.  Tate took the recorder from him in the parking lot at the station.  Exhibit 9, 209:24-210:24.

328.    Hughes then called Ford about the incident, and Ford already knew about it. Exhibit 9, 176:1-4.

329.    Hughes then called Nelson to come to the station, and Nelson said he could not come to the station because he had been drinking.  Exhibit 9, 180:9-11.

330.    There is no evidence that Hughes called Dee or Kries as Tate claimed in his report.  In fact, Tate reported that when Hughes was asked if he called Trustee Dee, Hughes responded, "I was following my chain of command" looking at Bernsen.  Exhibit EEE (BEH00026 & BEH00029).

331.    Hughes was not insubordinate to Bishop.  See ¶¶ 320 & 321 above and ¶ 390 below.

332.    Hughes was not insubordinate to Tate because he could not be directed to write a report that was not true.  See ¶ 323 above.  Of course, the best evidence of Hughes' interaction with Tate would be the recording of this interaction seized by Tate that has now conveniently disappeared.[12]

---

[12] The disappearance of the recording of Tate and Hughes' conversation will be the subject of a spoliation motion as part of the pretrial filings in this case.

333.     Hughes was not insubordinate to Ford or Nelson.  CF Exhibit EEE (BEH00028) in which Tate claims Hughes was making threats and yelling at Nelson and Ford with Exhibit EEE (BEH00026), which does not even report what Nelson or Ford purportedly reported to Tate. Additionally, see Exhibit R, Rules 6.04 and 6.05, which require written reports of employee conduct violating the Department's rules.  Neither Ford, nor Nelson, filed a written complaint that Hughes engaged in the misconduct of which Tate found Hughes guilty.

334.     There can be no dispute that Hughes reported the assault upon him by Tate.  See Exhibit EEE (BEH00026).  If the failure to report employee conduct that violates the Department's rules in writing is a terminable offense, Ford should also have been fired because he did not make a written report of Hughes' claimed insubordination to him that same day.  See ¶ 332 above.

335.     Like Shelton, and Bernsen, Hughes was never permitted to give his side of the story before he was fired.  See Exhibit EEE.  Ford never interviewed Hughes about the incidents that led to his discharge.  Exhibit 3, 206:21-23.

336.     According to Bernsen, when Bishop told Hughes to write the report, Hughes had the right to say he could not do it because he did not have all the tools (information) he needed to write the report, which was the source of the disagreement.  Exhibit 4, 59:9-17.

337.     At the time Ford asked Tate to investigate the Hughes/Bishop incident and its aftermath, he knew that Hughes had made an allegation against Tate that Tate assaulted him, in the aftermath.  Exhibit 3, 208:25-209:18.

338.     When Hughes was new at the job, he didn't speak up because he didn't want to get fired.  When he finally spoke up, he got fired.  Exhibit 9, 54:6-18.

**Disparate Treatment**

339.     Ford was aware of an allegation that Tate stalked a waitress at the Break Away Cafe.  According to Ford, this complaint was not investigated. Exhibit 3, 108:2-109:8.

340.     Dee did not know if the City investigated the allegation that Tate followed a women home from the Break Away Cafe and showed up at her apartment in the middle of the night unwelcome.  Dee received a letter from the woman about the incident.  As far as he knows, Tate was never disciplined for this incident.  Exhibit 12, 35:25-18.

341.     According to Tate, the waitress from the Break Away Cafe wrote a letter to the Trustees.  However, no formal investigation was conducted into the stalking allegations against him, and he was not disciplined.  This incident took place between January and June of 2009. Exhibit 2, 139:1-140:25.

342.     There are not even any documents memorializing the stalking incident involving Tate and the waitress at the Break Away Cafe (even though letters were written to the Trustees). Exhibit 3, 112:16-19 & ¶¶ 340-41 above.  Dee believes the woman's complaint should be in Tate's personnel file.  He was surprised that it was not.  Exhibit 12, 36:25-37:5.

343.     Dee was aware that Tate was also accused of tackling a woman on her front lawn and hitting and screaming at her.  He believes a formal complaint was filed by the woman. Exhibit 12, 44:23-25.

344.     Tate would leave the streets unattended when he got upset, and he was never disciplined.  Ford told Shelton Tate left because he and Tate got into it.  Exhibit 1, 151:1-7, 152:4-7, and 159:25-160:7.

