IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FELICIA SHELTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-2146-NAB |
| | ) | |
| VILLAGE OF BEL NOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE VILLAGE
OF BEL NOR'S MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

On March 2, 2012, Defendant the Village of Bel Nor (hereinafter "Bel Nor") filed its

motion for summary judgment (doc. 87) and supporting legal memorandum (doc. 86)

(hereinafter referred to as "Village's Memo").  In claiming that Bel Nor is entitled to judgment

as a matter of law, it misrepresents and ignores the full summary judgment record, which shows

that numerous factual disputes make summary judgment inappropriate in this case.  For the

reasons discussed below, Bel Nor's summary judgment motion should be denied, except as to its

sovereign immunity defense.

**II.     STANDARD OF REVIEW**

This court has to decide based on the record identified by the parties whether there is any

material dispute of fact that requires a trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-

50 (1986).  If there is any material dispute of fact, summary judgment is inappropriate.  With

respect to employment actions, the Eighth Circuit has repeatedly cautioned that summary

judgment should seldom be granted "unless all of the evidence points one way and is susceptible

to no reasonable inferences sustaining the position of the nonmoving party."  Hindman v.

Transkrit Corp., 145 F.3d 986, 990 (8th Cir. 1998).  The Eighth Circuit has cautioned against the district courts granting summary judgment motions in employment actions because such cases often depend on inferences rather than on direct evidence.  See e.g. Equal Employment Opportunity Commission v. Liberal R-II School District, 314 F.3d 920, 922 (8th Cir. 2002). See also Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1082 (8th Cir. 2010) (summary judgment should be used sparingly in discrimination and retaliation cases and is an inappropriate remedy in "very close" employment discrimination cases).[1]

The Defendants must establish their right to judgment with such clarity that there is no room for controversy.  Jewson v. Mayo Clinic, 691 F.2d 405, 408 (8th Cir. 1982).  All reasonable inferences must be viewed in the light most favorable to the Plaintiffs, and the Court must give them the benefit of all reasonable inferences to be drawn from the facts.  Id.  In ruling on a summary judgment motion, a court must remember that "credibility determinations, weighing the evidence, and drawing legitimate inferences from the facts are jury functions, not those of the judge . . ."  Anderson, 477 U.S. at 255.  While the court must review the record as a whole, it must also "disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Products. Inc., 530 U.S. 133, 151 (2000).  When the record creates a question of fact, such that a witness/party's credibility is in doubt, summary judgment is inappropriate.  Sitzes v. City of W. Memphis Ark., 606 F.3d 461, 480 (8th Cir. 2010).

It is for the finder of fact to determine the credibility of witnesses.  United States v. Phillips, 522 F.2d 388, 391 (8th Cir. 1975).  Credibility is determined by such factors as a witness' tendency to speak truthfully or falsely, the probability or improbability of the testimony

---

[1] As the 8th Circuit has also made clear, this does not mean that there is a separate summary judgment standard in discrimination or retaliation cases.  Smith, 625 F.3d at 1082-83.

given, the interest of the witness in the result of the trial, and the witness' capacity and willingness to testify truthfully and accurately, among other factors.  *Id.*  If the trier of fact believes that a witness testified falsely as to a material issue in the case, the trier of fact may reject all or part of the witness' testimony.  *Id.*  These factors need to be considered by this Court in reviewing the summary judgment record because there is evidence not only that the Defendants have made false statements that the jury is not required to believe[2] but that their attorneys have been less than candid in the summary judgment record presented to this Court.[3]

While issues of witness credibility are not typically raised in summary judgment motions, the central issues is in this case are whether Plaintiff Felicia Shelton (hereinafter "Shelton")  was fired because of her race and/or gender and all of the Plaintiffs were fired  because they engaged in protected activity as they claim, or were fired because they violated Department policies, as Bel Nor claims.  Interwoven into the facts are issues relating to the credibility of the witnesses due to demonstrably false statements made by the Defendants in an effort to conceal their illegal discrimination.  Because a court may not remove the assessment of credibility from the jury, when who the jury believes will determine the prevailing party, summary judgment is inappropriate.  Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir, 2002).

## III.   ANALYSIS

### A.   Sovereign Immunity

As Plaintiffs have previously advised this Court, they do not wish to waste time and

---

[2] By way of example but by no means exhaustive, Ford claimed that he never used the word "nigger" while on duty at Bel Nor, that he never referred to Shelton as a "nigger", and that he never used racial slurs in his capacity as a Bel Nor police officer or its chief, which is refuted by four other witnesses. Cf. Plaintiffs' Statement, ¶ 210 to ¶¶ 196-203 & 206-209.  Nelson claimed he was unaware of Ford's pornography at the police  station, while Shelton testified that Nelson did see Ford's pornography.  Plaintiffs' Statement, ¶ 177.

[3] By way of example, counsel for Defendants filed an affidavit that Bel Nors' July 1, 2009 through June 30, 2010 insurance policy applied to Plaintiffs Bernsen and Hughes' public policy discharge claims, even though these Defendants were not fired until July 2010, and therefore, the policy filed with the Court was not applicable on its face to these claims.

scarce judicial resources pursuing claims that are barred by the doctrine of sovereign immunity. While the Missouri Supreme Court has not squarely addressed the issue of whether language like that contained in Bel Nor's 2010-2011 insurance policy operates to preserve sovereign immunity, the Court cited an appellate opinion standing for this proposition with approval and as the correct interpretation of the law.  See Amick v. Pattonville-Bridgeton Terrace Fire Prot. Dist., 91 S.W.3d 603, 605 (Mo. banc 2002).  Additionally, Plaintiffs recognize the cases cited in Defendant Village of Bel Nor's Memorandum in Support of Its Motion for Summary Judgment (doc. 86) (hereinafter " Village's Memo"), p. 3.  Therefore, Plaintiffs John Bernsen (hereinafter "Bernsen") and Bryan Hughes (hereinafter "Hughes") do not address further herein the sovereign immunity issue raised by Bel Nor.

### B.      Shelton's Discriminatory Discharge

#### 1.      Shelton Has Presented Direct Evidence of Discrimination

The Village's burden-shifting analysis in support of its motion for summary judgment shows a basic misunderstanding of the law.  Village's Memo, p. 4.  Bel Nor claims it is  entitled to judgment as a matter of law because Shelton failed to establish one of the elements required to establish a *prima facie* case under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668  (1973).  However, the McDonnell Douglas burden-shifting analysis does not apply when a plaintiff presents direct evidence of discrimination.  Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 621-22, 83 L.Ed.2d 523 (1985).  Rather, a district court commits error in applying the McDonnell Douglas factors when there is direct evidence of discrimination.  Carney v. Martin Luther Home, Inc., 824 F.2d 643, 648 (8th Cir. 1987).

"Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder

that an illegitimate criterion actually motivated the adverse employment action." <u>King v. United States</u>, 553 F.3d 1156, 1160 (8th Cir. 2009) (quoting <u>Ramlet v. E.F. Johnson Co.</u>, 507 F.3d 1149, 1152 (8th Cir. 2007) (internal quotation and alteration omitted)).  See also <u>Daugherty v. City of Md. Heights</u>, 231 S.W.3d 814, 818 (Mo. 2007).  Direct evidence of discrimination "may include evidence of actions or remarks of the employer that reflect a discriminatory attitude, comments which demonstrate a discriminatory animus in the decisional process, or comments uttered by individuals closely involved in employment decisions." <u>Id</u>. (quoting <u>King v. Hardesty</u>, 517 F.3d 1049, 1058 (8th Cir. 2008)) (internal quotations omitted).

Here there is direct evidence that all of the individuals involved in the firing of Shelton were racists and sexists, and therefore, there is direct evidence of a link between the discriminatory animus and Shelton's termination.[4]  See Plaintiffs' Statement, ¶¶ 196-257.  By way of example, the evidence shows that Chief Scott Ford (hereinafter "Ford") regularly referred to African-Americans using such racist terms as "nigger," "pimp," "porch monkey," and "ghetto."  Plaintiffs' Statement, ¶¶ 196-97, 201, 207-07, & 209.   He referred to Shelton as a "ghetto nigger."  Plaintiffs' Statement, ¶¶ 202-203.  Knowing such racist comments are both inappropriate and offensive, when African-Americans could hear him, Ford would us the word "canadian" to refer to African-Americans.  Plaintiffs' Statement, ¶ 207.  The Urban Dictionary defines "canadian" as an "expression for black people used by whites as 'code' when they want to refer to blacks in a semi-derogatory manner without being detected in a group of people."  See http://www.urbandictionary.com/define.php?term=canadian.

Lt. Richard Tate (hereinafter "Tate") called a black man a "coon" and was heard saying

---

[4] Defendants cannot negate this evidence by claiming that Ford hired Shelton knowing she is an African-American female because Shelton was hired by Ford's predecessor, Chief Matt Lauer.  Plaintiffs' Statement, ¶ 269.

about African-Americans: "those fucking people get on my nerves."  Plaintiffs' Statement, ¶ 214.  Even Police Commissioner Walt Nelson (hereinafter "Nelson") admitted to using  the word "nigger" as often as once a month.  Plaintiffs' Statement,  ¶ 215.   Ford told Hughes that he and Nelson were on the same page and felt the same way about African Americans: that Nelson was a racist and hated black people.  Plaintiffs' Statement, ¶ 216.  Clearly, there is sufficient direct evidence of racial animus on the part of Ford, Tate, and Nelson, who were all closely involved in Shelton's discharge, to survive a motion for summary judgment.  King, 553 F.3d at 1160.

There is similar evidence of gender animosity among the decision-makers to survive a summary judgment motion.  Plaintiffs' Statement, ¶¶ 217-256.  Ford created a gender hostile work environment by keeping pornography in the station and pin-up girls on the bathroom wall.  Plaintiffs' Statement, ¶¶ 220-22, 232, 235-36, 237-38.  He would not give Shelton a locker (that he was willing to give to Hughes) because he kept his pornography in it.  Plaintiffs' Statement, ¶¶ 217-19 & 226-29.  Ford would say that women should not be in law enforcement and referred to women as "stupid," "cunts," and only good for "laying on their backs."  Plaintiffs' Statement, ¶¶ 247-50.  Ford even told Shelton on one occasion, "The only reason that they let you arrest them is because they want to fuck you and you're halfway attractive."   Plaintiffs' Statement, ¶ 245.  Tate also referred to women as stupid, lazy, cunts, and said they had no business in police work.  Plaintiffs' Statement, ¶¶ 251-53.  Nelson also referred to women as stupid bitches and said that most women could not do police work and need to find a different job.  Plaintiffs' Statement, ¶¶ 255-56.  Therefore, there is also sufficient evidence that those closely involved in Shelton's discharge had a sexist animus to survive summary judgment.

## 2. If Shelton's Case is an Indirect Evidence Case, It Still Survives Summary Judgment

Initially, Defendants claim that Title VII and MHRA claims are analyzed under the same

framework.  Village's Memo, p. 4.  This is not the case.  The Missouri Supreme Court has made

it clear that the MHRA's antidiscrimination safeguards  "are not identical to the federal standards

and can offer greater discrimination protection."  Howard v. City of Kan. City, 332 S.W.3d 772,

784 (Mo. 2011) (quoting Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818-19 (Mo.

banc 2007)).[5]  Plaintiffs' discrimination/retaliation claims under the MHRA are discussed in

Plaintiffs' Combined Memorandum in Opposition to Scott Ford, Richard Tate, and Walt

Nelson's Motions for Summary Judgment, pp. 3-9 & 10-13, which is incorporated by reference

herein for the sake of brevity.  Therefore, if this Court grants Bel Nor's summary judgment on

Shelton's (and the other Plaintiffs') Title VII claims, summary judgment should be denied as to

their MHRA claims.

 If this Court agrees with Bel Nor that this in an indirect evidence of discrimination

case, which Shelton does not concede for the reasons set forth above, she has presented sufficient

indirect evidence of discrimination to survive a motion for summary judgment.  Bel Nor's only

argument in support of summary judgment is that Shelton was fired for a legitimate

nondiscriminatory reason, the pursuit, which was not pretextual.  Village's Memo, pp. 4-6.  This

issue can be addressed briefly because, at a minimum, disputes of fact preclude summary

judgment on this issue.  As both Ford and Tate concede, if this pursuit took place as Shelton

reported, the pursuit was legitimate under Bel Nor's policy.  Plaintiffs' Statement, ¶ 36.  There is

no requirement for authorization to leave the Village in hot pursuit of a felony.  Plaintiffs'

Statement, ¶ 86.  While Shelton did notify dispatch that she was initiating a pursuit, she failed to

---

[5] By way of example, the MHRA permits punitive damage claims against political subdivisions. *Id.* at 789.  As Defendants concede, a plaintiff under the MHRA need not prove that discrimination was a substantial or determining factor in the adverse action, but only a contributing factor.  Village's Memo, p. 4, citing EEOC v. Con-Way Freight, Inc. 622 F.3d 933, 938 (8th Cir. 2010) (quoting Daugherty, 231 S.W.3d at 820).  In Daugherty, the Missouri Supreme Court further held that whether discrimination was a contributing factor is the proper way to analyze a summary judgment motion because a plaintiff has no higher standard to survive summary judgment than to submit a claim to the jury. *Id.*

provide all of the reasons for the pursuit.  Plaintiffs' Statement, ¶ 34.  Former Internal Affairs Division Commander, Police Chief, and City of St. Louis Mayor, Clarence Harmon (hereinafter "Harmon"), opined that an officer could begin a pursuit without informing the dispatcher of the rationale for it when the circumstances evolve rapidly.  In such a case, the reason for the pursuit might not be communicated until the vehicle was stopped.  Plaintiffs' Statement, ¶ 385.  Bernsen testified that he authorized the pursuit by not terminating it while he was attempting to collect all of the information necessary to make an informed decision before the pursuit terminated naturally.  Plaintiffs' Statement, ¶¶ 33 & 308-09.  Ford admitted that he authorized a pursuit this same was when a white male officer engaged in a pursuit.  Plaintiffs' Statement, ¶¶ 33 & 368.

