IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| FELICIA SHELTON, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 10-CV-2146-NAB |
| | ) |
| VILLAGE OF BEL NOR, et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S COMBINED MEMORANDUM IN OPPOSITION TO SCOTT FORD, RICHARD TATE AND WALT NELSON'S  MOTIONS FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

On March 2, 2012, Defendants Scott Ford (hereinafter "Ford"), Richard Tate (hereinafter "Tate") and Walt Nelson (hereinafter "Nelson") filed separate motions for summary judgment, statements of fact (docs. 70, 65, and 71), and supporting legal memoranda (docs. 82, 84, and 79), arguably in an attempt to unnecessarily increase the cost of this litigation.  Because many of the issues are overlapping and the same legal standards apply, Plaintiffs file a single response to these motions for the sake of brevity.  These Defendants, like the Village of Bel Nor, claim they are entitled to judgment as a matter of law by misrepresenting and ignoring the full summary judgment record, which shows that factual disputes make summary judgment inappropriate in this case.  For the reasons discussed below, the individual Defendants' summary judgment motions should be denied in their entirety.

**II.     STANDARD OF REVIEW**

See the Standard of Review set forth in Plaintiffs' Memorandum in Opposition to the Village of Bel Nor's Motion for Summary Judgment (hereinafter "Plaintiffs' Opposition to Bel Nor")  filed this day, which is incorporated by reference as if fully set forth herein for the sake of

brevity.

## III. ANALYSIS

### A. The Defendants' Official Immunity Claims (Ford's Memo, p. 3; Tate's Memo, p. 10; and Nelson's Memo, pp. 8-9)

All of the individual Defendants claim that they are entitled to official immunity. However, immunity defenses are not available to claims brought under the MHRA. The Missouri Supreme Court has held that "because the Missouri General Assembly included the phrase 'the state, or any political or civil subdivision' in the definition of 'employer' in § 213.010, it is clear the legislature intended to treat the state and its subdivisions in the same manner as it treats other employers." Howard v. City of Kan. City, 332 S.W.3d 772, 788 (Mo. 2011). As a result, the Supreme Court concluded that punitive damages are available against a political subdivision in MHRA cases. Id. Similarly, Missouri courts have held that § 213.111 R.S.Mo. "is an express denial of the defense of sovereign immunity for the state and its political and civil subdivisions in those instances and for the remedies the statute identifies." Keeney v. Mo. Highway & Transp. Comm'n, 70 S.W.3d 597, 600 (Mo. App. S.D. 2002). Because the legislature intended to treat political subdivisions like any other employer, the defense of official immunity is unavailable to the individual Defendants, or they would be given protection that other individuals acting in the interest of their employers do not receive.[1]

If this Court should disagree, official immunity is unavailable to the individual Defendants because the evidence shows that they acted with bad faith or malice. Under Missouri law, the discretionary nature of an act does not end the analysis as to whether an official is

---

[1] Defendants concede that official immunity applies only to municipal employees in their individual capacities. See Ford Memo, p, 3, and cases cited there. The Missouri Supreme Court has held that the MHRA is intended to reach not just the corporate or public employer but any person acting directly in the interest of the employer, such as a supervisory employee. Hill v. Ford Motor Co., 277 S.W.3d 659, 669 (Mo. 2009). Missouri would not extend official immunity under the MHRA to municipal officials when sovereign immunity is unavailable to the municipality itself.

2

entitled to official immunity.  An official is not entitled to such immunity for a discretionary act done in bad faith or with malice.  State ex rel. Twiehaus v. Adolf, 706 S.W.2d 443, 446 (Mo. banc 1986).  A defendant acts with malice when:

> he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others. …   Blue v. Harrah's N. Kan. City, LLC, 170 S.W.3d 466, 479 (Mo. App. W.D. 2005).

Bad faith is defined to include conscious wrongdoing. *Id.*  Clearly, intentionally discriminating against an employee because of her race and/or gender or retaliating against employees because they engaged in protected activity constitutes bad faith and/or malice, making the defense of official immunity unavailable to these defendants.