345.     Dee also heard that Tate walked off the job once for 4 hours, but he does not know if it was investigated.  He heard about this incident from more than one source, to include a Trustee.  Exhibit 12, 37:9-21 & 44:3-10.

346.    According to Tate, when Bishop engaged in a pursuit he was pursuing for another agency to take over the pursuit and then terminated it.  Bishop did not even report this pursuit until a later time.  No report on this pursuit was prepared.  Bishop received a written reprimand. Exhibit 2, 109:1-20.

347.    Bishop also drove out of sector on duty and got into a fight, and he was not disciplined.  Exhibit 1, 154:21-155:8.

348.    Officer Derek Owens used to go out of sector to visit a girl while he was on duty, and he was never disciplined.  Exhibit 1, 155:17-25.

**The March and June Performance Memos**

349.    Ford drafted a memo to Nelson dated March 28, 2010 about problems he inherited in the police department.  This memo was drafted 16 months after he was made chief and after the EEOC incident.  Exhibit 3, 138:4-139:23.  As set forth in ¶¶ 270 & 304-05 above, this memo stood in contrast to Shelton and Bernsen's performance evaluations.

350.    Ford admitted that he did not document problems with Bernsen and Shelton dating back to 2008 until March of 2010.  Exhibit 3, 145:6-19.

351.    According to Ford, Shelton was grossly insubordinate on 2 occasions in the two months before the March 28, 2010 memo, but these incidents were not documented, nor was Shelton disciplined for them, because of his friendship with Bernsen.  Exhibit 3, 155:1-12.

352.    Shelton and Bernsen were not written up or disciplined for the other incidents documented in the March 28, 2010 memo because of Ford's friendship with Bernsen.  Exhibit 3, 155:13-20.

353.    In June 2010, Ford still was not taking more action about Shelton's purported "poor report writing" because of his relationship with Bernsen.  Exhibit 3, 160:10-23.

354.    Ford further claimed in this memo that Bernsen botched a DWI report that would likely lead to huge problems when it came to prosecution of the case but took no action (other than verbal).  Ford further testified he had no idea how this DWI case resolved itself.  Exhibit 3, 163:12-24.

355.    On June 9, 2010, Ford wrote that Shelton and Bernsen were undermining the agency with their constant gossip and false tales.[13]  Exhibit 3, 166:13-18.

356.    Tate saw the March 28, 2010 and June 2010 memos from Ford to Nelson.  Exhibit 2, 33:2-14.

357.    Tate told Ford it was ill-advised to show the March 28, 2010 memo to the Board because some of it was inflammatory and not provable.  Exhibit 2, 34:1-21.

358.    Tate admitted that Ford's memos contained allegations against Bernsen and Shelton that were not the subject of written discipline.  Exhibit 2, 36:14-18.

359.    Ford admitted that by the June 9, 2010 memo, it was Ford's opinion that morale was a problem because Bernsen, Shelton, and Hughes had alienated themselves from everyone else in the department and banded together.  Exhibit 3, 170:13-171:2.

**Policies and Procedures**

360.    Department Manual Rule 6.04 provides that complaints by the police commissioner be in writing, although they may be unverified.  Exhibit R, Rule 6.04 (VBN00044)

361.    Manual Rule 6.13 provides for both the questioning of an employee accused of wrongdoing that can result in dismissal, demotion, suspension, or transfer for punitive reasons and provides for the use of polygraph examinations as part of the investigation.  Exhibit 19.

---

[13] A reasonable jury could infer that the gossip and false tales were their reports to Dee and Kries that Ford had pornography at the station and was creating a hostile work environment for Shelton.

362.     Department Manual Rule 6.11 gives any member of the police department who has been dismissed the right to appeal the decision to the Board of Trustees.  Upon the receipt of such an appeal, the Chairman is required to call a hearing within thirty (30) days after the date the appeal is filed.  Exhibit R (VBN00045)

363.     The Village/Department's Sexual Harassment Policy, Rule 14, does not provide for a reporting procedure (except for using the chain of command) when the chief is violating the Sexual Harassment Policy.  See Exhibit R (VBN00120-22).

364.     Nelson (the Police Commissioner) was not familiar with the Village's sexual harassment policy.  Exhibit 5, 61:4-6.