Bel Nor claims that Shelton engaged in an improper pursuit for traffic despite physical evidence that supports Shelton's claim that she was forced off the road to avoid being hit.  Plaintiffs' Statement, ¶¶ 292-93.  It also claims that Shelton was driving in an unsafe manner during the pursuit because she was traveling at a high rate of speed, even though it had no objective evidence of Shelton's speed, and she was never asked how fast she was traveling.  Plaintiffs' Statement, ¶¶ 294-95.  Shelton was never even interviewed about the pursuit or given a polygraph, as permitted by Department policy, if Ford and Tate thought she was lying to them about it.  Plaintiffs' Statement, ¶¶ 298, 361, & 382.  Bel Nor did not even appoint the review board required by Department policy after the Shelton pursuit.  Plaintiffs' Statement, ¶ 299.  Harmon opined that the "investigation" that led to Shelton's discharge was incomplete and relied on assumptions inconsistent with accepted police practices, and that in his opinion her pursuit would have resulted in a written reprimand if she had been in Ford's good graces.  Plaintiffs' Statement, ¶¶ 380-82 & 384.  A reasonable jury could infer that Ford and Tate conducted an inadequate investigation and did not follow Department policy because they were simply looking

for reasons to fire Shelton because of her race and gender.  This is particularly true when Ford told Tate the pursuit was bad before Tate began his "investigation" and Bel Nor reported to its insurance carrier that the pursuit violated Bel Nor policy before its investigation was completed. Plaintiffs' Statement, ¶¶ 25 & 291.

A reasonable jury could conclude that Shelton was fired for a pretextual reason (improper pursuit), just as Officer Steve Goodwin had been before her.  Plaintiffs' Statement, ¶¶ 60.  While Goodwin was not fired because he was female or African-American, or even in retaliation for engaging in protected activity, he was fired in retaliation by Ford and Tate, after he applied for both of their positions, was promised the lieutenant position by Ford, and challenged both Ford and Tate when he was not given the position as promised.  Plaintiffs' Statement, ¶¶ 60 & 376. That Schaefer and Bishop were not fired after engaging in pursuits (in Schaefer's case, the same pursuit as Goodwin) further supports this inference because either the Department has "zero tolerance" for bad pursuits (and those who engage in them are fired), or it does not.  Bishop's (white male)  improper pursuit was the most egregious because he did not even report it at the time it occurred but after the fact.  Plaintiffs' Statement, ¶¶ 62, 346, & 348.  Bishop's pursuit was never even investigated and his discipline minor.  Plaintiffs' Statement, ¶¶ 62 & 346.

Additionally, Ford and Tate's treatment of Shelton stands in stark contrast to the lack of discipline imposed when white males engaged in more egregious conduct.  By way of example, Tate stalked a waitress (leaving the Village, following her home, and showing up at her door unwanted) and abandoned in his duties, but was never disciplined.  Plaintiffs' Statement, ¶¶ 339-342.  In fact, when the woman who had been stalked wrote a letter complaining to the Trustees, her complaint was never investigated, and the complaint was never even associated with Tate's personnel file.  Plaintiffs' Statement, ¶¶ 341-42.  In addition to the pursuit that violated

9

Department policy, Bishop drove out of sector and got into a fight, and he was not disciplined.

Plaintiffs' Statement, ¶ 347.  Officer Derek Owen would visit a girl, taking him out of sector

while on duty, and he was never disciplined.  Plaintiffs' Statement, ¶ 348.  Clearly, it is not the

nature of the conduct that dictates discipline in the Bel Nor Police Department.

### C.    The Village Is Not Entitled to Summary Judgment on Shelton's § 1983 Equal Protection Claim

Initially the Village claims that Shelton's equal protection claim fails because she has

failed to show that she was treated differently than others similarly situated.  Village's Memo, p.

7.  This is an over simplistic analysis of Shelton's equal protection claim.  The order and burden

of proof laid down by the Supreme Court for Title VII cases applies to "race and sex

discrimination in employment brought under 42 U.S.C. §§ 1981 and 1983."  Goodwin v. Circuit

Court, 729 F.2d 541, 545 (8th Cir. 1984); Ottman v. City of Independence, 341 F.3d 751, 756 (8th

Cir. 2003).  Therefore, for the reasons set forth above, which are incorporated by reference

herein for the sake of brevity, Shelton's § 1983 sex and gender discrimination claims also

survive summary judgment.

Bel Nor further claims that it is not liable because Shelton alleged in her Complaint

(Exhibit A, ¶ 76) that Ford possessed final policymaking authority, which he does not.  Village's

Memo, p. 7.  Once again, this is not the case.  Shelton alleged:

> 76.    The actions complained of herein were made by those with final policy-making authority and/or approved by those with final policy-making authority within the the Village as part of a deliberate policy of discrimination against African American, female employees of the Village, who are treated less favorably than their white, male counterparts.  Exhibit A, ¶ 76.

Ford is not mentioned in paragraph 76 of the Complaint.  As the Village concedes,

unconstitutional government policy, necessary for a § 1983 claim, can be inferred by a "single

decision taken by the highest officials responsible for setting policy in a particular area of the

10

government's business."  Village's Memo, p. 7, citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988).  As the Village concedes, its Board of Trustees has final policymaking authority, which Shelton does not dispute.  Village's Memo, p. 8.  In this case, Shelton (and Bernsen and Hughes) timely appealed their dismissals to the Board of Trustees pursuant to the Village's appeal policy.  Plaintiffs' Statement, ¶¶ 172 & 362.

At the time Shelton was fired and appealed, the Board of Trustees knew that Ford had pornography in the police station, a violation of the Village's sexual harassment policy.  Plaintiffs' Statement, ¶¶ 171 & 262.  Dee's testimony as to whether the Board knew that Ford had called Shelton a "nigger" at this time of her discharge was in conflict.  Plaintiffs' Statement, ¶ 189.  Nonetheless, the Board knew that 3 police officers had been fired by Ford shortly after they complained about Ford's pornography at the station.  The Board did not investigate the pornography allegations against Ford or give Plaintiffs the appeal hearings they requested.  Plaintiffs' Statement, ¶ 171-72.  Even when Dee brought to the Board's attention Hughes' complaint that he was assaulted by Tate and requested an investigation, the Board did nothing.  Plaintiffs' Statement, ¶ 137.

While it does not appear that that the 8th Circuit Court of Appeals has addressed the issue, the 9th Circuit has held that a governmental entity may be liable when a plaintiff proves "that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."  Glenn v. Wash. County, 661 F.3d 460, 475 (9th Cir. 2011).  See also Praprotnik, 485 U.S. at 127 (when "a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the

municipality because their decision is final.")  The Board's ratification of Shelton's termination makes Bel Nor liable for it.