### B.      Shelton Has Presented Sufficient Evidence that Race and Gender Contributed to Her Discharge to Survive Summary Judgment (Ford's Memo, pp. 3-6, Tate's Memo, pp. 3-6; and Nelson's Memo, pp. 2-3)

Next the individual Defendants claim that Felicia Shelton (hereinafter "Shelton") has produced insufficient evidence of race and gender discrimination to survive summary judgment.  The Missouri Supreme Court has held nothing in the MHRA "requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age, disability, or other protected characteristics contributed to the unfair treatment, that is sufficient." Daugherty v. City of Md. Heights, 231 S.W.3d 814, 819 (Mo. 2007).  This is a lower standard than what a plaintiff is required to prove to establish discrimination under federal law.  A "contributing factor" has been defined as one "that contributed a share in anything or has a part in producing the effect." McBryde v. Ritenour Sch. Dist., 207 S.W.3d 162, 170 (Mo. App. E.D. 2006) (quoting *Webster's Third New International Dictionary*).  Therefore, the MHRA "imposes liability on an employer when an improper

3

consideration is a contributing factor, regardless if other factors also exist." *Id.*

To survive summary judgment, a plaintiff must establish from the record that there are two plausible, but contradictory, accounts of the essential facts. Daugherty v. City of Md. Heights, 231 S.W.3d. at 820. Because Shelton has proven unlawful employment discrimination under the more stringent standard of Title VII for the reasons set for in Plaintiffs' Opposition to Bel Nor, pp. 4 through 10, this argument is incorporated by reference herein for the sake of brevity.

Plaintiffs address briefly the case of McCullough v. Commerce Bank, 349 S.W.3d 389, 399 (Mo. App. W.D. 2011) cited by Defendants in support of summary judgment. See Ford's Memo, p. 6 and Tate's Memo, p. 6. Defendants claim that this case stands for the proposition that speculative evidence does not suffice to establish a contributing factor, suggesting that McCullough addressed the sufficiency of the evidence presented. This is not the case. McCullough actually addressed the issue of jury instructions submitted by the plaintiffs. The Court stated:

> Moreover, Appellants have not identified the evidence of pretext they claim was presented at trial. Appellants only generally assert that "[Appellants] presented an abundance of evidence casting considerable and compelling doubt on the reason given by [Commerce Bank] for [Appellants'] terminations," leaving us to speculate about the nature of the vaguely described "evidence." *Id.*

Therefore, the issue was with the appellant's failure to create a sufficient record for review, not the sufficiency or speculative nature of the evidence itself. Shelton has fully detailed the reasons there are two plausible, but contradicting accounts of the essential facts, which are not speculative, making summary judgment improper.

Missouri's anti-discrimination law, like its federal counterpart, draws a distinction between cases involving direct evidence of discrimination and those involving indirect evidence,

4

noting that direct evidence cases are not common because most employers "are shrewd enough to not leave a trail of direct evidence." Holmes v. Kan. City Mo. Bd. of Police Comm'rs, 2012 Mo. App. LEXIS 133, *29 (quoting Daugherty, 231 S.W.3d at 818 n. 4).  In this case Ford, Tate, and Nelson were not shrewd enough to avoid a trail of direct evidence because each have made statements showing that they are sexists and racists.  Plaintiffs' Statement, ¶¶ 196-257. Additionally, there is a trail of an intent to retaliate.  Plaintiffs' Statement,  ¶¶ 258-268. Therefore, Plaintiffs believe that they have presented direct evidence of race, gender, and retaliatory animus in support of their claims under the MHRA, and that their claims survive summary judgment for the reasons set forth in Plaintiffs' Opposition to Bel Nor, pp. 4 through 6 and 17 through 18, which are incorporated by reference herein.

 If this Court should disagree, which Plaintiffs do not concede herein, to establish a *prima facie* of indirect evidence discrimination in the workplace, the employee must show: (1) s/he was a member of a protected class; (2) s/he was qualified to perform the job; (3) s/he suffered an adverse employment action; and (4) s/he was treated differently from similarly situated males/whites.  Ruppel v. City of Valley Park, 318 S.W.3d 179, 185 (Mo. App. E.D. 2010).  Ford argues (or at least suggests) that Shelton must show that she was treated differently than white males to survive summary judgment.  Ford's Memo, p. 5.  For the reasons discussed at Plaintiffs' Opposition to Bel Nor,  p. 9, Ford and his co-conspirators handling of the three different pursuits actually supports Shelton's claim that these Defendants do not impose discipline based on the facts of a case, but their improper biases and prejudices.  Otherwise, all Bel Nor employees who engaged in improper pursuits would have been treated the same and fired.