## The Chain of Command

365.     Ford told Hughes that no one could talk to Nelson.  Exhibit 9, 48:16-23.  All of the police officers knew not to talk to Nelson because Ford routinely said, "Nobody is to talk to Nelson.  He knows everything that is going on here, and he's in control."  Exhibit 9, 136:14-20.

366.     After the EEOC incident with Shelton, Ford posted on the bulletin board that officers could be terminated for discussing police matters with the City administration.  Exhibit 9, 133:5-9.

367.     Shelton was also told that she could not jump the chain of command and go to an alderperson.  Exhibit 1, 284:15-18.

## Other

368.     Ford, Tate, and Nelson are all white males.  See Complaint (doc. 1), ¶¶ 5-7 and Bel-Nor Answer (doc. 38), ¶¶ 5-7.  Shelton is a black female and Bernsen and Hughes are white males.  Bishop, Kimbrell and Owens are all white males. Exhibits 20-a, 20-b & 20-c.

369.     In 2010 when Plaintiffs were fired, the Village Trustees were Kevin Buchek, Walt

Nelson, Stephanie Kries, Bill Dee, and Conrad Phillipp, Jr., who are all white.  Exhibit 10, ¶ 10.

370.    Nelson recommended the hiring of Ford.  Exhibit 5, 69:18-19.

371.    Nelson and Ford are friends.  Exhibit 1, 309:7.

372.    Whenever discipline is imposed, Nelson discusses it with the chairman first to
make sure he concurs with the decision.  Exhibit 5, 79:10-15.

373.    Ford told Shelton that Nelson was aware of all that was going on and that she was
suspended because of Nelson.  Exhibit, 301:3-18. See also ¶ 365 above.

374.    No investigation of which Ford was aware was conducted into the plaintiff's
allegations.  Exhibit 3, 102:2-15.  Nelson confirmed that the Village did not investigate the
plaintiffs' allegations.  Exhibit 5, 71:7-23.

375.    Goodwin applied for both the chief and lieutenant positions at Bel Nor.  Exhibit 3,
17:18-18:3.

376.    Tate has 12 years of experience as a police officer and had been a detective for the
Bel-Ridge Police Department prior to joining the Bel Nor Police Department.

377.    Tate represented the Village's interests in the unemployment compensation
appeal hearing relating to Shelton's discharge.  Exhibit 22.

**Clarence Harmon's Expert Opinions**

378.    The omission of physical evidence from Tate's investigative report supporting
Shelton's claim that she took evasive action to avoid being hit suggests that Tate was looking for
reasons to support Shelton's termination rather than attempting to conduct a fair and impartial
investigation.  Exhibit 23, p. 3.

379.    Tate's investigation of the pursuit was incomplete because he did not interview
other officers involved or Shelton.  Exhibit 23, p. 3.

64

380.    Tate concluded that Shelton prepared a false police report and violated the Department's pursuit policy without using one of the tools available to him – a polygraph examine.  Instead, Tate made a number of assumptions (that the car did not attempt to hit Shelton, that if it did, there was no criminal intent, and that Shelton was traveling 61 mph) inconsistent with accepted police practices.  Exhibit 23, pp. 3-4.

381.    Tate's efforts to find the driver of a white SUV that Shelton reported was almost hit by the car she was pursuing was designed to discredit Shelton rather than discover the facts of the pursuit given the number of white SUVs on the road, particularly when Tate failed to interview officers involved in the pursuit, such as Shelton and Bernsen.  Exhibit 23, p. 4.

382.    Harmon opined that Shelton's pursuit would not have resulted in the termination of an officer in good graces as evidenced by the inadequacy of the investigation, all presumptions being made against Shelton, and the Department's failure to follow its own rules and regulations regarding the investigation of pursuits.  Exhibit 23, p. 4.  Harmon further opined that in another context, this pursuit would have resulted in a written reprimand.  Exhibit 24:41:2-6.

383.    In Harmon's opinion an officer could begin a pursuit without informing the dispatcher of the rationale for it when the circumstances evolve rapidly.  In such a case, the reason for the pursuit might not be communicated until the vehicle was stopped.  Exhibit 24, 52:2-24.

384.    If Tate believed that Shelton filed a false police report regarding the pursuit, he was duty bound to present the information to the prosecuting attorney.  For Tate to claim that this was unnecessary was inconsistent with accepted police practices.  Exhibit 23, pp. 4-5 & Exhibit 24, 74:3-16.