### D. Shelton's § 1981 Claim Survives Summary Judgment

Bel Nor claims that Shelton's § 1981 claim does not survive summary judgment for the same reasons it claims her Title VII claim fails.  Village's Memo, p. 8.  However, it concedes that the elements required to prove employment discrimination under Title VII and § 1981 are identical.  Village's Memo, p. 8, citing <u>Bennett v. Nucor Corp.</u>, 656 F.3d 802, 818 (8th Cir. 2011).  Therefore, for the reasons discussed at pages 4 through 10 above, which are incorporated by reference for the sake of brevity, Shelton's § 1981 claim also survives summary judgment.

### E. Shelton's Hostile Work Environment Claim Survives Summary Judgment

Next Bel Nor claims that Shelton cannot survive summary judgment on her hostile work environment claim, arguing that what Ford subjected her to was only "simple teasing, offhand comments, and isolated incidents."  Village's Memo, p. 10.  Bel Nor wants this Court to make credibility determinations by concluding that Shelton's allegations are not true, even though other witnesses support her claims that Ford created a racially and sexually hostile work environment.  See Village's Memo, p 10 (referring to Shelton's unsupported allegations) and n. 4. Cf. Plaintiffs' Statement, ¶¶ 197-200, 203, 206-07, & 237-38,  which show that Shelton's statements are not unsupported.  What is more troubling is that Bel Nor fails to advise this Court that Shelton testified that while she gave specific examples during her deposition, the racial and sexual discrimination and harassment took place on a daily basis.  Plaintiffs' Statement, ¶ 257. The pin-up pictures that Ford hung in the bathroom (until he was made to take them down) would also have been a daily reminder that Ford objectified and demeaned women.  Plaintiffs' Statement, ¶¶ 235-36.  Goodwin, Cochran, and Hughes' testimony show that Ford could not

control his hostility towards African Americans and women, creating a pervasively hostile work environment.  Plaintiffs' Statement, ¶¶ 199-200, 203, 206-07, 226-29, 233, 235, &237-38. Sadly, Bel Nor continues to take the position it did when Ford's misconduct was reported to it by Dee, that what Ford subjected Shelton to was no big deal (after all boys will be boys).  This is the reason that Bel Nor never investigated the Plaintiffs's serious allegations, and the reason Nelson asked Dee if he liked what he saw when he reported the pornography.  Plaintiffs' Statement, ¶¶ 244 & 375.

To establish that the harassment altered a term, condition, or privilege of employment, a plaintiff must show that it was "severe or **pervasive** enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive."  Diaz v. Swift-Eckrich, Inc., 318 F.3d 796, 800 (8th Cir. 2003).  (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)) (emphasis added).  The court must look at "'all the circumstances' to assess the degree of the harassment, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; … whether it unreasonably interferes with an employee's work performance.'"  Id. (quoting Harris, 510 U.S. at 23).  Additional factors in determining an actionable hostile work environment include the physical proximity of the harasser and the presence or absence of other people.  Id.  While "infrequent rude behavior does not create a hostile environment, such claims may be 'based on the cumulative affect of individual acts.'"  Id. (quoting Amtrak v. Morgan, 536 U.S. 101, 115 (2002)).

Bel Nor relies on cases involving isolated incidents of misconduct in an attempt to convince this court that the daily demeaning of Shelton at work was not sufficiently severe or

pervasive to constitute a hostile work environment.  Village's Memo, pp. 10-11.  However, this case is more like Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999) (evidence of a host of indignities over the course of some two years to include verbal abuse interlaced with sexual and racial epithets, rude sexual gestures, sexual insults, and acts of vandalism in work area created actionably hostile work environment); Rorie v. UPS, 151 F.3d 757, 761-762 (8th Cir. 1998) (telling employee she smelled good, patting her on the back, brushing up against her, and always coming on to her and/or being flirty, which continued throughout employment cannot be said to not constitute sexual harassment as a matter of law); and Watson v. CEVA Logistics U.S., Inc., 619 F.3d 936, 943 (8th Cir. 2010) (racial slurs and comments, as well as comments directed at plaintiffs and made in their presence and directed to them and made in the presence of others including, "I hate them damn n****rs," and "f**king n****r," particularly when some comments were made in a manner that a jury could reasonably conclude would be particularly demeaning or humiliating sufficiently hostile to survive summary judgment), than the cases cited by Bel Nor.  In Watson, the Court further noted a difference between slurs and racial graffiti because a slur is only heard once but graffiti remains until the employer acts to remove it.  *Id.*  Here Shelton was subjected to Ford's pin-up girls on a daily basis and his pornography on a regular basis (albeit not daily).  Plaintiffs' Statement, ¶¶ 222 & 236.

It is also important to note that when Ford mistakenly believed that Shelton had filed an EEOC complaint against the Department, he became physically intimidating towards her, pinned her up against the wall before calling her a "ghetto nigger" in Hughes' presence as Shelton was trying to leave.  Plaintiffs' Statement, ¶¶ 202-03.  Whether the conduct is physically threatening, as well as the totality of the circumstances, is used to determine whether a hostile work environment exists.  Watson, 619 F.3d at 942.  As the Court concluded in Watson, "We remain

14

cognizant of the fact that '[a] work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents.'" *Id.* (quoting <u>Carter</u>, 173 F.3d at 702). Here the cumulative effect of daily workplace harassment because of Shelton's race and gender allow her hostile work environment claim to survive a motion for summary judgment. Contrary to Bel Nor's claim, the record does not establish isolated conduct and comments but a work environment permeated with racial and gender hostility. Cf. Village's Memo, p. 11.

**F.   Plaintiffs' Retaliation Claims Survive Summary Judgment**

**1.   A Mistaken Belief that An Employee Engaged in Protected Activity Provides Protection**

Once again, Bel Nor misrepresents the facts when it argues that Shelton claims that she was discharged based solely on her <u>opinion</u> that Ford believed she engaged in protected activity when the EEOC called. Village's Memo, p. 12. Hughes confirmed that Ford believed that Shelton had contacted the EEOC about the Department. Plaintiffs' Statement, ¶ 179. Bel Nor incorrectly argues that Shelton could not be retaliated against because she did not engage in protected activity. Village's Memo, p. 12, citing <u>Murphy v. St. Louis Univ.</u>, 2011 U.S. Dist. LEXIS 85987, *17-18 (E.D. Mo. 2011); <u>Farnsworth v. Covidien, Inc.</u>, 2010 U.S. Dist. LEXIS 1905, *50-53 (E.D. Mo. 2010); <u>Chastain v. UPS, Inc.</u>, 2010 U.S. Dist. LEXIS 11088, *20-21 (E.D. Mo. 2010). Not surprising, none of these cases address the actual issue before this court but stand only for the proposition that a plaintiff cannot suffer retaliation when s/he did not engage in protected activity. By way of example in <u>Murphy</u> the plaintiff claimed that she was being harassed because when she received written discipline from her supervisor, she submitted rebuttals that the discipline was unfair, but she never complained of race, age or gender discrimination. *Id.*

None of the cases cited by Bel Nor address the issue before this Court: whether liability can attach when an employee suffers retaliation because the employer mistakenly believes that the employee engaged in protected activity.  While the 8th Circuit has not addressed this issue in the context of Tile VII, it has addressed it in the context of the Fair Labor Standards Act. Section 15(a)(3) provides that it shall be unlawful for any person:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.  29 U.S.C. § 215(a)(3).