 While evidence of disparate discipline may be relevant to showing that race or gender was a contributing factor to discipline imposed, that a plaintiff was treated differently from

5

similarly situated males is not necessary to establish a *prima facie* case of discrimination under Missouri law.  Holmes, 2012 Mo. App. LEXIS 133, at *25, n. 6.  "The fourth element of a *prima facie* discrimination case also can be met if the employee provides some other evidence that would give rise to an inference of unlawful discrimination."  *Id*.  Here there is sufficient other evidence giving rise to an inference that the individual Defendants engaged in unlawful discrimination, particularly in light of their animosity towards women and blacks.  See Plaintiffs' Opposition to Bel Nor, pp. 6-10.  Therefore, even if this Court analyzes this case as an indirect evidence case, there is sufficient evidence to survive a motion for summary judgment.

   C.  **Tate and Nelson Were Involved in Plaintiffs' Terminations, And Therefore, Are Liable for Their Misconduct (Tate's Memo, pp. 3-6 & Nelson's Memo, pp. 2-3)**

Tate and Nelson both claim that they did not terminate Shelton or discriminate against her.  Tate and Nelson's claims that Shelton has no facts showing their involvement in her termination  do not even pass the straight face test, much less the good faith test.  See Tate's Memo, p. 4 and Nelson's Memo, p. 3.  There can be no doubt that Tate recommended Shelton (and all of the Plaintiffs') terminations because the Defendants produced memos showing this to be the case.  See Exhibits HH, SS, and EEE.  While Tate may claim that he originally recommended Shelton's reduction in hours instead of termination, there is no doubt that Tate ultimately recommended Shelton's termination. Exhibit  EEE.  A reasonable jury could infer that Tate changed his original recommendation (if he really made it) as part of the broader conspiracy among the individual Defendants to discriminate and/or retaliate against Shelton, particularly when he admitted that Ford wanted Shelton be fired.  Plaintiffs' Statement, ¶ 301.  Similarly, for the Defendants to argue that Nelson had no role in Shelton (or the other Plaintiffs') terminations) is simply false.  Nelson admitted that he was involved in **every** termination decision in the

6

Department, that he discussed John Bernsen (hereinafter "Bernsen") and Shelton with Ford at length, that he had the authority to countermand any disipcline/termination decision made by Ford.  Plaintiffs' Statement, ¶¶ 52, 148, & 178.

To the extent that Tate and Nelson attempt to split hairs by claiming that only Ford had the authority to terminate Plaintiffs, this claim is both untrue and legally irrelevant.  Nelson admitted he could countermand Ford's recommended discipline, which would include any termination.  Plaintiffs' Statement, ¶ 148.  As set forth above, the statutory language of the MHRA is clear that its reach includes "any person acting directly in the interest of the employer.  A supervisory employee clearly falls into that category."  Hill, 277 S.W.3d at 669.  Because Tate and Nelson were acting in the interest of the employer and supervisory employees when they participated in the decisions to terminate Plaintiffs, they are equally liable for their discharges.

Tate and Nelson's own legal memoranda show that the position they have taken is without merit.  As these Defendants concede, the MHRA imposes individual liability "when the individuals directly oversaw or were actively involved in the discriminatory conduct."  Tate's Memo, p. 5, citing Reed v. McDonald's Corp., 2012 Mo. App. LEXIS 72, *8-9 (Mo. App. S.D. 2012).  See also cases cited in Reed and Nelson's Memo, p. 3.  Here there is no dispute that as Police Commissioner, Nelson directly oversaw Ford.  Additionally, there is no dispute that both Tate and Nelson were actively involved in the discriminatory conduct (terminations).

Tate and Nelson would have this Court believe that even if they participated in the decision to terminate Shelton, there is no evidence that they did it to discriminate against her.  However, the evidence in this case shows that Ford, Tate, and Nelson were a pack of racists and sexists, who clearly did not believe that women belonged in a police department.  Plaintiffs' Opposition to Bel Nor, pp. 4-6.  Additionally, Ford made it clear to Shelton and Bryan Hughes

7

(hereinafter "Hughes") that Nelson knew exactly what was taking place in the Department and supported Ford and his motives. Plaintiffs' Statement, ¶¶ 216, 365, & 373. Nelson and Ford even approached Hughes about getting rid of Shelton. Plaintiffs' Statement, ¶ 118. When Dee wanted to investigate the Department, it was Nelson who voiced the most vocal opposition to any investigation. Plaintiffs' Statement, ¶ 244. As a reasonable jury could infer that Nelson opposed this investigation because it would uncover his own misconduct. At a minimum, Nelson can be held liable for the animus of Ford because he ratified the decision, without any independent investigation, knowing that Shelton was fired shortly after she, Ford, and Bernsen complained about Ford's possession of pornography at the station. See Staub v. Proctor Hospital, 131 S.Ct. 1186, 1193 (2011). See also Plaintiffs' Statement, ¶ 176.