385.    An inadequate investigation was conducted before Bernsen was demoted for failing to adequately supervise Shelton's pursuit because Bernsen was not given the opportunity to explain his actions orally or in writing.  Exhibit 23, p. 5.

386.    Bernsen was recommended for severe discipline twice (demotion and termination) without being asked a single question about the incidents resulting in discipline.  It would be unusual and poor practice to recommend termination without giving the affected officer an opportunity to respond.  Exhibit 23, p. 5.

387.    Inconsistencies between Tate's reports involving Bernsen and Hughes regarding the chain of command issue would lead a reasonable person to conclude that Tate was looking for reasons to fire Bernsen.  Exhibit 23, p. 5.

388.    There are times when the chain of command cannot be followed in a paramilitary organization.  When a command officer is abusing his power and authority, subordinates have no choice but to break the chain of command to obtain relief.  Exhibit 23, p. 6.  When Ford told Hughes that Tate would be handling the situation involving him, it was understandable for Hughes to go outside the chain of command.  Exhibit 24, 101:21-25.  The Police Commissioner would be one of the persons an officer might want to talk to unless the Police Commissioner had knowledge of the activity or there was a belief he would not effectively provide supervision or sanction over the chief.  Exhibit 24, 112:3-9.

389.    The reasons used to terminate Bernsen and the process used to terminate him were inconsistent with acceptable police practices.  Exhibit 23, p. 6.

390.    In Harmon's opinion after a review of the audio recording, the interaction between Bernsen and Bishop did not rise to the level of insubordination or verbal abuse.  Exhibit 23, p. 6.

391.    Tate should not have been permitted to investigate allegations against Hughes after Hughes accused Tate of assaulting him because Tate had an interest in the outcome of the investigation. To allow Tate to investigate Hughes under these circumstances was inconsistent with accepted police practices and calls into question the validity of the investigation that resulted in Hughes' termination. Exhibit 23, pp. 3 & 6.

392.    The Bel Nor sexual harassment policy is deficient because it fails to direct officers where to report sexual harassment involving the Chief of Police. Exhibit 23, p. 5.

393.    Pornography in a police department is detrimental to the good order, morale, and discipline of a police department, which negatively impacts operational effectiveness. This is particularly true when a command rank officer engages in the conduct and subordinates are aware of it because it creates the perception that the rules do not apply equally. Exhibit 23, p. 7.

394.    Spending long periods of time in the bathroom viewing pornography could be perceived by other officers as stealing time. Exhibit 23, p. 7.

395.    A chief's use of sexist and racist comments in a police department also is detrimental to the good order, morale, and discipline of a police department, which negatively impacts operational effectiveness. Minority officers would know that their skills and abilities would not result in advancement. Such comments give both minority and majority officers no real incentive to perform to their potential. Additionally, such comments make it clear that some citizen are less important, negatively impacting operational effectiveness. Exhibit 23, p. 7.

396.    In Bel Nor, half of a very small police department was dismissed within a span of 3 weeks in the absence of the kind of investigation Harmon was accustomed to seeing, and therefore, outside of what he would interpret as good administration. Exhibit 24, 68:21-69:23.

397.    If Harmon was conducting an internal affairs investigation, he would interview

and take a statement from everyone involved.  Exhibit 24, 72:9-13.

398.    Harmon also questioned the chief remaining involved in this discipline after he suspected involvement of the officers in reporting his possession of pornography, as this would allow the chief's personal biases and prejudices to influence the discipline imposed and taint the final decision.  Exhibit 23, p. 6.

Respectfully submitted,

PLEBAN & PETRUSKA LAW, LLC


By:    _____/s/ Lynette M. Petruska_____
       C. John Pleban, #MO24190
       Lynette Petruska, #MO41212
       Talmage E. Newton, IV, #MO56647
       2010 S. Big Bend Blvd.
       St. Louis, MO 63117
       (314) 645-6666
       (314) 645-7376        FAX

       Attorneys for Plaintiffs


**Certificate of Service**

I hereby certify that on this 2nd day of April, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which automatically sent notification of such filing to counsel for the Defendants:  Andrew J. Martone, Caryl L. Flannery, and William J, Clark, IV, 1650 Des Peres Rd., Suite 200, St. Louis, MO 63131.


       ____/s/ Lynette M. Petruska_____