Similarly, Title VII and the MHRA make it an unlawful employment practice for an employer to discriminate (or retaliate) against an employee because s/he has opposed any practice made an unlawful employment practice by the Act or because s/he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act.  42 U.S.C. § 2000e-3(a) and §213.070.2 R.S.Mo.

In concluding that 29 U.S.C. § 215(a)(3) applied when an employee was fired because the employer mistakenly believed he had engaged in protected activity, the Court reasoned that "c]ourts have therefore not hesitated to apply the protection of section 15(a)(3) to activities less directly connected to formal proceedings where retaliatory conduct has a similar chilling effect on employees' assertion of rights."  Saffels v. Rice, 40 F.3d 1546,  1548 (8th Cir. 1994).  The Court noted that this same reasoning had been applied to § 8(a)(3) of the National Labor Relations Act.  Id. 1549.  See also Fogleman v. Mercy Hosp., 283 F.3d 561, 571 (3rd Cir. 2002) ("we have consistently held that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken belief that the employee engaged

16

in protected activity"). Therefore, Bel Nor's claim that an employer cannot be held liable under the nation's antidiscrimination laws because the employer mistakenly believed that the employee engaged in protected activity is incorrect.

Additionally, the evidence in this case shows that Shelton, Bernsen, and Hughes all reported Ford's possession of pornography to Dee, and therefore, all engaged in protected activity. Plaintiffs' Statement, ¶¶ 91 & 263. Additionally, Shelton reported the pornography to Bernsen, her supervisor. Plaintiffs' Statement, ¶¶ 260 & 276. Both internal complaints of discrimination and informal complaints to superiors constitute protected activity. Gagnon v. Sprint Corp., 284 F.3d 839, 854, n. 4 (8th Cir. 2002).

> ### 2.    Plaintiffs Have Presented Sufficient Evidence That They Were Retaliated Against for Engaging in Protected Activity to Survive Summary Judgment

As with Shelton's race and gender discrimination claims under Title VII and the MHRA, this Court must first decide whether Plaintiffs retaliation claims are direct evidence or indirect evidence claims. As set forth above, if they are direct evidence claims, using the burden shifting analysis argued by the Village would be improper. Carney, 824 F.2d at 648. Shelton and Bernsen went to Dee about the pornography on or about June 9, 2010. Plaintiffs' Statement, ¶ 263. In a memo purportedly dated the same day, Ford complained to Nelson that Shelton and Bernsen were discussing the Department in a negative manner to Trustee Kreis and that Bernsen had conveyed negative feelings about the command to Trustee Dee. Exhibit JJ (FAS00323). A reasonable jury could conclude that these negative discussions about the Department and negative feelings about the command included the commander's pornography at the station. This is particularly true because the evidence further shows that Ford told Hughes that if Bernsen and Shelton thought they were going to go to Dee about the pornography, they had another thing

17

coming.  This statement was made on or about June 11, 2010, two days after Shelton and

Bernsen reported the pornography to Dee.  Plaintiffs' Statement, ¶ 266.  Shelton was fired 19

days later over the bogus pursuit charge discussed above.  Plaintiffs' Statement, ¶ 50.  Bernsen

was fired July 12, 2010, also over bogus charges discussed in more detail below, approximately

one month after Ford made this statement. Plaintiffs' Statement, ¶ 99.  Hughes was fired July 7,

2010, less than a month after this protected activity.  Plaintiffs' Statement, ¶ 147.  Before Shelton

was fired, Ford and Nelson solicited Bernsen's help getting rid of Shelton, with the promise of a

full-time job.  This conversation also took place two days after Shelton and Bernsen went to Dee

about the pornography.  Plaintiffs' Statement, ¶ 118.  According to Ford, Buchek called him and

told him that Bernsen had called as was upset that there were pornogrpahic magazines in the

station.  Plaintiffs' Statement, ¶ 267.  Therefore, Ford had notice of Bernsen's protected activity.

Shortly after the pornography was reported to Dee, Ford's behavior towards Hughes changed:

there was a lack of communication,  Ford no longer trusted Hughes, and they no longer rode

together.  Plaintiffs' Statement, ¶ 268.  Additionally, Ford's June 9, 2010 memo (Exhibit JJ)

included Hughes with Shelton and Bernsen as part of the problem, and Ford testified that by then

all three had alienated themselves from everyone else in the department and banded together.

Plaintiffs' Statement, ¶ 359.  A reasonable jury could infer that Ford had learned that all three

Plaintiffs had reported his pornography by the time they were disciplined and discharged.

Therefore, Plaintiffs' retaliation claims are direct evidence claims, making the burden shifting

analysis used by Bel Nor improper.

      If this Court should disagree with Plaintiffs, Bel Nor still is not entitled to summary

judgment on Plaintiffs retaliation claims under the burden shifting analysis because the purported

reasons for Plaintiffs' discharge are nothing but pretext to hide illegal retaliation.  The 8th Circuit

Court of Appeals had held that timing alone is insufficient to show a pretextual motive for

purposes of rebutting a purported legitimate, nondiscriminatory reason for an adverse

employment action.  Fitzgerald v. Action, Inc., 521 F.3d 867, 875 (8th Cir. 2008).  However, the

Court went on to hold:

> We cannot [however] presume that fact finders view each piece of evidence in isolation,
> and most cases that involve claims of retaliation stem from rich factual backgrounds that
> provide ample evidence to support and/or disprove allegations of retaliation. In all such
> cases, the evidence of pretext and retaliatory intent must be viewed in its totality. Viewed
> within the context of the overall record, temporal proximity may directly support an
> inference of retaliation, and it may also affect the reasonableness of inferences drawn
> from other evidence. Id. (quoting Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1122
> (8th Cir. 2006)).

In Fitzgerald, the Court held that under the totality of the circumstances, temporal proximity

between the protected activity and termination supported an inference of retaliatory intent.  Id.

The same would be true in this case based upon the evidence set forth above, as well as

Harmon's opinion regarding the inadequacy of the investigations that led to Plaintiffs'

terminations.  Plaintiffs' Statement, ¶¶ 378-397.  A reasonable jury could infer these

investigations were designed to achieve the result of Plaintiffs' terminations.

　　　To the extent that Bel Nor claims that accumulated misconduct or longstanding

performance problems support its purported legitimate nondiscriminatory reasons for Plaintiffs'

discharge, such is not this case.  "Where an employer tolerates an undesirable condition for an

extended period of time, and then, shortly after the employee takes part in protected conduct,

takes an adverse action in purported reliance on the long-standing undesirable condition, a

reasonable jury can infer the adverse action is based on the protected conduct."  Id. at 875-76

(citing Eliserio v. United Steelworkers of America Local 310, 398 F.3d 1071, 1079-80 (8th Cir.