As to Tate, the evidence shows that he was charged to "investigate" three employees accused of misconduct serious enough that it could (and would) result in their terminations. Tate, an experienced police officer with 12 years of experience, who had previously been a detective, and therefore, knew how to conduct investigations, failed to interview any of the Plaintiffs to get their side of the story before recommending their terminations. Plaintiffs' Statement, ¶ 376 and Exhibits HH, SS, and EEE. In Shelton's case, Tate concluded that Shelton was lying about the pursuit, even though physical evidence supported her claim, and the Department had a tool available to it (polygraph test) to determine if Shelton was telling the truth, but never used it. See Exhibit HH and Plaintiffs' Statement, ¶¶ 292-93, 361, & 380. A reasonable jury could infer that all of this occurred because Tate was not interested in the facts but in finding reasons to get rid of the Plaintiffs in furtherance of the conspiracy. There were numerous problems with these investigations, which were inconsistent with accepted police practices. Plaintiffs' Statement, ¶¶ 379-398. A reasonable jury could infer that no police

8

department is this inept, and that these "investigations" were simply designed to result in Plaintiffs' terminations as Ford, Tate, and Nelson had agreed.

> **D.     Tate's Omission from Plaintiff's MHRA Charges Does Not Require His Dismissal (Tate's Memo, pp. 2-3)**

Unlike Defendants, who have made up a factual record to suit their needs or ignored inconvenient facts, Plaintiffs do not need to distort the record to survive summary judgment. Plaintiffs admit that Tate was omitted from the MCHR filing, The issue is whether "there is a substantial identity of interest between the parties sued and those charged to permit plaintiffs claims to proceed against Tate." Ford, 277 S.W.3d at 669.  Plaintiffs agree that the four-part test set forth in Hill is used to determine whether this identity of interest exists.  See Tate's Memo, p. 3.  However, they disagree with Tate's superficial analysis that these factors require the dismissal of Plaintiff's  MHRA claims against him.  Here the interests of the named parties are sufficiently similar to the unnamed party that it would be unnecessary to include Tate in the MCHR proceeding.   By way of example, when Shelton's unemployment compensation appeal was heard, it was Tate, not Ford, who represented the Village's interests, showing an identity of interests.  Plaintiffs' Statement, ¶ 377.  More importantly, if Tate's interests were not identical to the other Defendants, he could not be represented by the same attorneys in this action.  No prejudice has resulted to Tate in not being named in the MCHR proceeding.  The charges of discrimination were filed on August 11, 2010, right to sue letters were issued on September 21, 2010, and the lawsuit was filed on November 16, 2010.  See e.g. Village's Statement (doc. 87), ¶¶ 55, 57, & 58.  In this short time period, Tate could hardly be prejudiced by the failure to name him in the MCHR charge.

Additionally, Tate failed to advise this Court that the court in Ford further stated:

9

>equally important is the availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements **especially when demanding full and technical compliance would have no relation to the purposes for requiring those procedures in the first instance**. *Id.* at 670 (quoting Glus v. G. C. Murphy Co., 562 F.2d 880, 888 (3rd Cir. 1977) (emphasis in original in Ford).

Under all of the relevant factors, Plaintiffs MHRA claims should be permitted to proceed against Tate.

### E. Shelton's Hostile Work Environment Claim Survives Summary Judgment

#### 1. Shelton's Hostile Work Environment Claim Against Scott Ford (Ford's Memo, pp. 6-9)

Under the MHRA race or sexual harassment "creates a hostile work environment when sexual conduct either creates an intimidating, hostile or offensive work environment or has the purpose or effect of unreasonably interfering with an individual's work performance." Hill, 277 S.W.3d at 666. Ford relies exclusively on federal cases in arguing that he did not create a hostile work environment. Ford's Memo, pp. 8-9. As set forth at pages 12 through 15 of Plaintiffs' Opposition to Bel Nor, which is incorporated by reference herein for the sake of brevity, Shelton's work environment was sufficiently hostile to survive a motion for summary judgent under federal law, and therefore, under the MHRA.