2005)).  Here Plaintiffs "performance issues" were not issues at all until Ford mistakenly

believed that Shelton complained to the EEOC and when Plaintiffs reported Ford's possession of

pornography to Dee. Plaintiffs' Statement, ¶¶ 349-59. In fact, Defendants would now have this Court believe that Shelton was at fault for two accidents: one involving another person backing into her stationary car and the other involving a police van hitting her police vehicle when she was not even in it! Plaintiffs' Statement, ¶¶ 2-4. A reasonable jury could not only infer that Defendants made up reasons to fire Plaintiffs at the time they were discharged but continue to do so in a desperate effort to avoid the consequences of their own misconduct.

Because Plaintiff has already discussed the pretextual nature of Shelton's discharge at pages 6 through 10 above, her retaliation claim is only discussed further herein as to Bel Nor's claim that she, like Bernsen and Hughes, had performance issues that predated their wrongful discharges. As set forth above, these previously undocumented and undisciplined "prior performance issues" actually show the pretextual nature of Shelton's discharge because **nothing** was done until after the Plaintiffs engaged in protected activity or were believed to have done so. A reasonable jury certainly does not have to believe that Ford did not address serious issues with Shelton until right before she was fired because Ford and Bersen were friends. Plaintiffs' Statement, ¶¶ 350-58. Even Tate admitted that some of the complaints made by Ford were improvable and should not have been made. Plaintiffs' Statement, ¶ 357.

Additionally, these "performance issues" stand in contrast to Ford's evaluations of Shelton and Bernsen. Shelton's January 31, 2010 performance evaluation stated: "P.O. Shelton meets the standards set forth by the agency as a patrol officer" and recommended her for a raise. Plaintiffs' Statement, ¶ 270. Bernsen's performance evaluations in 2009 and/or 2010 stated: "Sgt Bernsen meets the standard expectations set forth by this agency"; "He (Bernsen) has shown time and time again he is supervisory material"; and "John meets the standards set forth by the agency for the position he holds as a sergeant." Plaintiffs' Statement, 304-05.

20

Bel Nor claims that, Bernsen and Hughes, like Shelton, were terminated for legitimate, nondiscriminatory reasons as evidenced by the complaints lodged against them that resulted in their discharges, as well as "ongoing performance issues."  Village's Memo, pp. 13-14. Ultimately, Bernsen was fired for 2 counts of insubordination for failing to use the chain of command when contacting or having knowledge that Trustees Dee and Kries were contacted after Hughes was assaulted by Tate, one count of insubordination for allegedly refusing to answer Ford's question about who contacted Trustee Dee, and one count of insubordination for not wearing his body armor on duty.  Exhibit SS.  Significantly, Tate's "investigation" did not even include questioning Bernsen for his response to the purported allegations.  See Exhibit SS (JB00012).  A reasonable jury could infer that Tate did not interview Bernsen for his side of the story, necessary for a complete investigation, because the Defendants were only looking for reasons to fire Bernsen.

Talking to Trustees, even if this were true,  had not previously resulted in termination, much less discipline, although it appears that Ford tried to make sure nobody talked to the Village's administration after he thought Shelton filed and EEOC complaint.  See Exhibits X & JJ (FAS00323) & Plaintiffs' Statement, ¶ 366.  That this same conduct did not previously result in discipline (much less termination) creates a reasonable inference that Bernsen was fired in retaliation for his protected activity.  <u>Fitzgerald</u>, 521 F.3d at 875-76 .  Bernsen was clear that he wore his body armor on a daily basis after he was instructed to do so.  Plaintiffs' Statement, ¶¶ 77 & 312.  He was equally clear that Ford did not wear his.  Plaintiffs' Statement, ¶ 313. Bernsen denied being insubordinate to Ford in refusing to answer a question because Ford never posed a question to him.  Plaintiffs' Statement, ¶ 315.  Therefore, the reasons given for Bernsen's termination were pretext to conceal illegal retaliatory discrimination.  Additionally, **all** of the

Corrective Actions referenced in Tate's Complaint 2010-6 occurred **after** Ford became aware that Bernsen had reported his possession of pornography to Dee, further evidence of retaliation.[6] Exhibit SS (JB00012).

Similarly, Hughes was charged with four counts of insubordination for refusing to write a report involving the call Bishop took over, refusing to write a report as directed by Tate, and his contact with Ford and Nelson; three counts of improperly failing to use the chain of command for contacting Trustees; and for failing to follow Department policy, apparently for failing to report Tate's assault upon him.  See Exhibit EEE.  There can be no dispute that Hughes reported Tate's assault upon him because it is included in Tate's "investigative" report.  Exhibit EEE.  In fact, Ford and 3 Trustees knew about this assault, so Hughes can hardly be accused of failing to report it.  Apparently, Ford and Tate took issue with Hughes failing to report this assault in writing.  However, if a writing was required to avoid discipline, Ford should also have been disciplined because he allegedly witnessed Hughes being insubordinate to him and did not put his complaint in writing.  Plaintiffs' Statement, ¶ 334.

Hughes was not insubordinate to Bishop because he stated he was willing to write the report, and he was never ordered to write the report.  Plaintiffs' Statement, ¶¶ 320-321.  He was not insubordinate in his communications with Bishop.  Plaintiffs' Statement, ¶ 390.  Hughes could not write the memo Tate told him to write because Tate wanted him to include false information.  Plaintiffs' Statement, ¶ 323.  If Ford and Nelson complained that Hughes was insubordinate to them for yelling at them and making threats, there is nothing to support this claim, as they never filed written complaints against Hughes, as required.  Plaintiffs' Statement, ¶¶ 333.  Hughes only called Ford and Nelson to let them know about the assault.  Ford already

---

[6] Bernsen admitted the one Corrective Action issued against him before he engaged in protected activity was valid.  However, he testified the others were not.  Plaintiffs' Statement, ¶¶ 94-96.

knew about it, and Nelson said he could not come to the station because he had been drinking.

Plaintiffs' Statement, ¶¶ 328-29.  Hughes told Ford that he did not call Trustees Dee and Kries.

Plaintiffs' Statement, ¶ 330.  As set forth above, even if Hughes or Bernsen called Trustees,

Nelson was in the chain of command as Police Commissioner, and a police officer can break the

chain of command when a command officer is abusing his power and authority.  Plaintiffs'

Statement, ¶ 388.  Like Bernsen and Shelton, Hughes was terminated without being given the

opportunity to tell his side of the story, further evidence that Tate's investigation was not about

fact finding but finding reasons to fire Hughes.  Plaintiffs' Statement, ¶ 335.  For all of the

reasons set forth above, the reasons given for Hughes termination, like Shelton and Bernsen's ,

were nothing but pretext to cover illegal retaliation.