If this Court should disagree, as set forth above, the MHRA's antidiscrimination safeguards "are not identical to the federal standards and can offer greater discrimination protection." Howard v. City of Kan. City, 332 S.W.3d 772, 784 (Mo. 2011) (quoting Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818-19 (Mo. banc 2007)). Missouri courts recognize that in most hostile work environment claims, "the discriminatory acts are not of a nature that can be identified individually as significant events; instead, the day-to-day harassment is primarily significant, both as a legal and as a practical matter, in its cumulative effect." Alhalabi v. Mo. Dep't of Natural Res., 300 S.W.3d 518, 526 (Mo. App. E.D. 2009).

In Hill, a hostile work environment was found to exist when a supervisor asked plaintiff details about her panties and bra, made other sexual comments, asked plaintiff how much she weighed and that he could bench press her, told plaintiff and another female employee he wanted one on top and the other on the bottom, and he could use an hour of "h—d." Ultimately, this gender hostile work environment and discrimination led to Plaintiff's termination like in Shelton's case. Hill, 277 S.W.3d at 662. In Alhalabi a hostile work environment was found to exist when a supervisor made false accusations in a performance evaluation in an effort to manufacture reasons to terminate the plaintiff and then more harshly targeted and disciplined the plaintiff after he complained of discrimination. Alhalabi, 300 S.W.3d at 525-26. Therefore, Shelton's hostile work environment claim under the MHRA survives summary judgment, even if this Court should conclude it does not survive under Title VII.

### 2. Shelton's Hostile Work Environment Claim Against Nelson (Nelson's Memo, pp. 3-4)[2]

Nelson claims that he is entitled to summary judgment on Shelton's hostile work environment claim because he testified that he was not aware of and did not authorize or approve of Ford's misconduct. Nelson's Memo, p. 4. While Nelson conveniently claimed that he was not aware of Ford's hostile and offensive conduct, the jury is not required to believe him in light of other evidence. Evidence shows that Nelson was aware of the pornography at the station because he saw it. Plaintiffs' Statement, ¶ 75. It would be hard for Nelson to miss the 15 pin-up girls Ford hung in the bathroom. Plaintiffs' Statement, ¶¶ 235-36. Dee testified that the Board of Trustees was already aware of Ford's pornography when he reported it to them, Plaintiffs' Statement, ¶ 171. Nelson's response to Dee's report of serious misconduct on the part of the

---

[2] Shelton does not address the hostile work environment claim against Tate because Tate did not address this claim in his summary judgment motion, presumably because he previously admitted that he knew that Ford had pornography at the station and did nothing about it and further admitted his knowledge of and participation in the racially hostile environment. Plaintiffs' Statement, ¶¶ 63, 75, & 209.

11

Chief of Police was asking Dee if he liked what he saw. Plaintiffs' Statement, 244. Nelson was the most vocal in opposition to any investigation by the Board. Plaintiffs' Statement, ¶ 244. Most importantly, Ford told Hughes and Shelton that Nelson knew exactly what was going on at the station, and he was in control. Plaintiffs' Statement, ¶¶ 365 & 373.

A reasonable jury could conclude that in light of Ford's pervasive hostility towards women and African-Americans, even known by police officers outside the Bel Nor Police Department, that it was impossible for Nelson not to know about Ford's misconduct. Plaintiffs' Statement, ¶¶ 206-07 & 237-28. This is particularly true when Nelson participated in the discussion about getting rid of Shelton. Plaintiffs' Statement, ¶ 118. Therefore, Nelson, the Police Commissioner and Ford's supervisor, is equally liable for the hostile work environment Shelton was forced to endure.

While Nelson also claims that Shelton was not subjected to a hostile work environment, for the reasons previously discussed, this is not the case.

   **F.**  **Plaintiffs' Retaliation Claims Survive Summary Judgment**

     **1.**  **Ford's Mistaken Belief that Shelton Engaged in Protected Activity (Ford's Memo, p. 10; Tate's Memo, pp. 7-8; and Nelson's Memo, pp. 6-7)**

The issue of Ford's mistaken belief that Shelton engaged in protected activity has been fully addressed in Plaintiffs' Opposition to Bel Nor, pp. 15 through 17, which is incorporated by reference herein for the sake of brevity.