### G.    Plaintiffs' Conspiracy Claim Against the Village Survive Summary Judgment

#### 1.    The Intracorporate Conspiracy Doctrine Does Not Preclude Relief

Bel Nor relies upon Cross v. General Motors Corp, 721 F.2d 1152, 1156 (8th Cir. 1983) to

Support its claim that the intracoprorate conspiracy doctrine entitles it to relief.  Village's Memo,

p. 14.  However, as Cross recognizes, when a case involves not a single act of discrimination but

continuing violations of discrimination and harassment (and in this case retaliation), a conspiracy

claim is not foreclosed because it is asserted against a single corporation or government entity.

Cross, 721 F.2d at 1156.  This is the case "where individual defendants are named as well as the

corporation, and those individuals acted outside the scope of their employment or for personal

reasons."  *Id.*  Here there is no dispute that Ford, Tate, and Nelson are sued in their individual

capacities.  See Exhibit A, ¶¶ 5-7.  The evidence in this case shows that Ford regulary harassed

Shelton because of her race and gender, that Tate and Nelson were aware of the sexually hostile

work environment (pornography) and did nothing other than participate in the firings of

23

Plaintiffs, that Ford told Hughes that Nelson was on the same page with him: a racist who hated black people. Plaintiffs' Statement, ¶¶ 75, 216 & 257. As the district court recognized in Coley v. M & M Mars, Inc., 461 F. Supp. 1073, 1077 (M.D. Ga. 1978), race (or gender) relations are not business matters, and therefore, in such a case there is a sufficient likelihood of personal not business motivation for the actions taken. Because Plaintiffs have named the individual Defendants Ford, Tate, and Nelson, and there is ample evidence that they acted for personal racist, sexist, and/or retaliatory reasons, Plaintiffs conspiracy claim survives, despite the intracorporate conspiracy doctrine.

### 2. There Is Sufficient Evidence of a "Meeting of the Minds"

Next Bel Nor claims that there is no evidence of a meeting of the minds amongst the individual defendants. Village's Memo, p. 15. To establish a conspiracy under § 1983, a plaintiff need only present evidence "sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights." White v. McKinley, 519 F.3d 806, 816 (8th Cir. 2008). As the Eight Circuit has explained:

> The question of the existence of a conspiracy to deprive the
> plaintiffs of their constitutional rights should not be taken from
> the jury if there is the possibility that the jury could infer from
> the circumstances a meeting of the minds or understanding
> among the conspirators to achieve the conspiracy's aims. Putman
> v. Gerloff, 701 F.2d 63, 65 (8th Cir. 1983) (internal quotations and citations
> omitted).

The Eighth Circuit has recognized that because the elements of a conspiracy are rarely established except by circumstantial evidence, even at the summary judgment phase judgment for the defendants "is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided." Westborough Mall, Inc. v. City of Cape Girardeau, 693 F.2d 733, 743 (8th Cir. 1982). There must be insufficient

evidence to support "any reasonable inference of a conspiracy." *Id.*

While the Village claims that Plaintiffs admit that they have no evidence that Ford, Tate, and Nelson conspired to violate their civil rights, once again, this is simply a sleight of hand trick on the part of Defendants who have repeatedly been less than candid with this Court in the summary judgment record.  Village's Memo, p. 15.  Plaintiffs, who are not lawyers and did not have the benefit of the Defendants depositions, could not fully analyze their conspiracy claim.  With the benefit of these depositions, Defendants go so far as to claim that there is no evidence that Tate and Nelson were even involved in the decisions to terminate Plaintiffs, which false claims are addressed in Plaintiffs' Combined Memorandum in Opposition to Ford, Tate, and Nelson's Motions for Summary Judgment, pp. 6 though 9.  See also Tate's Memorandum in Support of His Motion for Summary Judgment (doc. 84), pp. 3-6 and Nelson's Memorandum in Support of His Motion for Summary Judgment (doc. 79), pp. 2-3.

The evidence in this case shows that Nelson wanted Shelton suspended for two days before Tate investigated the allegation of unsafe driving against her, which is the suspension Shelton received.  Plaintiffs' Statement, ¶ 52.  Nelson admitted he was involved in the demotion of Bernsen by admitting that "we" demoted him.  Plaintiffs' Statement, ¶ 98.  Ford and Nelson called Hughes into the station to discuss getting rid of Shelton two days after the Plaintiffs' reported Ford's pornography to Dee.  Plaintiffs' Statement, ¶ 118.  Despite their claims to the contrary, both Tate and Nelson were involved in Plaintiffs' discharges.  See Exhibits II, SS, and EEE & Plaintiffs' Statement, ¶ 64.  Nelson admitted that he was talking to Ford 3-4 times a day in 2009-2010 and discussing Shelton and Bernsen weekly and sometimes daily.  Plaintiffs' Statement,  ¶ 178.  Ford told Hughes that he and Nelson were on the same page and felt the same way, meaning they were both racists and hated black people and that Nelson knew everything

that was going on in the Department and was in control. Plaintiffs' Statement, ¶¶ 216 & 365 . Nelson was the most vocal in opposition to any investigation by the Board after the Plaintiffs' allegations were reported to it by Dee. Plaintiffs' Statement, ¶ 109. A reasonable jury could infer that Nelson opposed this investigation because he knew it would lead to him.

Tate was appointed to "investigate" all of the allegations of misconduct against Plaintiffs and in each case completed his "investigation" and recommended termination without bothering to interview the Plaintiffs, even though he was an experienced police officer and investigator. Plaintiffs Statement, ¶¶ 298, 317, 335, & 376 and Exhibits II, SS, and EEE. Harmon opined that these investigations were inadequate and inconsistent with accepted police practices. Plaintiffs' Statement, ¶¶ 378-80, 385-87, 389, & 396. Harmon observed that almost half of a very small police department was dismissed within a span of 3 weeks in the absence of the kind of investigation he was accustomed to seeing, and therefore, outside of what he would interpret as good administration. Plaintiffs' Statement, ¶ 396. A reasonable jury could infer that the only reason Tate conducted sham investigations was because he was part of the broader conspiracy to fire Plaintiffs in violation of their civil rights. Tate was even permitted to "investigate" Hughes after Hughes had accused him of misconduct that was part of the investigation, which tainted the result. Plaintiffs' Statement, ¶ 391 . Tate even admitted that he changed Shelton's recommended discipline from reduction in hours to termination because Ford wanted Shelton fired. Plaintiffs' Statement, ¶ 301.

There is more than enough circumstantial evidence in this case to support a conspiracy claim against the individual defendants and to grant Bel Nor summary judgment on this claim would be error, as it was in Westborough Mall, Inc., 693 F.2d at 733. In fact, there is more evidence to support a conspiracy in this case than in Rohrbough v. Hall, 2008 U.S. Dist. LEXIS

89961, *22-24 (E.D. Mo. 2008), in which a conspiracy claimed survived a summary judgment motion.  In <u>Rohrbough</u>, the court held there was sufficient evidence of a conspiracy when plaintiff introduced evidence that there was either another officer at the scene whose presence and acts were concealed, or the officer on the scene used much more force than he stated in his report or deposition. Additional evidence supporting the conspiracy was that the Commander of the Internal Affiard Division could not recall any instance in which a police officer either reported excessive force by another officer, or corroborated a citizen's claim of excessive use of force.