     **2.**  **There is a Sufficient Casual Connection Between the Retaliation Plaintiffs Suffered and Their Protected Activity to Survive Summary Judgment (Ford's Memo, pp. 10-11; Tate's Memo, pp. 8-10; and Ford's Memo, pp. 7-8)**

The evidence shows a casual connection between Plaintiffs' protected activity and their

12

terminations for the reasons set forth in Plaintiffs' Opposition to Bel Nor, pp. 17 through 23, which is incorporated by reference herein for the sake of brevity. Plaintiffs' further note that as with discrimination claims, a plaintiff pursuing a retaliation claim under the MHRA need only show that his/her protected activity was a "contributing factor" in the termination. Ford's Memo, p. 9, citing Daugherty, 231 S.W.3d at 820. Because the MHRA applies a less stringent standard for liability than Title VII, even if this Court should decide that Plaintiffs' federal retaliation claims do not survive summary judgment, which Plaintiffs do not concede herein, their retaliation claims under the MHRA would survive.

### 3. Tate and Nelson's Claims That They Did Not Retaliate Against Plaintiffs (Tate's Memo, p. 8 and Nelson's Memo, pp. 6-7)

Once again Tate and Nelson claim that they did not terminate the Plaintiffs, and did not retaliate against them. This issue has previously been addressed above. Tate and Nelson also claim that they did not suspend Shelton. As to Tate, Exhibit FF (FAS00104) negates this claim becuase it shows that Tate recommended Shelton's suspension. While Nelson may now be claiming that he did not participate in the decision to suspend Shelton, both Tate and Ford negate this claim. Plaintiffs' Statement, ¶ 52 & 373.

## G. Shelton's Equal Protection Claim Against the Individual Defendants Survives Summary Judgment

### 1. The Individual Defendants Are Liable In Their Individual Capacities for Violating Shelton's Equal Protection Rights (Ford's Memo, pp. 12-13; Tate's Memo, pp. 14-15; Nelson's Memo, pp. 9-10)

As set forth in Plaintiffs' Opposition to Bel Nor, p. 10, the order and burden of proof laid down by the Supreme Court for Title VII cases applies to "race and sex discrimination in employment brought under 42 U.S.C. §§ 1981 and 1983." Goodwin v. Circuit Court, 729 F.2d 541, 545 (8th Cir. 1984); Ottman v. City of Independence, 341 F.3d 751, 756 (8th Cir. 2003).

Therefore, any claim that Shelton is not entitled to relief because she failed to allege or show that she was treated differently than other similarly situated officers is an overly simplistic analysis of whether Shelton has stated a claim for relief under the Equal Protection Clause.  Because Shelton's race and gender discrimination claims  survive summary judgment  under Title VII for the reasons set forth in Plaintiff's Opposition to Bel Nor, pp. 4-10, Shelton's equal protection claim  survives summary judgment against the individual Defendants.

> 2. **The Individual Defendants Are Liable In Their Official Capacities (Ford's Memo, pp. 13-14; Tate's Memo, pp. 13-14; Nelson's Memo, pp. 11-12)**

Next the individual Defendants in their official capacities claim that they cannot be held liable under § 1983 because there is no evidence of an unconstitutional policy or custom.  As these Defendants argue, a suit against an individual in his or her official capacity is a suit against the city (or Village).  See e.g. Ford's Memo, p. 13-14, citing Wilson v. Spain, 209 F.3d 713 (8th Cir. 2000).  Therefore, for the same reasons that Bel Nor is liable for Shelton's equal protection claim as set forth at pages 10 through 11 of Plaintiffs' Opposition to Bel Nor, which is incorporated by reference herein for the sake of brevity, the individual Defendants in their official capacities are liable under § 1983 for the violation of Shelton's equal protection rights.