### 3.      Bel Nor is Liable for This Conspiracy Because Its Results Were Ratified by Those With Final Policymaking Authority

For the reasons set forth a pages 10 through 11 above, Bel Nor can be held liable for the individual Defendants' conspiracy because the Trustees ratified the results of the conspiracy.

### H.      Plaintiffs' Failure to Instruct, Train, Supervise, Control, Discipline and Negligent Retention Claim Survives Summary Judgment

Finally, Ben Nor claims that it cannot be held liable for failing to adequately train Ford and Tate.  While the Village focuses on June 9, 2010 as the date it became aware of numerous problems with Ford, as set forth above, a reasonable jury could conclude that Bel Nor knew about  these issues before June 9 through Tate (a lieutenant) and Nelson (the Police Commissioner), who were both aware of the pornography and Ford's racist behavior.  Plaintiffs' Statement, ¶¶ 63, 75, 209, 216, & 365.   In fact, when Dee reported the pornography to the Trustees, their response led him to believe they were already aware of it.  Plaintiffs' Statement, ¶ 171.  While Nelson claims that he did not know about Ford's racist and sexist conduct, a reasonable jury does not have to believe him in light of evidence to the contrary.  More importantly, the Village's sexual harassment policy ensures that its Trustees will not know about

sexual harassment, particularly when committed by the Chief of Police, because it requires sexual harassment to be reported to the Chief or his subordinates.  The policy does not permit employees to report outside the Department when the Chief is the harasser.  Plaintiffs' Statement, ¶ 363.  There is no policy or mechanism for reporting discrimination that is not sexual harassment, with the Village relying solely on the chief of police or department head to ensure compliance with Title VII.  Exhibit R. Rule 3.13.  Therefore, these polices and any trainings pursuant to them are defective and permitted a racist and sexist chief to engage in discriminatory conduct with impunity.

"Whether failure to train constitutes a policy or custom does not require the existence of a continuing, widespread, and persistent pattern of unconstitutional misconduct like <u>Monell.</u> <u>Johnson v. Phillips</u>, 2011 U.S. Dist. LEXIS 12019, *7 (E.D. Mo. 2011) (citing  <u>Larson by Larson</u> <u>v. Miller</u>, 76 F.3d 1446, 1454 (8th Cir. 1996)), *aff'd in part and revs's in part as to qualified in immunity* in <u>Johnson v. Phillips</u>, 664 F.3d 232 (8th Cir.  2011).  "If the policy itself is unconstitutional then municipal liability can be established where the misconduct is linked to the unconstitutional policy." *Id.* (citing <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985)).  "But if the policy is not itself unconstitutional, 'considerably more proof than the single incident will be necessary' to contribute fault to the municipality and establish the causal connection between the policy and the constitutional deprivation." *Id.* (citing <u>Tuttle</u>, 471 U.S. at 824).  Here the Village's sexual harassment policy and discrimination policy are unconstitutional because they require officers to report sexual harassment committed by the Chief to either the Chief himself or his subordinates, thereby permitting the perpetuation of the Chief's misconduct.  Additionally, the Village's policy does not provide any mechanism for the reporting of discrimination that is not sexual harassment, making the Chief the sole enforcement

mechanism to prevent illegal discrimination, even when he is the discriminator.

If this Court should disagree that the policy itself is unconstitutional, notice that the procedures were inadequate can be implied if the failure to train is so likely to result in a constitutional violation that the constitutional violation was patently obvious.  Larson, 76 F.3d at 1454.  The question becomes: "would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect."  City of Canton v. Harris, 489 U.S. 378, 391 (1989).  Here training was deficient under the deficient policies set forth above.  Additionally, there had been no sexual harassment training since 2007 according to documents produced by the Defendants.  See Exhibit NN.  There is no evidence that The Village/Department ever trained in an effort to prevent illegal discrimination under Title VII.  When three officers (one the victim of Ford's misconduct and all three reporters of this misconduct) were fired in close proximity and requested review by the Board, the Board did nothing.  Plaintiffs' Statement, ¶ 172.  Trustee and Police Commissioner Nelson was not even familiar with the Village's sexual harassment policy.  Plaintiffs' Statement, ¶ 364.  A reasonable jury could conclude that Plaintiffs would not have suffered the injuries at issue in this lawsuit had Bel Nor's training not be deficient as identified above.  Canton, 489 U.S. at 391.  Therefore, Bel Nor is liable to Plaintiffs for the injuries they suffered (wrongful terminations) as a result of its training failures.

## III.    CONCLUSION

There can be little doubt in this case that virtually every material fact is in dispute, making summary judgment improper and Bel Nor's filing of its summary judgment motion (except as to the issue of sovereign immunity) a waste of scarce judicial resources.  More troubling, Bel Nor's statement of facts and legal briefing evidence a bad faith effort to distort the

record and misrepresent the law.  Therefore, in addition to denying Bel Nor's summary judgment

motion (except as to the issue of sovereign immunity) for the reasons set forth above,[7]

Plaintiffs respectfully suggest that this Court should impose sanctions against Bel Nor pursuant

to this Court's inherent powers in order to discourage the filing of frivolous summary judgment

motions that only unnecessarily increase the cost of litigation.  If this Court does not believe that

sanctions are warranted, should Plaintiffs prevail at trial, they ask this Court to consider that the

Defendants unnecessarily filed four separate statements of fact and legal memoranda, which they

renumbered and reordered but were largely redundant, to unnecessarily increase the cost of this

litigation by creating unnecessary work for Plaintiffs and this Court, when making an award of

attorneys' fees.

Respectfully submitted,

PLEBAN & PETRUSKA LAW, LLC


By: _____/s/ Lynette M. Petruska_____
C. John Pleban, #MO24190
Lynette Petruska, #MO41212
Talmage E. Newton, IV, #MO56647
2010 S. Big Bend Blvd.
St. Louis, MO 63117
(314) 645-6666
(314) 645-7376          FAX

Attorneys for Plaintiffs

---

[7] While Plaintiffs believe that they have briefed every issued raised by Defendants in their 4 separate briefs.  If this Court should disagree, Plaintiffs respectfully request that this Court direct Plaintiffs to provide additional briefing on any issue omitted, due to the difficulty of sorting out the different and redundant issues raised by Defendants in their four separate briefs.

**<u>Certificate of Service</u>**

  I hereby certify that on this 2nd day of April, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which automatically sent notification of such filing to counsel for the Defendants:  Andrew J. Martone, Caryl L. Flannery, and William J, Clark, IV, 1650 Des Peres Rd., Suite 200, St. Louis, MO 63131, attorneys for Defendants.


          /s/ Lynette M. Petruska