> 3. **Final Policy Making Authority Does Not Impact the Individual Defendants' Liability (Ford's Memo, pp. 14-15; Tate's Memo, pp. 11-13; Nelson's Memo, pp. 10-11)**

The individual Defendants also argue that they do not possess final policymaking authority.  It is unclear as to what difference this makes to the individual Defendants' liability.  As to Shelton's claim against the Defendants in their official capacities, liability attaches for the reasons set forth in section (G)(2) above.  To the extent that the individual Defendants are sued in their individual capacities, liability under § 1983 only requires that the defendant was

14

personally involved in the constitutional violation. See e.g. Tate's Memo, p. 11, citing Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805 (8th Cir. 2010). Because each of the individual Defendants was directly involved in Shelton's illegal termination, they are liable to her in their individual capacities regardless of whether they possessed final policymaking authority. Defendants reliance upon Davison v. City of Minneapolis, 490 F.3d 648, 660-61 (8th Cir. 2007), is misplaced as to any claims against the individual Defendants in their individual capacities because it addressed the issue of municipal liability, not individual liability. See e.g. Ford's Memo, p. 15.

### 4. Tate and Nelson Are Not Entitled to Qualified Immunity (Tate's Memo, pp. 11-13 & Nelson's Memo, pp. 9-10)

Tate and Nelson's claims of qualified immunity are based upon their claims that they were not involved in the conspiracy to terminate Shelton, premised upon their false claim that they were not even involved in the decision to terminate Shelton's employment. Tate's Memo, p. 12 & Nelson's Memo, p. 10. For the reasons set forth above, there is sufficient evidence that Tate and Nelson participated in Shelton's illegal termination. Therefore, according to these Defendants' own legal argument and analysis, they are **not** entitled to qualified immunity. At a minimum, "genuine issues of material fact exist with respect to the degree of each defendant's involvement" in Shelton's termination, making summary judgment improper in this case. See Heartland Acad. Cmty. Church, 595 F.3d at 806. Even the cases cited by Defendants show that their request for summary judgment on this ground is frivolous. By way of example, Tate and Nelson direct this Court to Strinni v. Mehlville Fire Protection Dist., 681 F. Supp. 2d 1052, 1082 (E.D. Mo, 2010). Tate's Memo, p. 11 & Nelson's Memo, p. 9. In Strinni, Chief Silvernail was entitled to qualified immunity **because** he did not participate in the disciplinary decision or investigate the discharged employee's conduct. *Id.* Had he done either of these two things, he

15

would have been liable to the plaintiff for the wrongful discharge.  Because both Tate and Nelson participated in Shelton's discharge and Tate purportedly "investigated" Shelton's conduct, they are not entitled to qualified immunity.

  **H.** **Shelton's § 1981 Claim Survives Summary Judgment Because Brought Pursuant to § 1983 (Ford's Memo, pp. 15-16; Tate's Memo, pp. 15-16; and Nelson's Memo, pp. 12-13)**

Next the individual Defendants claim that Shelton's § 1981 claim fails because it was not brought pursuant to § 1983.  Once again, this simply is not the case.  At paragraph 8 of the Complaint, Plaintiffs allege their claims are brought pursuant to § 1983, among other bases for liability.  Paragraph 8 is incorporated by reference into Count III through paragraph 80 of the Complaint. None of the cases relied upon by Defendants discuss the pleading requirements of a § 1981 claim, only that such claims brought against a state actor must be brought pursuant to § 1983, which Shelton has done in this case.

  **I.** **Plaintiffs' Conspiracy Claims Survive Summary Judgment**

    **1.** **The Intracorporate Conspiracy Doctrine Does Not Bar Plaintiffs' Claims (Ford's Memo, pp. 16-17; Tate's Memo, p. 17; and Nelson's Memo, pp. 13-14)**

Plaintiffs' discussion of the intracorporate conspiracy doctrine set forth at pages 23 through 24 of Plaintiffs' Opposition to Bel Nor is incorporated by reference as if fully set forth herein for the sake of brevity.

    **2.** **There Is Sufficient Evidence of a "Meeting of the Minds" to survive Summary Judgment (Ford's Memo, pp. 17-19; Tate's Memo, pp. 17-19; and Nelson's Memo, pp. 14-15)**

Plaintiffs' discussion of the sufficiency of the evidence supporting their conspiracy claims set forth at pages 24 through 27 of Plaintiffs' Opposition to Bel Nor is also incorporated by reference as if fully set forth herein for the sake of brevity.

16

> **3. Defendants Are Not Entitled to Qualified Immunity (Ford's Memo, pp. 19-20; Tate's Memo, pp. 19-20; and Nelson's Memo, p. 15)**

The only reason that the individual Defendants claim that they are entitled to qualified immunity as to Plaintiffs' conspiracy claim is that there is insufficient evidence of a conspiracy (meeting of the minds) and insufficient evidence that Defendants violated Plaintiffs' rights. Because these issues have already been fully briefed, they are not repeated herein.

> **J. Plaintiffs' Failure to Instruct, Train, Supervise, Control, Discipline and Negligent Retention Claim Against Nelson Survives Summary Judgment (Nelson's Memo, pp. 15-20)**

As a final matter, Nelson claims that he cannot be held liable for failing to instruct, train, supervise, control, and/or discipline Tate and Ford for the same reasons that Bel Nor is not liable. Therefore, Plaintiffs' Opposition to Bel Nor, pp. 27 through 29 is incorporated by reference as if fully set forth herein for the sake of brevity.  Nelson also raises the defense of qualified immunity relating to his role as Ford and Tate's supervisor as to the claim brought against him in his individual capacity.  "[A] supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010).  For the reasons previously discussed, Nelson's direct participation in the violations imposes liability and negates qualified immunity.

If this Court should disagree, liability attaches for a failure to supervise when such failure amounts to deliberate indifference to or tacit authorization of the offensive acts.  Brockinton v. City of Sherwood, 503 F.3d 667, 673 (8th Cir. 2007).  Tacit authorization exists when evidence shows that "the official at least implicitly approved or knowingly acquiesced in the unconstitutional conduct of the offending employees." Shorts v. Bartholomew, 255 F.App'x 46, 53 (6th Cir. 2007).  Deliberate indifference is shown when there is evidence "that a municipal

17

actor disregarded a known or obvious consequence of his action [or inaction]." Board of Commr's of Bryan County v. Brown, 520 U.S. 397, 410 (1997).  For the reasons previously discussed, which are not repeated for the sake of brevity, but most importantly because Ford told Shelton and Hughes that Nelson knew exactly what was going on and was in control (Plaintiffs' Statement, ¶¶ 365 & 373), there is sufficient evidence that Nelson tacitly authorized Tate and Ford's conduct.  At a minimum, in light of the pervasive sexist and racist environment that existed at the Bel Nor Police Department at the time Plaintiffs were fired, Nelson, as Police Commissioner, showed deliberate indifference to the offensive acts, making him liable for Plaintiffs' civil rights violations.

### III.    CONCLUSION

The individual Defendants summary judgment motions, statements of facts, and legal briefing evidence the same bad faith effort to distort the record and misrepresent the law contained in Bel Nor's summary judgment motion.  There can be little doubt in this case that virtually every material fact is in dispute, making summary judgment inappropriate and the individual Defendants' filings a waste of scarce judicial resources.  Therefore, in addition to denying the individual Defendants' summary judgment motions in their entirety for the reasons set forth above,[3] Plaintiffs respectfully suggest that this Court should impose sanctions against them pursuant to this Court's inherent powers in order to discourage the filing of frivolous summary judgment motions.  If this Court does not believe that sanctions are warranted, should Plaintiffs prevail at trial, they ask this Court to consider that the Defendants unnecessarily filed four separate statements of fact and legal briefs, which they renumbered and reordered but were

---

[3] While Plaintiffs believe that they have briefed every issued raised by Defendants in their 4 separate briefs.  If this Court should disagree, Plaintiffs respectfully request that this Court direct Plaintiffs to provide additional briefing on any issue omitted, due to the difficulty of sorting out the different and redundant issues raised by Defendants in their four separate briefs.

largely redundant, to unnecessarily increase the cost of this litigation by creating unnecessary work for Plaintiffs and this Court, when making an award of attorneys' fees.

                        Respectfully submitted,

                        PLEBAN & PETRUSKA LAW, LLC


                        By:        /s/ Lynette M. Petruska
                               C. John Pleban, #MO24190
                               Lynette Petruska, #MO41212
                               Talmage E. Newton, IV, #MO56647
                               2010 S. Big Bend Blvd.
                               St. Louis, MO 63117
                               (314) 645-6666
                               (314) 645-7376       FAX

                        Attorneys for Plaintiffs


## Certificate of Service

    I hereby certify that on this 2nd day of April, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which automatically sent notification of such filing to counsel for the Defendants:  Andrew J. Martone, Caryl L. Flannery, and William J, Clark, IV, 1650 Des Peres Rd., Suite 200, St. Louis, MO 63131, attorneys for Defendants.


                               /s/ Lynette M. Petruska